## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  HONORABLE LISA W. WANG**

**ROYAL GOVERNMENT OF CAMBODIA,**

    **Plaintiff,**

**v.**

**UNITED STATES,**

    **Defendant,**

    **and**

**AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE**

    **Defendant-Intervenor.**

**Court No. 25-cv-00173**

---

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFF ROYAL GOVERNMENT OF CAMBODIA

Mark B. Lehnardt
Davis & Leiman
1012 Connecticut Ave., N.W., Ste.1012
Washington, D.C. 20036
Tel.: 202.642.4850
Email:  MLehnardt@DLTrade.com

*Counsel to Royal Government of Cambodia*

March 24, 2026

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..........................................................................................................ii

TABLE OF AUTHORITIES....................................................................................................iv

INTRODUCTION ...................................................................................................................1

STATEMENT PURSUANT TO USCIT R.56.2(c)(1) ...........................................................3

    I.    ADMINISTRATIVE DETERMINATION UNDER REVIEW.......................................3

    II.    ISSUES PRESENTED.....................................................................................................4

    III.    REQUEST FOR COURT ORDER AND RELIEF SOUGHT......................................5

JURISDICTION ......................................................................................................................5

STATEMENT OF FACTS .......................................................................................................6

    I.    Major Timeline Events..................................................................................................6

        A.    Petition & Scope ...................................................................................................6

        B.    Initiation & Respondent Selection .......................................................................7

        C.    Preliminary & Final Determination, Briefing, Hearing & Order..................................8

    II.    Only Authorized Cambodian Officials Could Approve And Certify Submissions..........10

    III.    Cambodia's Requests For Extensions Of Time And Its Submissions ........................11

    IV.    New Subsidy Allegation Questionnaire Issued During Cambodian Holidays
When No Authorized Official Could Authorize A Timely Extension Request.......................12

    V.    Simple Second Supplemental Questionnaire & Second NSA Questionnaire.................12

    VI.    Verification Outline & Verification...................................................................13

    VII.    Commerce Knew About ISC Cambodia ........................................................14

    VIII.    Confusion Regarding Verification Exhibits ................................................14

SUMMARY OF THE ARGUMENT ......................................................................................15

ARGUMENT ........................................................................................................................16

    I.    Commerce Decision To Apply Adverse Facts Available Based Upon The Absence
Of Exhibits From The Verification Of the Royal Government Of Cambodia Was Not
Supported By Substantial Evidence Or In Harmony With Law .............................................17

        A.    Commerce Abused Its Discretion And Denied Due Process When Denying The
Out-Of-Time Request Of The Royal Government Of Cambodia For One Additional
Day To Submit Verification Exhibits .................................................................................17

        B.    Commerce Is Required To Include Copies Of The Verification Exhibits It Took
On The Record Of This Investigation.................................................................................22

    II.    Commerce Cannot Countervail So-Called Transnational Subsidies .............................23

    III.    The AFA Rates Commerce Selected Are Unlawfully And Outrageously High..............29

A.    The Department's Inclusion of Transnational Subsidies in the AFA Rate Renders the AFA Rate Punitive and Not Supported By Record Evidence ..........................30

IV.    ISC Cambodia Is A Standards-Setting Government Agency, Not A Producer Or Seller Of Solar Panels ........................................................................................32

V.    To The Extent Cambodia's Other Arguments Survive Commerce's AFA decision, Commerce Cannot Countervail Programs That Are Not Specific Or Companies That Commerce Knows Are Not Producers Or Exporters Of Subject Merchandise. ......................33

CONCLUSION AND PRAYER FOR RELIEF............................................................................34

# TABLE OF AUTHORITIES

**Cases**

*AMS Assocs. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013)......................................24

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 123 S. Ct. 748, 154 L. Ed. 2d 653 (2003)................................................................................................................................24

*Duncan v. Walker*, 533 U.S. 167, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)..........................23

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000)............................................................................................................30, 31

*FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120 (2000) ..........................................26

*Floral Trade Council v. United States*, 13 CIT 242, 709 F. Supp. 229 (1989) ..........................22

*Jindal Poly Films Ltd. v. United States*, 794 F. Supp. 3d 1384, 1390-91 (Ct. Int'l Trade 2025) ........................................................................................................................17

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)................................................................28

*Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026) ................................................................23

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)................................................................27

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ..............................................................................................................31

*Özdemir B oru San. VE Tic. Ltd. Sti. v. United States*, 273 F.Supp.3d 1225 (Ct. Int'l Trade 2017) ..........................................................................................................30

*Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) ................................20

*Pulsifer v. United States*, 601 U.S. 124, 144 S. Ct. 718, 218 L.Ed. 2d 7 (2024) ........................27

*Shengyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015)................................................................................................................24

*Tau-Ken Temir LLP v. United States*, 147 F.4th 1363 (Fed. Cir. 2025) ......................................16

*TRW Inc. v. Andrews*, 534 U.S. 19, 122 S. Ct. 441, 151 L.Ed. 2d 339 (2001)..........................23

*United States v. Universal Fruits & Vegetables Corp.*, 30 CIT 706, 433 F. Supp. 2d 1351 (2006)..........................................................................................................23

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025)................................................23

*Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342 (2024)......................................27

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013)................................................................................................................19

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d 1363 (Fed. Cir. 2005) ........................................................................23

**Statutes**

19 U.S.C. § 1516a(a)(2)(A)(i)(II) ...................................................................................5

19 U.S.C. § 1516a(b)(2)........................................................................................22

19 U.S.C. § 1671(d) .............................................................................................24

19 U.S.C. § 1671(e) .............................................................................................24

19 U.S.C. § 1677(5)(B)..........................................................................................23

19 U.S.C. § 1677(5A)(D)........................................................................................25

19 U.S.C. § 1677e(c)............................................................................................30

19 U.S.C. § 1677e(d)(1)(A) .....................................................................................29

19 U.S.C. § 1677e(d)(3).........................................................................................29

19 U.S.C. § 3512(d) .............................................................................................20

28 U.S.C. § 1581(c) ..............................................................................................5

**Other Authorities**

*Statement of Administrative Action accompanying the Uruguay Round
Agreements Act*, H.R. Doc. No. 103-316 (1994), reprinted in 1994
U.S.C.C.A.N. 4040 .........................................................................................20

**Rules**

USCIT R.3(a)(2) ................................................................................................5

**Regulations**

19 C.F.R. § 351.302(b) .........................................................................................17

19 C.F.R. § 351.302(c)......................................................................................17, 18

19 C.F.R. § 351.302(c)(2)...................................................................................17, 18

19 C.F.R. § 351.527 ..........................................................................................26, 28

19 C.F.R. § 351.527 (2023)......................................................................................26

**Administrative Determinations**

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic
Cells, Whether or Not Assembled Into Modules, From the People's Republic of
China: Final Scope Determination and Final Affirmative Determinations of
Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*,
88 Fed. Reg. 57,419 (Dep't of Commerce Aug. 23, 2023)................................................6, 7

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)................................................................................................27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 17,406 (Dep't of Commerce April 25, 2025) ..................................4, 9, 23

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Kingdom of Cambodia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 80,877 (Dep't of Commerce Oct. 4, 2024)........................8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 43,816 (Dep't of Commerce May 20, 2024) ...................................................................................7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders*, 90 Fed. Reg. 26,791 (Dep't of Commerce June 24, 2025)..................................................4, 10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic 0f China*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012)..............................................................................................6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012)..............................................................................................6

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 88 Fed. Reg. 29,850, (Dep't of Commerce May 9, 2023) ..........................................26

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,826 (Dep't of Commerce March 25, 2024)..........................................26

*Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) ...............................25

Plaintiff Royal Government of Cambodia (Cambodia) hereby submits its Rule 56.2 motion for judgment on the agency record, challenging certain aspects of the final determination of the Department of Commerce and the resulting order in the countervailing duty investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells") from the Kingdom of Cambodia.

## INTRODUCTION

This investigation involved the one of the two countries in Asia designated by the U.S. as "least developed" countries.  Cambodia had never been involved previously with countervailing duty investigations, and had never previously participated in any U.S. trade remedy proceeding.  Further, Cambodia was unrepresented during the entire investigative stage of the investigation, hiring counsel for the case briefing and hearing at the very end.  Despite being a first time mandatory respondent with few resources and no previous experience, Commerce refused to allow Cambodia to correct an error caused in large part by Commerce's own confusing and contradictory instructions.  Despite challenges, Cambodia filed questionnaire responses, supplemental questionnaire responses, and participated fully in verification, providing everything Commerce asked for.

This underdog story was cut short, however, because Cambodia was confused by messages from Commerce.  On one side, in the verification outline Commerce "requested" that Cambodia file verification exhibits after the verification ended.  But at verification, Commerce took copies of all the verification exhibits and provided confusing instructions about what Cambodia should do with its copies of the verification exhibits.  Commerce sent an email to the Cambodian embassy at 9:40 a.m. on the morning of the deadline for filing, telling them that Cambodia was required to file its copies of the verification exhibits by 5:00 p.m. that day.  But it was far too little, far too late. When Commerce sent the email, it was already almost 10 p.m. in

1

Cambodia, long after all government workers had gone home.  Far too late in Cambodia to locate copies of all the verification exhibits, collecting them in one location, and submitting them to Commerce.  Further, Embassy staff were not authorized to make decisions about filings at Commerce, and it was too late to contact the authorized members of ministry hierarchy to approve a request for extension of time to submit.  Cambodia could not file the verification exhibits timely and did not know what it could do.

Commerce did not issue a verification report for Cambodia.  Commerce instead appended to the memorandum setting out the briefing schedule a memorandum to file about the verification of Cambodia.  Despite all Cambodia's time and effort responding to questionnsiares and successfully participating in verification, and despite Commerce officials taking copies of all the verification exhibits with them from Cambodia to Washington, D.C., Commerce pointed to the failure to file verification exhibits to justify not issuing a substantive verification report.

> *Because the Government of Cambodia did not file and serve the verification exhibits on the record, in accordance with 19 CFR 351.307, this memorandum serves as Commerce's explanation regarding the verification results of the Government of Cambodia. As a result, we hereby find that the Government of Cambodia's questionnaire responses remain unverified.*

With the words describing Cambodia's questionnaire responses as "unverified," hearkening to the words the AFA statute, the writing was on the wall.  No doubt Commerce would apply total adverse facts available (AFA) to Cambodia, despite Cambodia's herculean efforts.  Even though Commerce found no failing in the verification itself, it was likely that Commerce would use AFA to justify ignoring all of Cambodia's efforts – all its submissions, and all of the time and effort preparing for and participating to Commerce's satisfaction would be wasted.

Cambodia finally hired U.S. counsel for the case briefing and hearing, who filed an out-of-time request for extension of time to file the verification exhibits, which Commerce denied.  Commerce also rejected the arguments Cambodia raised in its case brief about AFA, a

2

respondent that objectively did not produce solar cells, and programs that could not be countervailed because they were not specific, unavailable to the solar industry, or simply not countervailable under Commerce's own regulations or the statutes Congress passed. Among these arguments, that Congress did not authorize Commerce to create so-called "cross-border subsidies. Commerce rejected this argument, as well as Cambodia's arguments that the 110.13% AFA rate was unreasonably high. In place of the AFA rate Cambodia argued was unreasonably high, Commerce incredibly imposed an AFA rate of 3,403.96% -- the highest AFA rate ever by more that 2,500 percentage points. It is possible that the new politically appointed Deputy Assistant Secretary who decided what the rate should be wanted to make a name for himself with the new administration, but that splash was fully afoul of the law that the administration appears to flout as it sees fit.

In this case, Commerce has cast aside the guardrails Congress set up to keep the trade law focused on fair and accurate calculation of duties to countervail subsidies provided by governments to prod  The law does not allow Commerce to unreasonably shorten the time for parties to respond or to reject a request to correct a misunderstanding when time remains. Commerce should have permitted Cambodia to submit the verification exhibits once Cambodia understood its responsibility. The 3,403.96% rate applied to uncooperative companies is multiples of the highest rates ever previously decided, as if they come not from beyond reality and even fairy tale, with little thought for Congressional set boundaries and judicially recognized principles. Commerce ignored its own law in rejecting

## STATEMENT PURSUANT TO USCIT R.56.2(c)(1)

### I.    ADMINISTRATIVE DETERMINATION UNDER REVIEW

The RGC contest aspects of Commerce's final determination in the countervailing duty investigation of solar cells from Cambodia. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 17,406 (Dep't of Commerce April 25, 2025) ("Final Determination") P.R.544; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders*, 90 Fed. Reg. 26,791 (Dep't of Commerce June 24, 2025) ("*Order*") P.R.554.

## II.    ISSUES PRESENTED

1. The RGC submissions unverified or otherwise apply adverse facts available (AFA) based upon verification exhibits not having been submitted via ACCESS.

   First, Commerce should have granted the out-of-time request for extension of time on the basis of the extraordinary circumstances of the RGC's first participation in a countervailing duty investigation, that it was unrepresented, and that – despite written language in the verification outline – Commerce's verbal instructions and actions at verification caused confusion such that the RCG did not know what was expected. Further, when Commerce sent an email reminder on the fifth day after verification to remind the RGC to submit verification exhibits, it was already too late – not only because the Embassy of the RGC in Washington DC could not reach anyone in Cambodia where it was after 9 p.m., but the Embassy in Washington DC also could not obtain necessary authority to make any submission. Commerce should grant the RGC time to submit the exhibits, or simply place on the record of the investigation copies of the exhibits that Commerce took with it.

   Second, Commerce also cannot apply AFA to the RGC based on the verification exhibits not having been formally submitted by the RGC because Commerce obtained copies of all the verification exhibits and thus had an independent obligation to place them on the record of the review.

2. Even if this Court affirms Commerce's AFA decision, Commerce cannot countervail the electricity programs. First, the Electricity Fee Reduction Program is not specific and was not used during the POI. Second, the Rural Electrification Fund Cannot Be Used By The Solar Cell Industry.

4

3. Commerce included ISC Cambodia as a producer and/or exporter of solar cells from Cambodia even though Commerce knows, as evidenced by information on its own website, that ISC Cambodia is not a producer or exporter of solar cells, but is a standards body in the Cambodian government. Even though Commerce rejected some information about ISC Cambodia based upon an incorrect submission method, it cannot turn a blind eye to public information Commerce itself issued.

4. Commerce ignored record evidence of post-entry audits conducted by the General Department of Customs and Excise (GDCE) to examine whether raw materials imported exempt of customs duties were actually consumed in the process of making exported final products. Commerce's regulations preclude the imposition of countervailing duties when "the government in question has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts." *See* 19 CFR § 351.518(a)(4); 19 CFR § 351.519(a)(4). Without such audits, no member of the solar industry could import raw materials import-duty free. Evidence of GDCE post-entry audits was submitted on the record by Solarspace, and is uncontroverted. Thus all exempted import duties on raw materials are not subject to countervailing duties.

5. The Business Recovery Guarantee Scheme is available to all businesses in Cambodia, and thus is not specific and thus cannot be countervailed.

6. The AFA rates assigned to the allegedly non-cooperating parties is entirely disconnected from any reality and must change. Commerce's calculation of the 3,403.96% rate is not only not sustainable as it pertains to an unlawful cross-border subsidy finding, but is also outrageous, and should be attributed only to non-subject merchandise. Thus, the 3,403.96% rate cannot be used for AFA purposes and Commerce must redetermine an appropriate AFA rate.

## III.    REQUEST FOR COURT ORDER AND RELIEF SOUGHT

The request for court order and the relief sought by the RGC is included after the argument presented below.

### JURISDICTION

This action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II). This action contests legal and factual conclusions set forth in the Final Determination and Order. Cambodia timely filed the summons within 30 days of publication of the Order and timely filed the complaint within 30 days of the filing of the summons. See USCIT R.3(a)(2); ECF 1, Summons; ECF 7, Complaint. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

5

**STATEMENT OF FACTS**

I.    **Major Timeline Events**

A.  **Petition & Scope**

On April 24, 2024, the American Alliance for Solar Manufacturing Trade Committee ("Petitioner") filed a petition for the imposition of countervailing duties on imports of solar cells and modules from Cambodia, Malaysia, Thailand and Vietnam.  *See Petition*, P.R.1-14/C.R.1-14. This was the first ever countervailing duty investigation involving Cambodia.

Petitioners proposed scope language excluding all merchandise subject to the antidumping and countervailing duty orders on solar cells from China:

> Also excluded from the scope of these investigations are all products covered by the scope of the antidumping and countervailing duty orders on *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic 0f China*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and antidumping duty order); and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order)

*Petition*, at 16 (P.R.2-4).  This proposed scope language effectively excluded all solar cells or solar panels subject to a circumvention finding on solar cells produced in Cambodia from certain inputs sourced from China.  *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't of Commerce Aug. 23, 2023) ("*Circumvention Final*").  Among alleged foreign producers, Petitioners listed, "ISC Cambodia," identifying the company website as a Cambodian government domain, "www.isc.gov.kh".  *Petition*, Ex.I-23, P.R.2.

6

### B. Initiation & Respondent Selection

On May 14, 2024, Commerce initiated a CVD investigation covering imports during the period of investigation ("POI") from January 1, 2023 through December 31, 2023. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 43,816 (Dep't of Commerce May 20, 2024) P.R.77. The initiated scope of the investigation adopted the specific exclusion of solar cells covered by the AD and CVD orders on solar cells from China. *Initiation.*, 89 Fed. Reg. at 80,880, P.R.77. Thus, this investigation excluded all solar cells found by Commerce to be circumventing the China AD and CVD orders through Cambodia. That included solar cells from Lao PDR that are made from silicon wafers from China "and where more than two of the following components in the module/ laminate/panel were produced in China: (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes." *Circumvention Final*, 88 Fed. Reg. 57,419.

Because of the scope language and circumvention finding, Commerce instructed parties to respond to the Quantity & Value Questionnaire by excluding as non-subject merchandise any solar cells made from wafers from China:

> Specifically, ***do not*** report POI sales of the following:
>
> - Solar cells produced with Chinese wafers in Cambodia, Malaysia, Thailand, or Vietnam, that are not assembled into solar modules.
>
> - Solar modules consisting of solar cells that were produced in Cambodia, Malaysia, Thailand, or Vietnam from wafers produced in China and where more than two of the following components in the solar modules were produced in China: (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.

7

- Solar cells or solar modules that meet the descriptions above, and that are transshipped from Cambodia, Malaysia, Thailand, or Vietnam to the United States through another third country.

- Solar cells completed in Cambodia, Malaysia, Thailand, or Vietnam from a Chinese wafer, and then the solar cells are sent to another inquiry country (Cambodia, Malaysia, Thailand, or Vietnam) for assembly into a solar module with three or more of the Chinese components that are listed in the second bullet point above, and the solar module is then exported to the United States.

*See Corrected Q&V Questionnaire*, Att. at 2-3 P.R.78 (emphasis in original).  Commerce mailed Quantity & Value Questionnaires to 14 alleged Cambodian exporters or producers listed in the Petition.  P.R.80.

Commerce selected Solarspace New Energy (Cambodia) Co., Ltd. (f.k.a. L-Q New Energy Co., Ltd.) ("Solarspace"), and Jintek Photovoltaic Technology Co., Ltd. ("Jintek").  *See Respondent Selection Mem.*, at 6, P.R.150.  And Cambodia, for the first time ever, was a mandatory respondent also.  *See Questionnaire* P.R.173.

**C.  Preliminary & Final Determination, Briefing, Hearing & Order**

On October 1, 2024, Commerce issued the preliminary determination, P.R.381, which published in the Federal Register on October 4, 2024.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Kingdom of Cambodia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 80,877 (Dep't of Commerce Oct. 4, 2024) P.R.387.  Commerce preliminarily calculated an 8.25% subsidy rate for SolarSpace, and 68.45% AFA rates for Jintek and ISC Cambodia.  *Id.*

Commerce issued a post-preliminary determination relate to new subsidy allegations about cross-border subsidies:  that that the Government of China was subsidizing production of

8

solar cells in Cambodia.  P.R.494.  Commerce found that China did not cooperate and thus, on the basis of AFA, that the Goverment of China was subsidizing solar cell production in Cambodia.  *Id.*, at 3-8.  Commerce also found that Cambodia had not cooperated – failing to timely file a response to an initial questionnaire about cross-border subsidies, and only partially responding to a supplemental questionnaire.  *Id.*, at 9-10.  Thus, Commer found that the Cambodian market for solar-cell inputs was distorted.  *Id.*  Commerce discarded SolarSpace's benchmark submissions as "not related to actual sales," and accepted petitioner's benchmark data.  *Id.*, at 15-16.   With the post-preliminary determination, Commerce raised the rate for SolarSpace to 137.07%, P.R.495, the AFA rate to 729.86%.  P.R.494, Appx.  Commerce expanded the AFA rate coverage to include Hounen Solar Inc. Co., Ltd., and Sloar Long PV-Tech (Cambodia) Co., Ltd., because when Commerce made the extraordinary decision to verify Q&V responses of those two producers, they declined.  *Id.*, at 2 & nn.6-7.

The parties submitted case briefs and rebuttal briefs.  *See PRC case br.,* P.R.521; *Pet'r case br*., P.R. 522; *SolarSpace case br*., P.R. 523; *BYD case br*., P.R.524; *Cambodia case br*., P.R.526; *Cambodia rebuttal br.*, P.R.531; *SolarSpace rebuttal br*., P.R.532; *Petr. rebuttal br*., P.R.533.  Commerce held a hearing on April 3, 2025.  P.R.535.  The final determination published in the Federal Register on April 25, 2025.  *Final Determination*, 90 Fed. Reg. 17,406, P.R.544.  In the *Final Determination*, Commerce rejected arguments asserting that Commerce could not countervail alleged cross-border subsidies, that Commerce improperly applied AFA to Cambodia, that certain programs were not countervailable, that Commerce overlooked record information confirming that SolarSpace's benchmark submissions were based on actual transactions, that Commerce could not countervail non-subject solar cells, that Cambodia's customs audit laws made exempted VAT on imported raw materials incorporated in exported

products not countervailable, and that Commerce had knowledge that ISC Cambodia is not a producer of subject merchandise. *Id.* Commerce recalculated SolarSpace's subsidy rate to 534.67%, and the AFA rate to 3,403.96%. *Id.* The countervailing duty order published on June 24, 2025. *Order*, 90 Fed. Reg. 26,791, P.R. 554.

## II.    Only Authorized Cambodian Officials Could Approve And Certify Submissions

Before initiating the investigation, Commerce sent a letter to Cambodia, through its embassy in Washington, D.C., offering to meet with Cambodia to discuss the petition. *Meeting Invitation*, P.R.23. Commerce held a video conference on May 7, 2024, with several Cambodian officials connecting from Cambodia, and one official from the Cambodian embassy in Washington, D.C. *Consultations Memo*, P.R.61. The top officials from Cambodia who participated in the meeting included the following:

> Tan Tepi Kanika, Under Secretary of State, Ministry of Commerce (MOC)
> Long Kemvichet, Director General of International Trade, MOC

*Id.* As the investigation proceeded, only these two officials (or their replacements), located in Cambodia, were authorized signatories on Cambodia's filings, embassy officials had no authority to act independently. *See Cambodia Out-of-Time Request for Extension of Time (EOT)*, at PDF-4, P.R.504; *see also*, *Cambodia IQR EOT Request* (Kemvichet), P.R.198; *Cambodia IQR Second EOT Request* (Kemvichet), P.R.223; *Cambodia IQR* (SAM Sithisak, Under Secretary of State, Ministry of Commerce), P.R.233-239; *Cambodia SQR EOT Request* (Kemvichet), P.R.328; *Cambodia SQR EOT Request 2* (THOL Nara, Acting Director General of International Trade), P.R.340; *Cambodia SQR* (Sithisak), P.R.346-362; *Cambodia NSA QR EOT Request* (Nara), P.R.389; *Cambodia SQR 2* (Sithisak), P.R. 405; *Cambodia NSA QR* (Sithisak), P.R. 439.

Cambodia explained that authorization by proper officials is essential for its submissions in the investigation, and without proper authorization, a submission could not be made on behalf

10

Cambodia. *See* P.R.389. ("As the RGC is a government entity, it requires specific authorization from high-ranking government officials before taking any action regarding the preparation and submission of the response.").

### III.    Cambodia's Requests For Extensions Of Time And Its Submissions

Cambodia appeared *pro se* for most of the investigation, seeking extensions of time as necessary to understand and respond to the questionnaires. *See Cambodia IQR EOT Request*, P.R.198; *Cambodia IQR Second EOT Request*, P.R.223; P.R.233-239; *Cambodia SQR EOT Request*, P.R.328; *Cambodia SQR EOT Request 2*, P.R.340; *Cambodia NSA QR EOT Request*, P.R.389. The original deadline for the initial questionnaire response was August 9, 2025. *See id.* On August 2, 2025, the RGC requested a 21-day extension of time ("EOT") until August 30, 2025, to answer the initial questionnaire P.R.198, and on August 7, 2025, Commerce only granted a single week to August 16, 2025 P.R.203. Cambodia submitted a second request, on August 14, 2025, this time asking for a two-week extension until August 30, 2025. P.R.223. On August 15, 2025, Commerce granted a 3-day extension, until August 19, 2025, P.R.224. Cambodia filed its initial questionnaire response on August 19, 2025. P.R.233-239/C.R.94-120.

On September 6, 2024, Commerce issued a supplemental questionnaire to the RGC, with a deadline of September 13, 2024. P.R.306. On September 13, 2024, the RGC filed a request for a "seven (7)" day extension of time, until September 19, 2025, to respond. P.R.328. Commerce granted only a 5-day extension, until September 18, 2025. P.R.330. On September 18, 2025, the RCG requested an "eleven (11)" day extension to September 28, 2025. P.R.340. Commerce granted a 2-day extension, to September 20, 2024. P.R.341. The RCG filed its response on September 20, 2024. P.R.346-362.

11

IV.     **New Subsidy Allegation Questionnaire Issued During Cambodian Holidays When No Authorized Official Could Authorize A Timely Extension Request**

On Friday, September 20, 2024, Commerce issued a supplemental NSA questionnaire (NSA SQ), due September 30, 2024.  P.R.366.  The NSA SQ requested information about the polysilicon and silicon wafer industries in Cambodia.  *Id.*

Seven days after the September 30, 2024 deadline for Cambodia's NSA response, Cambodia sought a 14-day extension of time to extend the deadline for the NSA SQR to October 14, 2024.  P.R.389.  Cambodia explained that, because of timing differences, the NSA SQR issued on Friday did not appear on ACCESS until Wednesday, September 24, 2024.  *Id.*  Further, the NSA SQ was issued during the 15-day Festival of Ancestral Respect in Cambodia (with national holidays on October 1-3, most employees traveling before and after those days, and officials necessary for approval to file submissions absent from government offices.  *Id.*  ("As the RGC is a government entity, it requires specific authorization from high-ranking government officials before taking any action regarding the preparation and submission of the response.")  Thus, extraordinary circumstances prevented Cambodia from submitting an earlier request for extension of time.  *Id.*  Commerce didn't care.  Commerce denied the extension request on the basis of untimeliness, stating that, although Commerce was "sympathetic to the circumstances underlying {Cambodia's} request, {Commerce did} not find they constitute extraordinary circumstances" under the specific examples provided in the regulatory history of the untimely-extension-request regulation.  *Denial of Extension*, at 1 (*citing Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't of Commerce Sept. 20, 2013)) P.R.395).

V.     **Simple Second Supplemental Questionnaire & Second NSA Questionnaire**

Commerce issued a second supplemental questionnaire – unrelated to the new subsidy allegation – to the RGC on October 11, 2025, asking only whether the RGC intentionally

12

described the customs duty exemptions for zone investors in special economic zones in a "near identical" manner to the response for similarly named programs for qualified investment projects (QIP) programs.  P.R.397.  Cambodia confirmed that the programs referred to "the same incentive regime."  P.R.405.

Commerce also issued a second new subsidy allegation questionnaire, this time requesting information about Cambodian silver paste and solar glass industries, uploading the questionnaire to ACCESS at 5:11pm on Tuesday, October 29, 2025, and granting one week, until Tuesday, November 5, 2025, to respond.  P.R.424.  The questionnaire requested information about volume and value of imports, private and publicly-owned producers, domestic consumption, laws and policies, industry association, price controls, value-added tax rate, and export controls related to silver past and solar glass.  *Id.*  Cambodia responded timely, explaining that "Cambodia is a free-market economy," and that much of the information about production and consumption was "not available."  P.R.439.  Cambodia provided import information, as requested.  *Id.*, Att.I.

### VI.    Verification Outline & Verification

Commerce issued a verification agenda, choosing to verify only responses related to three Cambodian government ministries:  (1) the General Department of Customs and Excise (GDCE), to review customs duty exemptions for QIPs and zone investors in SEZs,; (2) the Council for the Development of Cambodia (CDC) to review the same customs duty exemptions for QIPs plus certain tax exemptions for QIPs and certain activities under the Law on Investment; and (3) the Credit Guarantee Corporation of Cambodia (CGCC), to review two loan guarantee programs. P.R.481.  Commerce chose not to verify any other programs, including alleged benefits to certain electricity producers and users.  *Id.*

13

In the verification outline, Commerce stated that all information relied upon to prepare the questionnaire responses, "*must* be available for Commerce to examine," and Commerce also included a "*request* that {the RGC} file and serve verification exhibits no later than the end of the fifth business day after each verification is completed." *Id.* at 2 (emphasis added). Commerce also stated that "{i}f, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies." *Id.* at 3. Commerce conducted verification of the RGC January 16, 17, and 20, 2025. *Id.*

## VII.    Commerce Knew About ISC Cambodia

After verification, Cambodia sent an email to Commerce explaining that Commerce's own website identified one of the mandatory respondents, ISC, listing the exact same URL and contact information that appeared in the Petition. *Compare Petition*, Ex.I-23 (listing ISC Cambodia), P.R.2, *with, Email Correspondence*, P.R.496 (citing "https://www.trade.gov/country-commercial-guides/cambodia-standards-trade").

## VIII.    Confusion Regarding Verification Exhibits

Three weeks after verification of Cambodia concluded, Cambodia retained counsel. *See Entry of Appearance* P.R.497); *APO application* P.R.498). One week later, Commerce issued the briefing schedule, attaching a memorandum regarding the "Verification of the Government of Cambodia." P.R.502). In the memo, Commerce stated that it had reminded the RGC in the verification agenda, verbally during the verification, and via email on the fifth day after verification concluded that the RGC should file verification exhibits, but that the RGC had not. *Id.* Based solely upon verification exhibits not being filed on ACCESS, and discarding everything that happened during verification, Commerce found that the questionnaire responses of Cambodia "remain unverified." *Id.*

14

The day after Commerce declared Cambodia's responses unverified, Cambodia submitted another out-of-time request for an extension of time – this time to submit the verification exhibits. P.R.504. Cambodia explained that it was confused by Commerce's verbal instructions during verification. *Id.* Although the verification agenda requested that Cambodia submit verification exhibits, Commerce verifiers had taken copies of all verification exhibits with them. *Id.* To inexperienced Cambodia, Commerce taking copies of all verification exhibits seemingly removed the need for Cambodia to submit verification exhibits through ACESS. *Id.* Further, Cambodia pointed to confusing statements by Commerce verifiers to different about verification exhibits during verification. *Id*. Petitioners objected, citing language in the Verification report that it believed could not be mistaken. P.R.506. Cambodia submitted a rebuttal, explaining that petitioner's comments were from the perspective of a large Washington DC law firm with decades of experience with Commerce proceedings, not that of an unrepresented, least-developed country, with no prior experience with Commerce proceedings, and limited English language capabilities. P.R.507. Commerce denied the RGC request, asserting that the confusion was not an extraordinary event. P.R.513.

## SUMMARY OF THE ARGUMENT

Commerce unlawfully denied Cambodia's out-of-time extension request to submit verification exhibits, ignoring the specific circumstances of Cambodia and unlawfully limiting the definition of "extraordinary circumstances." Commerce's denials turned into Commerce's justification for applying AFA to Cambodia, including countervailing several programs on the basis of AFA. Commerce abused its discretion denying Cambodia's extension request; thus, this court must remand for Commerce to allow Cambodia to submit the verification exhibits, and to recalculate subsidies on the basis of a fully cooperative Cambodia. Further, all decisions influenced by Commerce decision to apply AFA to Cambodia must be reconsidered on remand.

15

Commerce's interpretation of the statute countervailing subsidies alleged to have been provided by the Government of China to producers in Cambodia conflicts with the statute's plain meaning, other provisions of the statutory framework, Commerce's own prior interpretation of the statute, and more than two decades of Commerce practice.  Commerce exceeded its authority by countervailing alleged transnational subsidy programs in the Final Determination, thus this case should be remanded to Commerce to recalculate subsidy rate without transnational subsidies.

Commerce must revise its AFA rate to something within this galaxy.  Commerce applied AFA to assign individual program rates for 17 different subsidy programs totaling 3,403.96%. This 3,403.96% rate is thousands of percentage points higher than any AFA rate in Commerce's history that counsel has been able to find while preparing this brief. A rate this high is so disconnected from any reality that it is contrary to law as unsupported by substantial evidence.

Finally, Commerce cannot blind itself to information is has made publicly available on its own website when conducting an investigation.  Thus, this Court should remand Commerce's determination to remove ISC Cambodia from being subject to this investigation.

**ARGUMENT**

Cambodia argues that Commerce unlawfully denied Cambodia's out-of-time requests for extensions of time, which led to an unlawful application of AFA.  Further, Commerce's decision to countervail so-called cross-border subsidies was unlawful, as its calculation of the AFA rate. Commerce ignored its own information establishing that one "respondent" should not have been a respondent, and unlawfully refused to address substantively other program-specific arguments.

16

I.      **Commerce Decision To Apply Adverse Facts Available Based Upon The Absence Of Exhibits From The Verification Of the Royal Government Of Cambodia Was Not Supported By Substantial Evidence Or In Harmony With Law**

Commerce should not apply adverse facts available based upon verification exhibits from the verification of the Royal Government of Cambodia not having been formally submitted on the record.  Commerce abused its discretion when it rejected the out-of-time request by the RGC for additional time to submit the verification exhibits.  Further, because Commerce took copies of the verification exhibits, Commerce was obligated to include those documents on the record of this investigation.

A.      **Commerce Abused Its Discretion And Denied Due Process When Denying The Out-Of-Time Request Of The Royal Government Of Cambodia For One Additional Day To Submit Verification Exhibits**

Commerce abused its discretion when it denied the out-of-time request by the RGC for additional time to submit the verification exhibits.  *Final IDM* at 36-41, P.R.538.  Cambodia explained the extraordinary circumstance preventing it from timely requesting an extension, and good cause existed to grant the extension.  *Cambodia Case Br.* at 7-12, P.R.526; *Cambodia Rebuttal Br.*, P.R.531.  Further, the factors under the Federal Circuit's recent decision in *Tau-Ken Temir LLP v. United States*, 147 F.4th 1363 (Fed. Cir. 2025), all weigh in favor of Cambodia, establishing that Commerce abused its discretion in denying Cambodia's request.  Thus, Commerce should be instructed to accept the verification exhibits and to reconsider all determinations influenced by its refusal to accept the verification exhibits.

Per 19 C.F.R. § 351.302(b), Commerce "may, for good cause, extend any time limit." For extension requests submitted after the applicable deadline, the requesting party must "demonstrate{} that an extraordinary circumstance exists."  19 C.F.R. § 351.302(c).  Commerce has defined "extraordinary circumstances" as "an unexpected event that: (i) Could not have been prevented if reasonable measures had been taken, and (ii) Precludes a party or its representative

17

from timely filing an extension request through all reasonable means."  19 C.F.R. § 351.302(c)(2).

Commerce rejected Cambodia's request based upon a strict reading of "extraordinary circumstances," *Final IDM*, at 38 ("there was no extraordinary circumstance like a natural disaster, riot, war, force majeure, or medical emergency preventing the Government of Cambodia from timely filing their verification exhibits"), P.R. 538.  But this Court has explained, however, that the plain language of section 351.302 is "not explicitly limited."  *Jindal Poly Films Ltd. v. United States*, 794 F. Supp. 3d 1384, 1390-91 (Ct. Int'l Trade 2025).  Indeed, Cambodia's circumstances were extraordinary, especially given Commere's confusing actions and communications.

This was Cambodia's first time being subject to investigation.  Its inexperience, limited resources, and limited language capabilities rendered what may be simple for experienced U.S. trade attorneys into confusing instructions in light of Commerce officials taking copies of all verification exhibts.  While verification outline "*request{s}* that you file and serve verification exhibits," *Verif. Outline* at 2, P.R.481, Commerce officials took copies of all the verification exhibits with them.  Commerce officials did not clarify at the verification that Cambodia still had to submit verification exhibits even though Commerce already had a copy.

The confusion was unexpected and could not have been prevented by reasonable measures in light of the inexperience, unfamiliarity with Commerce's procedural requirements, and general confusions that occur when operating in a language other than one's native language. And although Commerce asserted that it gave a "verbal reminder of the deadline to upload verification exhibits to the Government of Cambodia officials during verification," P.R.502, it

18

did not clear up any confusion: Cambodian officials saw verifying Commerce officials take copies of the verification exhibits with them.

And although Commerce sent an email to the RGC on January 27, 2025, at 9:40 AM, to the Embassy of the RGC in Washington, D.C., *Final IDM* at 39 & n.163, P.R.538, it was already 9:40 PM in the night in Cambodia – far too late to expect a midnight collection of exhibits and securing authorization from senior government official to submit the exhibits before 5:00 AM in Phnom Penh / 5:00 PM in Washington, DC.  Thus, extraordinary circumstance existed from "an unexpected event that: (i) Could not have been prevented if reasonable measures had been taken, and (ii) Precludes a party or its representative from timely filing an extension request through all reasonable means."  19 C.F.R. § 351.302(c)(2).

Commerce faults Cambodia for waiting to file an out of time extension request, *Final IDM* at 38, P.R.538, but this ignores Cambodia's circumstances.  Not only was Cambodia unrepresented until shortly before filing its extension request, it had a previous out-of-time extension request denied with the first new subsidy allegation questionnaire response.  The questionnaire was not available to Cambodia for several days, and then a national holiday with several officials unavailable prevented Cambodia from timely filing an extension request.  P.R.389.  Commerce denied that request.  P.R.395.  Thus, Cambodia's experience made it seem that an out-of-time request would be futile.  It was only after hiring counsel that Cambodia understood how to articulate a request under Commerce's requirements, and the importance of making such a request.

In Cambodia's extension request, Cambodia also explained how the required good cause element was satisfied:  Cambodia participated to the best of its limited ability and resources.

19

*Cambodia Case Br*. at 9, P.R.526.  Thus, extraordinary circumstances and good cause supported

Cambodia's request.

While the extraordinary circumstances and good cause justifying finding that Commerce'

abused its discretion, new jurisprudence confirms that Commerce abused its discretion.  After

Commerce issued the *Order* on June 24, 2025, P.R.554, the Federal Circuit provided further

guidelines for accepting late submissions in *Tau-Ken*:

1.  The remedial, not punitive nature of the antidumping duty law, and the underlying purpose of calculating margins as accurately as possible.

2.  The burden on the Department to accept the late filing.

3.  The implications on finality concerns.

4.  The party's efforts and reasons for untimeliness.

*Id.*, at 1374-75.  Under an analysis of these factors, Commerce should have allowed Cambodia to

submit the verification exhibits.

First, while the verification exhibits are not technically necessary for Commerce's

calculation of an accurate subsidy margins – that information was already on the record –

Commerce deemed the last step of receiving a second copy of the verification exhibits to be

necessary.   Thus the first factor weighs heavily in favor of allowing Cambodia to file the

verification exhibits.  *See Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d

1370, 1379 (Fed. Cir. 2013) (the "overriding purpose of Commerce's administration of

antidumping laws … to calculate dumping margins as accurately as possible"); *Statement of*

*Administrative Action accompanying the Uruguay Round Agreements Act*, ("SAA"), H.R. Doc.

No. 103-316, at 875 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4202 (stating, procedural

"speed" is not intended to outweigh "accuracy of results and fairness to the parties involved.");

19 U.S.C. § 3512(d) (stating, the SAA is authoritative).

20

Second, the burden on Commerce was exceptionally light – Commerce had already taken copies of the verification exhibits with it, so it already possessed all the information contained in the verification exhibits.  *Cambodia's Req.*, at 2-4, P.R.504; *Cambodia's Case Br.*, at 8-9, P.R.526 .  "'Commerce can also abuse its discretion by "refusing to accept updated data when there {i}s plenty of time for Commerce to verify or consider it."' (*quoting Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (collecting cases).

Third, while the timing was close to the final determination, there was sufficient time before the final determination, thus reducing concerns about finality.  Cambodia sought to submit the verification exhibits on February 18, 2025.  P.R.504.  While Commerce balked at Cambodia's request, Commerce itself placed new benchmark information on the record more than two weeks later, on March 6, 2025, P.R.514-517, and relied upon this information determine substantially higher subsidy rates.  Further, case briefs were not due until the extended deadline of March 19, 2025, over a month later.  P.R. 528.  Commerce's own actions establish that there was sufficient time to accept the verification exhibits.

Finally, Cambodia's efforts were like every underdog story.  Cambodia is a small country – designated by the U.N. as a least developed country.  Cambodia had few resources, inexperience in U.S. trade remedy proceedings, was unrepresented, had typical time-consuming government protocols for approving submissions, and faced an restrictive new extensions policies that severely restricted the time it had to prepare, approve, and submit responses.  Despite the challenges, Cambodia participated to the best of its ability.  Further, the reason for the untimely request was sincere confusion about Commerce officials taking copies of verification exhibits, and a too-little, too-late attempt by Commerce to remind Cambodia to submit the verification exhibits.

Thus, under *Tau-Ken*, Commerce's refusal to grant additional time for the RGC to submit the verification exhibits was an abuse of discretion, and this Court should remand for Commerce

21

to accept the verification exhibits and reconsider all decisions influenced by Commerce's

decision to apply AFA to Cambodia because of the verification exhibits.

**B. Commerce Is Required To Include Copies Of The Verification Exhibits It Took On The Record Of This Investigation**

Commerce also improperly resorted to AFA because Cambodia did not fail to cooperate

to the best of its ability and its responses were fully verified.  Commerce's short verification

report of the verification of the RGC points to Cambodia not having submitted verification

exhibits as the reason for finding the questionnaire responses of the RGC unverified.  But

Commerce's decision is based upon a fiction that verification was unsuccessful or that

Commerce did not have the verification exhibits.  P.R.502.  Commerce obtained copies of the

verification exhibits during verification, took the copies to Washington, D.C., and thus had a

responsibility to include them on the record of the proceeding.

The law requires that Commerce maintain on the administrative record all information

"obtained by the Secretary {or} the administering authority":

> (2) Record for review
>    (A) In general
>    For the purposes of this subsection, the record, unless otherwise
>    stipulated by the parties, shall consist of—
>        (i) a copy of all information presented to or obtained by the
>        Secretary, the administering authority, or the Commission during
>        the course of the administrative proceeding, including all
>        governmental memoranda pertaining to the case and the record of
>        ex parte meetings required to be kept by section 1677f(a)(3) of this
>        title

*See* 19 U.S.C. § 1516a(b)(2).  Here, because Commerce verifying officials "obtained" copies of

all the verification exhibits, they must be included with the administrative record.  *Floral Trade*

*Council v. United States*, 13 CIT 242, 709 F. Supp. 229 (1989) (where documents from earlier

underlying investigations had been reviewed by Commerce in course of scope proceedings but

excluded from administrative record for review, court held documents sufficiently intertwined

22

with relevant inquiry were part of record for review).  Commerce reviewed all the documents included with the verification exhibits, and thus they must be included with the administrative record.  Commerce cannot pretend it did not verify the responses of the RGC.

While Commerce requires that parties submit copies of verification exhibits, this is not a statutory or regulatory requirement imposed on respondents; it is a convenient practice that allows Commerce to comply with its statutory duty to compile the record for review.  19 U.S.C. § 1516a(b)(2).  Commerce claimed that its copy of verification exhibits are solely to ensure that there are no inconsistencies in what a respondent files, and that Commerce cannot place verification exhibits on the record because the respondent has to certify that they are accurate. P.R.504 at 40.  But these claims are superficial.  Commerce could request a single-page certification, and its copy of the verification exhibits are reviewed page-by-page for consistency before whisking them away to Washington, D.C.  In light of the confusion Commerce's actions caused, and Commerce's independent responsibility to place information it obtains on the record, Commerce must either place its copy of the verification exhibits on the record, or allow the RGC time to submit the verification exhibits.

## II.    Commerce Cannot Countervail So-Called Transnational Subsidies

Commerce impermissibly countervailed subsidy programs that the Department preliminarily determined on the basis of AFA were provided by the Government of China. Commerce countervailed "programs" related to mandatory respondent SolarSpace's purchases of inputs of solar wafers and solar glass and 12 more programs through AFA.  P.R.494 at 24. Commerce did not change this decision in the *Final Determination*, changing only benchmarks and AFA rates to raise the subsidy rates by hundreds and thousands of percent.  *Final Determination*, 90 Fed. Reg. at 17,407, P.R.544; *Final IDM*, P.R.538.

When the language of a statute is in issue, this Court must look to the cannons of statutory construction to determine the meaning. *United States v. Universal Fruits & Vegetables Corp.*, 30 CIT 706, 710, 433 F. Supp. 2d 1351, 1355 (2006). Among others, the court does not read statutory provisions in isolation, the statute must be read as a whole. *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d 1363, 1367 (Fed. Cir. 2005). Further, "{i}t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1342 (Fed. Cir. 2025) (*quoting TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L.Ed. 2d 339 (2001) (*quoting Duncan v. Walker*, 533 U.S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)) (internal quotations omitted)), *aff'd sub. nom. Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

Here, the statute, 19 U.S.C. § 1677(5)(B), restricts Commerce's ability to address subsidies provided by a government of a country other than the country in which the recipient firm is located. The statute defines "authority" with a specific geographic limitation: "a government of a country or any public entity *within* the territory of the country." 19 U.S.C. § 1677(5)(B) (emphasis added). Congress limited the definition of an "authority" to the government of the country potentially subject to a countervailing duty order, providing unambiguous intent to prohibit Commerce generally from countervailing subjects from "a government of a country or any public entity" outside "the territory of the country."

Congress provided specific, limited exceptions to the general rule. Congress granted Commerce authority to countervail subsidies that were (i) the treatment of international consortia, 19 U.S.C. § 1671(d), and (ii) upstream subsidies. 19 U.S.C. § 1671(e). These

24

exceptions prove the rule. Had Congress intended to allow Commerce generally to countervail subsidies provided by a government of a country other than the country in which the recipient firm is located, it would have had no need to provide such exceptions. This conclusion is supported by the rule of statutory construction, "expressio unios est exclusio alterius." *Shengyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1359 & n.1 (Fed. Cir. 2015) (*citing Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S. Ct. 748, 154 L. Ed. 2d 653 (2003) ("The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which {is} abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." Internal quotations marks and citations omitted)). That is, because Congress included two explicit exceptions, other applications are not permitted. *See, e.g., AMS Assocs. v. United States*, 737 F.3d 1338, 1344 (Fed. Cir. 2013) ("The unambiguous plain language of the regulation only authorizes Commerce to act on a *prospective* basis, and such express prospective authorization reasonably is interpreted to preclude retroactive authorization; *expressio unius est exclusion alterius*.").

Commerce, itself, has found that "to allow Commerce to inherently address subsidies from governments outside the country under investigation without evidence of the responding companies participation in an international consortium engaged in the production of subject merchandise – would render the international consortium provision superfluous." *See Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) *and accompanying Dec. Mem.* at Cmt. 6. Thus, contrary to Commerce's claims, *Final IDM* at 12, the exceptions for international consortia and

25

upstream subsidies would be improperly rendered superfluous under Commerce's new reading of the statute.

The result of applying the "expressio unios" cannon is further supported by statutory provisions requiring specificity, while Commerce's interpretation produces conflicts.  For any alleged subsidy, transnational or otherwise, countervailability requires specificity. The statutory requirement of specificity needs a "determination whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*…."  19 U.S.C. § 1677(5A)(D) (emphasis added).  Under the plain language of the specificity provisions, a measure that is transnational in nature cannot be specific.  China is not alleged to be providing a subsidy to an enterprise or industry within China, but outside its jurisdiction.

Commerce's specificity arguments otherwise do not hold up.  Commerce asserts that, "the Government of China provides the input only to a limited number of industries that use {the input} in production," *Post-Prelim IDM* at 19, 21, 23, P.R.494; *Final IDM*, at 26, and, e.g., that "the Government of China . . . directed an expansion of its polysilicon production in China, enabling state-owned and state-controlled companies to produce and sell polysilicon to Cambodian manufacturers of solar cells at artificially low costs," *id*. at 18, but that is not what the statute requires. Commerce must make its finding on the fact that the Government of China provides the subsidy to a limited number of companies within China, not companies in Cambodia.  Commerce therefore wrongly "confine{s} itself to examining a particular statutory provision in isolation," *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132 (2000), ignoring its obligation to read the statute as a whole.

Commerce spends much of its time analyzing its own past and present regulations and claiming "constitutional delegation" of authority to interpret the statute. *Final IDM* at 11-12, P.R.538.  Before 2024, Commerce's regulation on transnational subsidies stated that "a subsidy does not exist if the Secretary determines that the funding for the subsidy is supplied in accordance with, and as part of, a program or project funded: (a) By a government of a country other than the country in which the recipient firm is located."  19 C.F.R. § 351.527 (2023). Commerce revoked this regulation in its entirety, without providing replacement language. *See Final IDM* at 9-11 (quoting and discussing *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 88 Fed. Reg. 29,850, 29,870 (Dep't of Commerce May 9, 2023)) P.R.538; *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,826, 20,827 (Dep't of Commerce March 25, 2024) ("*Final Transnational Subsidy Rule*")). Commerce relied on the removal of this prohibition as its legal support for countervailing transnational subsidies in this investigation.  *See Final IDM* at 9-11, P.R.538.  Commerce, however, provided no statutory analysis in support of its new interpretation of its obligations under 19 U.S.C. § 1671(a).  *See Final Transnational Subsidy Rule*, 89 Fed. Reg. at 20,826–28.  Instead, Commerce merely claimed that its new interpretation is based on its practical experience from past investigations, and the changing nature of global trade.  *See id.*

To support its argument, Commerce points to the singular words "a government of a country," claiming that because the statute doesn't state that the government or country providing the subsidy must be the same government as the government of the country in which a subsidy is received.  *Id.* at 12, P.R.538. Commerce goes too far, claiming clear authority where none exists,

and seeking a construction requiring linguistic gymnastics. *See Pulsifer v. United States*, 601 U.S. 124, 164, 144 S. Ct. 718, 218 L.Ed. 2d 7 (2024). "That is not how statutory interpretation usually works." *Id.*

Commerce also claims "the statute clearly authorizes Commerce to investigate and countervail transnational subsidies." *Id.* at 12, P.R.538. However, "for a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity." *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1357 (2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)).

Notwithstanding Commerce's recently promulgated regulations, through which it claims authority to countervail transnational subsidies despite no changes to the underlying statute, Commerce had for over 25 years (correctly) taken the position that such subsidies were not actionable. In fact, in originally promulgating Section 351.527, Commerce specifically rejected the argument that there was a statutory basis for countervailing subsidies provided by one country to an entity producing or manufacturing the subject merchandise in another country. *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,405 (Dep't of Commerce Nov. 25, 1998) (specifically rejecting the argument that the statutory basis for not countervailing subsidies provided by one country to an entity producing or manufacturing the subject merchandise in another country no longer exists).

When Commerce promulgated the original section 351.527 of its regulations, Commerce explained that transnational subsidies were not countervailable because section 351.527 derives from prior section 303(a)(l) of the Act (now repealed), which stated:

> Whenever any country . . . shall pay or bestow, directly or
> indirectly, any bounty of grant upon the manufacture or production

28

> or export of any article . . . manufactured or produced in such country . . . there shall be levied a duty equal to the net amount of such bounty or grant. . . . {T}here is no other indication that Congress intended to eliminate this rule {providing that transnational subsidies are not countervailable}."

*Id.* With no changes to the statute since its 1998 regulations were promulgated, Commerce cannot now reasonably claim that the statute in fact means the opposite. If it is the case that the presumptions underlying the law have changed, *see Final IDM* at 9-10 (explaining that the prior regulation "was promulgated over 25 years ago in a global trade environment much different than the current trade environment"), it may be time for Congress to rewrite laws. Any change in the landscape does not justify circumventing Congress to accomplish what Commerce believes should be done. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374-75 (1986) ("{t}o permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."); *see Final IDM* at 9-11 (noting that "Commerce withdrew the self- imposed restriction previously found at 19 C.F.R. § 351.527"), P.R.538.

Accordingly, Commerce's interpretation of the statute countervailing subsidies alleged to have been provided by the Government of China to producers in Cambodia conflicts with the statute's plain meaning, other provisions of the statutory framework, Commerce's own prior interpretation of the statute, and more than two decades of Commerce practice. Commerce exceeded its authority by countervailing alleged transnational subsidy programs in the Final Determination, thus this case should be remanded to Commerce to recalculate subsidy rate without transnational subsidies.

## III.     The AFA Rates Commerce Selected Are Unlawfully And Outrageously High

To the extent this Court allows Commerce to continue to determine subsidy rates based upon AFA, Commerce must revise its AFA rate to something within this galaxy. Commerce

applied AFA to assign individual program rates for 17 different subsidy programs totaling 3,403.96%.  This 3,403.96% rate is thousands of percentage points higher than any AFA rate in Commerce's history that counsel has been able to find while preparing this brief. A rate this high is so disconnected from any reality that it is contrary to law as unsupported by substantial evidence.  Even though Commerce is not required to demonstrate that the AFA countervailing duty rate "reflects an alleged commercial reality *of the interested party*," 19 U.S.C. § 1677e(d)(3), this Court must remand this its selection of AFA rates so that it reflects the commercial reality of the industry.

### A. The Department's Inclusion of Transnational Subsidies in the AFA Rate Renders the AFA Rate Punitive and Not Supported By Record Evidence

As demonstrated above, Commerce erred in countervailing subsidies alleged to have been provided by the Government of China to producers in Cambodia. This is impermissible in any context for the reasons set forth above. However, Commerce's decision to include these subsidies in its selection of the AFA rate presents additional issues. Specifically, as explained below, Commerce's decision is inconsistent with the plain meaning of the statute and relevant court precedents indicating that AFA rates must be corroborated and cannot be punitive.

The statute requires that, in selecting an AFA rate, Commerce select, where available, "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country."  19 U.S.C. § 1677e(d)(1)(A).  Commerce is required to "corroborate that information from independent sources that are reasonably at their disposal," when applying rates that rely on secondary information.  19 U.S.C. § 1677e(c).  In assessing whether Commerce's selection of an AFA rate meets this standard, the Courts have interpreted the statute as requiring the AFA rate to be a reasonably accurate estimate of the respondent's actual rate. *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027,

30

1032 (Fed. Cir. 2000) (holding the corroboration requirement tempers the deterrent value of an AFA rate to prevent overreaching reality to maximize deterrence).  Specifically, the courts have required that "Commerce demonstrates probative value {of the AFA rate} by 'demonstrating {that} the rate is both reliable and relevant.'"  *Özdemir B oru San. VE Tic. Ltd. Sti. v. United States*, 273 F.Supp.3d 1225, 1247 (Ct. Int'l Trade 2017).

In the *Final Determination*, Commerce used the 471.25% rate calculated for a transnational subsidy—the Cross-Border Provision of Chinese Silicon Wafer for LTAR, a subsidy program alleged to have been provided by the Government of China—as the AFA rate for loan and grant programs preliminary found to have been provided by the Government of Cambodia. *Final Calc Memo*, Att.1, P.R541.  Even if the 471.25% rate were allowable for a single program, Commerce's selection of a rate related to the provision of goods for LTAR by the Government of China as the AFA rate applied for loan and tax programs administered by the Government of Cambodia has no probative value. These programs—including the Rural Electrification Fund (a program alleged to provide interest-free loans to support private electricity suppliers in rural areas), and the Business Recovery Guarantee Scheme (a public credit guarantee program that helps businesses access formal loans for working capital, investment, or expansion)—are not "the same or similar program" to the transnational LTAR programs.

Yet these programs, along with another loan program that Commerce allege provides a transnational subsidy, combine to a 1,885% CVD margin. Commerce cannot support such a significant AFA rate on the basis of programs that are plainly not the "same or similar" programs. Instead, Commerce selection of an AFA rate is plainly a punitive, results-driven exercise with little probative value. As such, it violates the plain meaning of the statute and consistent court

31

precedents. As noted above, at the core of Commerce's AFA methodology is a balance between incentivizing cooperation with the agency's investigations and the need to calculate reasonable margins. *F.lli De Cecco*, 216 F.3d at 1032. Courts have consistently recognized that the primary purpose of the AFA statute is not to punish companies, but rather to calculate accurate rates. *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("{Commerce's} primary objective {must be} the calculation of an accurate rate.").

Importantly, the courts have recognized that "Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual {net countervailable subsidy rate}." *F.lli De Cecco*, 216 F.3d at 1032. Yet that is precisely what Commerce has done here. Commerce calculated a 3,403.96% ad valorem AFA rate in this case. This rate has no basis in fact. It is based almost entirely on transnational subsidies that should never have been countervailed, and which Commerce has applied to programs with zero factual connection to other programs that contribute significantly to the overall AFA rate. Commerce must reverse this methodological decision in its final determinations and instead calculate an AFA rate that is accurate and probative and consistent with the statute.

IV.    **ISC Cambodia Is A Standards-Setting Government Agency, Not A Producer Or Seller Of Solar Panels**

Commerce improperly ignored information on its own website establishing that ISC Cambodia is not a producer or exporter of subject merchandise. Commerce placed upon the record an email from the Cambodian embassy that contained a reference to Commerce's own website, "https://www.trade.gov/country-commercial-guides/cambodia-standards-trade." *Email Correspondence*, P.R.496. While all that is on the record is a website address, it exposed

32

something that Commerce cannot hide, even though it asserts that information about ISC

Cambodia is not on the record. *Final IDM*, at 45, P.R. 538.

It is clear based on Commerce's own website, that the true identity of ISC Cambodia was

already known. On the website of the Department of Commerce, the Country Commercial

Guides for Cambodia, on the page identifying standards and trade, ISC Cambodia's identity is

plain, and Commerce cannot intentionally blind itself to what Commerce itself has published on

its own website. Information in the petition corroborates this fact – the website with Petitioner's

listing ISC Cambodia with Cambodian manufacturers is plainly a government website, ending in

".gov.kh." *Petition*, Ex.I-23 (listing ISC Cambodia), P.R.2. Accordingly, Commerce should

remove ISC Cambodia from the list of producers and exporters that are subject to this

investigation.

V.     **To The Extent Cambodia's Other Arguments Survive Commerce's AFA decision, Commerce Cannot Countervail Programs That Are Not Specific Or Companies That Commerce Knows Are Not Producers Or Exporters Of Subject Merchandise.**

Commerce unlawfully decided that Cambodia's questionnaire responses were

"unverifiable," and reached its program-specific determination on the basis of AFA. Despite its

resort to AFA, Commerce rejected several of Cambodia's arguments Cambodia, thus, should be

given a fresh opportunity to address any decision Commerce dismissed as moot, including

Cambodia's electricity programs, *Final IDM* at 46 ("{D}iscussion of whether these programs are

specific is moot. We are applying facts otherwise available with adverse inferences."), Customs

duty exemptions for raw materials, *id.* at 47-48 ("Commerce continues to find, absent new

information and based on AFA, that the Government of Cambodia does not have in place nor

applies a system that is reasonable and effective for confirming which inputs and in what

amounts are consumed in the production of the exported products, making normal allowance for

33

waste.{}  Therefore, in this final determination, we continue to find that the full value of the Customs Duty Exemption and Related Incentives for Raw Materials for Export Qualified Investment Projects program provides a benefit."); the Business Recovery Guarantee Scheme, *id.* at 48 ("We agree with the petitioner that discussion of whether this program is specific is moot. We are applying AFA pursuant to sections 776(a)(2)(A)(D) and 776(b) of the Act, because the Government of Cambodia did not act to the best of its ability to timely submit its verification exhibits.").

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Cambodia requests that the Court grant its Rule 56.2 Motion For Judgment On The Agency Record and remand this matter for further proceedings at Commerce in accordance with this Court's decision.

Respectfully submitted,

/s/Mark B. Lehnardt
Davis & Leiman
1012 Connecticut Ave., N.W., #1012
Washington, D.C. 20036
T. 202.642.4850
*Counsel to Royal Government of Cambodia*

34

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Mark B. Lehnardt, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and the Scheduling Order to this case. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is **10,028** words.