**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

ROYAL GOVERNMENT OF CAMBODIA,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,

Defendant-Intervenor.

Court No. 25-00173

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

REBECCA T MITCHELL
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
(202) 616-0467

*Attorneys for Defendant*

OF COUNSEL:

KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

August 17, 2026

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

| | | |
|---|---|---|
| ROYAL GOVERNMENT OF CAMBODIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br><br>Defendant-Intervenor. | ) | Court No. 25-00173 |

Upon consideration of the plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.

Dated: ____________________
New York, New York

____________________________
Lisa W. Wang, Judge

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

STATEMENT PURSUANT TO RULE 56.2 ..... 2

I. Administrative Determination Under Review ..... 2

II. Issues Presented for Review ..... 2

STATEMENT OF FACTS ..... 2

SUMMARY OF THE ARGUMENT ..... 11

ARGUMENT ..... 12

I. Standard of Review ..... 12

II. Commerce's Application of AFA to RGC Based on RGC's Failure to Timely Submit Verification Exhibits or Request an Extension Is Supported by Substantial Evidence and Otherwise In Accordance with Law ..... 13

A. Commerce Acted Within Its Discretion When Denying RGC's Three-Week-Late Request for an Extension of Time to File Verification Exhibits ..... 15

1. Commerce's Determination that RGC Failed to Establish Extraordinary Circumstances is Supported by Substantial Evidence and Otherwise in Accordance with Law ..... 16

2. Relevant Considerations Identified in Federal Circuit Precedent Show Commerce Did Not Abuse Its Discretion When Denying RGC's Untimely Extension Request ..... 19

B. Commerce Was Not Otherwise Required to Place RGC's Verification Exhibits in the Record ..... 24

III. Commerce Can Countervail Transnational Subsidies ..... 25

A. Relevant Background Relating to the Revocation of the Regulation Prohibiting the Countervailing of Transnational Subsidies ..... 26

B. The Statutory Framework for Countervailing Duties Allows Commerce to Countervail Transnational Subsidies ..... 28

1. The Plain Text and Context of 19 U.S.C. § 1671 Permits Commerce to Assess Duties on Transnational Subsidies ..... 29

2. Allowing Commerce to Countervail Transnational Subsidies Would Not Render 19 U.S.C. § 1671(d)-(e) Superfluous ..... 31

3. Commerce Is Not Statutorily Prohibited from Finding That a Transnational Subsidy Is Specific ............ 34

C. Commerce's Change in Position is Insufficient to Support RGC's Statutory Interpretation Argument ............ 37

IV. Commerce's Calculation of the AFA Rate is Supported by Substantial Evidence and Otherwise In Accordance With Law ............ 40

V. Substantial Evidence Supports Commerce's Inclusion of ISC Cambodia in this Investigation as a Producer and/or Exporter of Solar Cells from Cambodia ............ 44

VI. RGC's Challenge to Commerce's Application of Countervailing Duties to Certain Programs Fails Because RGC's Challenge to Commerce's Application of AFA Fails..... 46

# TABLE OF AUTHORITIES

## Cases

*ArcelorMittal USA LLC v. United States*,
337 F. Supp. 3d 1285, 1301 (Ct. Int'l Trade 2018) .......... 42

*Archroma U.S., Inc. v. Dep't of Commerce*,
--- F.4th ----, No. 2024-2159, 2026 WL 2275132 (Fed. Cir. Aug. 7, 2026) .......... 28, 37, 39

*Aristocraft of Am., LLC v. United States*,
269 F. Supp. 3d 1316 (Ct. Int'l Trade 2017) .......... 24, 45

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......... 12

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) .......... 32

*Beasley v. Shinseki*,
709 F.3d 1154 (Fed. Cir. 2012) .......... 34

*Bio-Lab, Inc. v. United States*,
487 F. Supp. 3d 1291 (Ct. Int'l Trade 2020) .......... 41

*Bio-Lab, Inc. v. United States*,
776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) .......... 39

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
5 F.4th 1367 (Fed. Cir. 2021) .......... 13

*Burrus v. Vegliante*,
336 F.3d 82 (2d Cir. 2003) .......... 30

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) .......... 13

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .......... 13

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) .......... 36, 37

*Dong-A Steel Co. v. United States*,
527 F. Supp. 3d 1350 (Ct. Int'l Trade 2021) .......... 45

*Dongtai Peak Honey Indus. Co. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015) .......... 15

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000) ........ 42

*Former Emp. of Drive Sol Glob. Steering, Inc. v. U.S. Sec'y of Lab.*,
181 F. Supp. 3d 1369 (Ct. Int'l Trade 2016) ........ 34

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) ........ 39

*Grobest & I-Mei Indus. (Viet.) Co. v. United States*,
815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ........ 23

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
992 F.3d 1348 (Fed. Cir. 2021) ........ 41

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) ........ 13

*Kaptan Demir Celik Endustrisi v. Ticaret A.S.*,
803 F. Supp. 3d 1291 (Ct. Int'l Trade 2025) ........ 44

*Kemira Fibres Oy v. United States*,
61 F.3d 866 (Fed. Cir. 1995) ........ 19

*KYD, Inc. v. United States*,
607 F.3d 760 (Fed. Cir. 2010) ........ 40

*Lesko v. United States*,
161 F.4th 1352 (Fed. Cir. 2025) (*en banc*) ........ 38

*Linyi Chengen Imp. & Exp. Co. v. United States*,
174 F.4th 1351 (Fed. Cir. 2026) ........ 24

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 39

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ........ 38

*Muscogee (Creek) Nation v. Hodel*,
851 F.2d 1439 (D.C. Cir. 1988) ........ 30

*Nexteel Co. v. United States*,
28 F.4th 1226 (Fed. Cir. 2022) ........ 39

*Ninestar Corp. v. United States*,
687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ........ 36

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 13

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) .......... 24

*Rodriguez v. Dep't of Veterans Affs.*,
8 F.4th 1290 (Fed. Cir. 2021) .......... 15

*Schlafly v. Saint Louis Brewery, LLC*,
909 F.3d 420 (Fed. Cir. 2018) .......... 31

*Smith-Corona Grp. v. United States*,
713 F.2d 1568 (Fed. Cir. 1983) .......... 38

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005) .......... 12

*Tau-Ken Temir LLP v. United States*,
147 F.4th 1363 (Fed. Cir. 2025) .......... 16, 21, 22, 23

*Torrington Co. v. United States*,
82 F.3d 1039 (Fed. Cir. 1996) .......... 18

*Trans Tex. Tire, LLC v. United States*,
519 F. Supp. 3d 1289 (Ct. Int'l Trade 2021) .......... 41

*United States v. Maverick Mktg., LLC*,
322 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) .......... 34

*United States v. Wells*,
519 U.S. 482 (1997) .......... 30

*Ventura Coastal, LLC v. United States*,
736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) .......... 38

*Zhaoyuan Junbang Trading Co. v. United States*,
822 F. Supp. 3d 1342 (Ct. Int'l Trade 2026) .......... 43

**Statutes**

19 U.S.C. § 1303, *repealed by* Pub. L. No. 103-465, title II, § 261(a), 108 Stat. 4908 (1994)
.......... passim

19 U.S.C. § 1516a .......... 12, 25

19 U.S.C. § 1671 .......... passim

19 U.S.C. § 1677 .......... passim

19 U.S.C. § 1677-1 .......... 32

19 U.S.C. § 1677e .......... passim

19 U.S.C. § 1677m .......... 6, 14

28 U.S.C. § 2637(d) .......... 35

5 U.S.C. § 706(2) .......... 12

Tariff Act of 1930, 46 Stat. 687 .......... 26

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 .......... 26

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4908 .......... 26

**Regulations**

19 C.F.R. § 351.302 .......... passim

19 C.F.R. § 351.302(c) .......... passim

19 C.F.R. § 351.307 .......... 8

19 C.F.R. § 351.308(j) .......... passim

19 C.F.R. § 351.527 .......... passim

*Countervailing Duties*,
62 Fed. Reg. 8,818 (Dep't of Commerce Feb. 26, 1997) .......... 27

*Extension of Time Limits*,
78 Fed. Reg. 57,790 (Dep't of Commerce Sep. 20, 2013) .......... 15, 16

*Preamble, Countervailing Duties*,
63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) .......... 27

*Regulations Improving and Strengthening Enforcement of Trade Remedies Through the Administration of Antidumping and Countervailing Duty Laws*,
88 Fed. Reg. 29,850 (Dep't of Commerce May 9, 2023) .......... 27, 28, 40

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, Final Rule*,
89 Fed. Reg. 20,766 (Dep't of Commerce Mar. 25, 2024) .......... passim

**Other Authorities**

*Certain Epoxy Resins from the Republic of Korea*,
90 Fed. Reg. 14,605 (Dep't of Commerce Apr. 3, 2025).................................................. 33

*Certain Van-Type Trailers and Subassemblies Thereof from Mexico*,
91 Fed. Reg. 34,218 (Dep't of Commerce June 5, 2026) ................................................. 33

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia*,
89 Fed. Reg. 96,226 (Dep't of Commerce Dec. 4, 2024) (preliminary det.).................... 20

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

| | | |
|---|---|---|
| ROYAL GOVERNMENT OF CAMBODIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br><br>Defendant-Intervenor. | ) | Court No. 25-00173 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for judgement upon the agency record filed by plaintiff, the Royal Government of Cambodia (RGC), challenging the U.S. Department of Commerce's (Commerce) final determination in the countervailing duty (CVD) investigation on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells) from the Kingdom of Cambodia (Cambodia). RGC Br., ECF No. 29. As demonstrated below, Commerce's final determination is supported by substantial evidence and otherwise in accordance with law. As such, the United States respectfully requests the Court deny RGC's motion, sustain Commerce's final determination, and enter judgement in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

The administrative determination under review is *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia*, 90 Fed. Reg. 17,406 (Dep't of Commerce April 25, 2025) (final determination) (P.R. 544), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 538). The period of investigation is January 1, 2023, through December 31, 2023.

### II. Issues Presented for Review

1. Whether Commerce's decision to apply adverse facts available (AFA) where RGC failed to timely submit verification exhibits or request an extension was supported by substantial evidence and in accordance with law.
2. Whether Commerce's determination to countervail transnational subsidies was supported by substantial evidence and in accordance with law.
3. Whether Commerce's calculation of the AFA rate was supported by substantial evidence and in accordance with law.
4. Whether Commerce's application of AFA to ISC Cambodia was supported by substantial evidence and in accordance with law.
5. Whether Commerce's determinations to countervail other programs was supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On April 24, 2024, Commerce received a CVD petition concerning imports of solar cells from Cambodia, filed on behalf of the American Alliance for Solar Manufacturing Trade Committee (Petitioner). *See* Petitions for the Imposition of Antidumping and Countervailing

Duties at 1 (Apr. 24, 2024) (P.R. 1, C.R. 1) (petition). The petition included a request for Commerce to investigate programs involving transnational subsidies from the People's Republic of China (China) implemented in cooperation with third-party governments, like RGC, to advance China's "Belt and Road Initiative." *See* Petition at 33 (P.R. 5, C.R. 5).

On May 14, 2024, Commerce initiated a countervailing duty investigation into solar cells from Cambodia. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam*, 89 Fed. Reg. 43816 (Dep't of Commerce May 20, 2024) (initiation notice) (P.R. 73). On March 22, 2024, Commerce issued quantity-and-value questionnaires to potential producers of merchandise under investigation, including ISC Cambodia. *See* Issuance of the Quantity and Value Questionnaires (Mar. 22, 2024) (P.R. 80). Although delivery of the questionnaire was confirmed, ISC Cambodia did not respond. *See* Respondent Selection at 2 (June 18, 2024) (P.R. 150, C.R. 42).

On June 18, 2024, Commerce selected Jintek Photovoltaic Technology Co., Ltd (Jintek) and Solarspace New Energy (Cambodia) Co., Ltd. (Solarspace) as the mandatory respondents. *Id.* at 1. Commerce issued questionnaires to the mandatory respondents, RGC, and the Government of China (GOPRC). *See* Countervailing Duty Questionnaire (July 3, 2024) (P.R. 173) (RGC Questionnaire); *see also* Transnational Countervailing Duty Questionnaire (July 3, 2024) (P.R. 175). In Commerce's questionnaire, Commerce notified the parties: "All information submitted is subject to verification. Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses." RGC Questionnaire at 11.

RGC timely sought two extensions of the deadline to submit questionnaire responses, both of which Commerce granted in part. *See* Extension Request for Submitting Government's Response to Section II of the Initial Countervailing Duty Questionnaire at 1 (Aug. 2, 2024) (P.R. 198); Extension of Deadline for Initial Questionnaire Response at 1 (Aug. 7, 2024) (P.R. 203); Request for Further Extension of Time at 1 (Aug. 14, 2024) (P.R. 223); Second Extension of Deadline for Initial Questionnaire Response at 1 (Aug. 15, 2024) (P.R. 224). RGC timely submitted its initial questionnaire response on August 19, 2024. Submission of Government's Response to Section II of the Initial Countervailing Duty Questionnaire at 1 (Aug. 19, 2024) (P.R. 233).

On September 6, 2024, Commerce issued a supplemental questionnaire to RGC and set a deadline of September 13, 2024. Supplemental Questionnaire to Initial Questionnaire Response at 1 (Sep. 6, 2024) (P.R. 306). RGC again timely sought multiple extensions that Commerce granted in part. Request for an Extension of Time for Submission of Supplemental Questionnaire to Initial Questionnaire Response at 1 (Sep. 13, 2024) (P.R. 328); Extension of Deadline for Supplemental Questionnaire Response at 1 (Sep. 13, 2024) (P.R. 330); Request for Further Extension of Time for Submission of Supplemental Questionnaire to Initial Questionnaire Response at 1 (Sep. 18, 2024) (P.R. 340); Second Extension of Deadline for Supplemental Questionnaire Response at 1 (Sep. 19, 2024) (P.R. 341). RGC timely filed its supplemental questionnaire response on September 20, 2024. Submission of Government's Response to Supplemental Questionnaire to Initial Questionnaire Response (Sep. 20, 2024) (P.R. 346).

In response to petitioner's new subsidy allegations, Commerce initiated an investigation into whether the cross-border provision of polysilicon, silicon wafer, silver paste, and solar glass

(collectively, inputs) from GOPRC to Cambodian solar cell producers for less-than-adequate renumeration (LTAR) constituted countervailable subsidies. *See generally* Decision Memorandum on New Subsidy Allegations (Sep. 20, 2024) (P.R. 363). Commerce issued new-subsidy-allegation questionnaires to GOPRC, to which the GOPRC timely provided partial responses. *See* GOPRC New Subsidy Allegation Questionnaire Response (Oct. 10, 2024) (P.R. 396); GOPRC NSA Questionnaire Response (Nov. 13, 2024) (P.R. 450, C.R. 213). Commerce additionally issued a supplemental new-subsidy-allegation questionnaire to RGC with a deadline of September 30, 2024. New Subsidy Allegation Questionnaire at 1 (Sep. 20, 2024) (P.R. 366).

On October 7, 2024, seven days after the deadline passed, RGC requested a 14-day extension of time to October 14, 2024. Request for Extension of Time for Submission of Government's Response to New Subsidy Allegation Questionnaire at 1-2 (Oct. 7, 2024) (P.R. 389). To justify its untimely request, RGC stated there was a technical delay in receiving the new-subsidy-allegation questionnaire and "some individuals {were} absent from work" for several days due to an important national holiday. *Id.* at 1. RGC also asserted that it required "specific authorization from high-ranking government officials" to "tak{e} any action" but did not state whether such high-ranking government officials were unavailable prior to the deadline or between the deadline and when RGC filed its untimely request. *Id.* Additionally, RGC pointed to its lack of counsel as an explanation for its inability to request an extension before the deadline. *Id.* Commerce denied RGC's untimely extension request, explaining that RGC failed to demonstrate extraordinary circumstances, as "the national holiday, authorization process timeline, and lack of local counsel were not unexpected events." Denial of Extension to Submit Government's Response to New Subsidy Allegation Questionnaire at 1-2 (Oct. 9, 2024) (P.R. 395).

On October 4, 2024, Commerce published its preliminary determination finding that countervailable subsidies are being provided to producers and exporters of solar cells from Cambodia. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Kingdom of Cambodia*, 89 Fed. Reg. 80,877 (Dep't of Commerce Oct. 4, 2024) (P.R. 387) (preliminary determination), and accompanying Preliminary Issues and Decision Memorandum (P.R. 382) (PDM). Based on ISC Cambodia's failure to respond to Commerce's quantity-and-value questionnaire, Commerce preliminarily applied facts otherwise available with an adverse inference under 19 U.S.C. § 1677e(a) and (b) and found that ISC Cambodia "used and benefited from all programs at issue in this proceeding." PDM at 12. Accordingly, Commerce included all programs that it preliminarily determined were countervailable in calculating ISC Cambodia's AFA rate. *Id.* Separately, Commerce found the following programs, among others, were countervailable subsidies: (1) the Customs Duty Exemption and Related Incentives for Raw Materials for Export Qualified Investment Projects; (2) Electricity Fee Reduction; (3) the Rural Electrification Fund; and (4) the Business Recovery Guarantee Scheme. *Id.* at 23-30. Commerce also notified parties that Commerce would verify information relied upon under 19 U.S.C. § 1677m. Preliminary Determination, 89 Fed. Reg. at 80,879.

On January 31, 2025, Commerce published its post-preliminary determination, dealing in pertinent part with the petitioner's new subsidy allegations on inputs provided from GOPRC for LTAR. *See* Decision Memorandum for the Post-Preliminary Determination at 1 (Jan. 31, 2025) (P.R. 494). Relevant here, Commerce preliminarily found that GOPRC had failed to provide a complete response to Commerce's questionnaire with respect to the transnational provision of inputs for LTAR. *Id.* at 3-7. Based on facts otherwise available, Commerce found that Chinese input suppliers were public entities, or "authorities," that provided financial contribution to

Cambodian solar cell and module producers in the form of the provision of goods. *Id.* Additionally, Commerce used facts otherwise available and found that the provision of inputs was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) because GOPRC provides the inputs only to a limited number of industries. *Id.* at 7.

On January 7, 2025, Commerce issued its agenda for the verification of RGC's questionnaire responses. Verification of the Government of Cambodia's Questionnaire Responses at 1 (Jan. 7, 2025) (P.R. 481) (verification agenda). The verification agenda states that Commerce "will require copies of certain documents for the verification report." *Id.* Separately, it provides that Commerce "request{s} that {RGC} file and serve verification exhibits no later than the end of the fifth business day after each verification is completed." *Id.* at 2. Verification exhibits "must be accompanied by" certificates of service and factual accuracy. *Id.* at 2-3. "If, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies." *Id.* at 3. Electronically filed documents were due by 5:00 p.m. Eastern Time on the deadline. *Id.* Finally, the verification agenda provides two contacts for "any questions regarding this verification." *Id.*

Between January 16 and 20, 2025, Commerce conducted verification of RGC's questionnaire responses. *See* Notification of Deadlines for the submission of Case and Rebuttal Briefs at 1, 4 (Feb. 18, 2025) (P.R. 502) (briefing schedule). During verification, Commerce "provided a verbal reminder of the deadline to upload verification exhibits." *Id.* at 4. The deadline to submit verification exhibits was January 27, 2025, at 5:00 p.m. Eastern Time. *Id.* On January 27, 2025 at 9:40 a.m. Eastern Time, Commerce sent an email to RGC to remind RGC that the deadline for submitting verification exhibits was that day. Out-of-Time Request for

Extension of Time to Submit Verification Exhibits at 4 (Feb. 19, 2025) (P.R. 504) (verification exhibit extension request). However, RGC did not file its verification exhibits. Briefing Schedule at 4. On February 18, 2025, Commerce issued its briefing schedule, as well as a memorandum finding that, because RGC did not file its verification exhibits in accordance with 19 C.F.R. § 351.307, RGC's questionnaire responses remained unverified. *Id.*

On February 19, 2025, more than three weeks after the deadline to submit verification exhibits and Commerce's reminder of that deadline, RGC submitted an out-of-time request for an extension of time to February 24, 2025, to submit verification exhibits. *See* Verification Exhibit Extension Request at 1. Therein, RGC argued that good cause and extraordinary circumstances existed to grant its untimely request because RGC was inexperienced at participating in Commerce proceedings and struggled to "fully understand" instructions. *Id.* at 2. Further, RGC contended that it did not understand that it had to submit verification exhibits because Commerce officials took copies of verification exhibits during verification. *Id.* at 2-3. To excuse the failure to act following Commerce's reminder on the day of the deadline, RGC explained that it was too late to collect exhibits or file a request for an extension of time because it was 9:40 p.m. in Cambodia. *Id.* at 4. Commerce denied RGC's untimely request because it determined that the explanation for RGC's failure to timely submit verification exhibits or a request for an extension did not constitute extraordinary circumstances under 19 C.F.R. § 351.302(c). Denial of Untimely Request for Extension to Submit Verification Exhibits at 1 (Feb. 27, 2025) (P.R. 513) (Extension Request Denial).

On March 12, 2025, RGC submitted its case brief and argued that: (1) Commerce should not apply AFA for RGC's failure to submit verification exhibits; (2) Cambodia's electricity programs, customs-duty exemptions for imported raw materials, and Business Recovery

Guarantee Scheme are not countervailable; (3) ISC Cambodia is not a producer or seller of solar panels; and (4) the AFA rate applied for 16 subsidy programs was unreasonably high. RGC Case Brief (Mar. 12, 2025) (P.R. 526). RGC's rebuttal brief focused solely on the application of AFA based on its failure to submit verification exhibits. *See generally* RGC Rebuttal Brief (Mar. 20, 2025) (P.R. 531). RGC's briefs are devoid of any argument related to the countervailability of transnational subsidies or the appropriate benchmarks to calculate the benefit received under those programs, and RGC did not argue that Commerce had incorrectly calculated any program's rate. *See generally* RGC Case Brief; RGC Rebuttal Brief. By contrast, GOPRC's case brief challenged the countervailability of transnational subsidies generally, as well as the particular transnational subsidies at issue. *See* GOPRC Case Brief at 5-7 (Mar. 12, 2025) (P.R. 521) (summarizing arguments).

On April 18, 2025, Commerce released its final determination. Final Determination, 90 Fed. Reg. at 17406. Commerce continued to find that countervailable subsidies are being provided to Cambodian producers and exporters of solar cells. IDM at 1.

First, Commerce determined that transnational subsidies are generally countervailable and rejected arguments to the contrary raised by GOPRC, Solarspace, and a Chinese solar cell producer. IDM at 8-13.

Second, Commerce applied AFA to RGC's questionnaire responses, explaining that RGC's inexperience with Commerce proceedings and misunderstandings of Commerce's instructions did not constitute extraordinary circumstances to warrant granting a three-week-late extension request to submit its verification exhibits, particularly where RGC had previously demonstrated its ability to timely file extension requests. IDM at 38-39. Commerce also noted

that RGC received multiple reminders during verification and a courtesy reminder on the day of the deadline and, despite these reminders, RGC did not seek clarification. IDM at 39-40.

Turning to RGC's argument that Commerce should have uploaded and relied on copies of exhibits obtained during verification, Commerce explained that "{t}he purpose of Commerce taking a copy of verification exhibits is to ensure that the proper verification exhibits are filed into the record." IDM at 40. Commerce uses copies of verification exhibits obtained during verification to address "inconsistencies" in the verification exhibits filed. IDM at 40. In essence, RGC had the burden to file verification exhibits and certify their accuracy, and Commerce would use its copies to check for any inconsistencies in RGC's filings. IDM at 40. Accordingly, Commerce found that RGC's questionnaire responses were unverified and that RGC "withheld information that was requested by Commerce, failed to provide information by the deadline for submission, significantly impeded this proceeding, and provided information that could not be verified." IDM at 40. Based on the foregoing, Commerce applied AFA to determine that each domestic subsidy program constituted a financial contribution, which conveyed a benefit on the respondents, and was specific, and included those programs in the AFA rate. IDM at 40-41.

Third, Commerce rejected RGC's argument that the AFA rates imposed were unreasonably high. IDM at 41-42. Commerce explained that it calculated the AFA rates in accordance with 19 U.S.C. § 1677e(d)(1)(A) and 19 C.F.R. § 351.308(j), applying a four-tier sequential analysis. IDM at 42-44. Commerce applied the highest above-*de minimis* rate for four programs used by Solarspace, the only cooperating mandatory respondent. IDM at 42. After explaining how rates were calculated, Commerce noted that RGC did not point to any evidence indicated that the subsidies analyzed were not available to the Cambodian solar industry or that the rates were calculated based on aberrational data. IDM at 44. Thus,

Commerce continued to apply the total AFA rate using the methodology set forth in the PDM, only recalculating based on changes in certain programs. IDM at 44.

Fourth, Commerce maintained its determination that ISC Cambodia is a producer or exporter of solar cells. IDM at 45. Commerce explained that RGC's arguments to the contrary were based on information outside the record of the investigation and that, because ISC Cambodia did not respond to the quantity-and-value questionnaire, Commerce applied AFA and determined that ISC Cambodia used and benefitted from all programs at issue in the proceeding. IDM at 45.

Finally, Commerce found that the electricity, customs-duty exemption and related incentives for raw material for export qualified investment projects, and the Business Recovery Guarantee Scheme programs were countervailable, and arguments to the contrary were moot because of the application of total AFA to RGC's questionnaire responses. IDM at 46-48.

## SUMMARY OF THE ARGUMENT

Commerce's final determination is supported by substantial evidence and otherwise in accordance with law. First, Commerce properly applied AFA to RGC under 19 U.S.C. § 1677e(a)-(b) because RGC failed to timely submit verification exhibits and related certifications or a timely extension request and because RGC did not establish extraordinary circumstances justifying its out-of-time request for an extension as required under 19 C.F.R. § 351.302(c). Second, Commerce properly determined that the transnational subsidies examined in the investigation were countervailable because they involved a financial contribution from GOPRC under 19 U.S.C. § 1677(5)(D), provided a benefit under 19 U.S.C. § 1677(5)(E), and the subsidies were *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii). Third, the AFA rate applied to all non-cooperative entities was a lawful application of Commerce's AFA hierarchy in

CVD proceedings under 19 C.F.R. § 351.308(j). Fourth, Commerce appropriately applied AFA to ISC Cambodia to determine the rate which ISC Cambodia should receive for any solar cells it produces in or exports from Cambodia. Fifth, RGC's arguments that the electricity, customs-duty exemption for raw materials, and Business Recovery Guarantee Scheme programs were not countervailable are derivative of its AFA arguments and fail for the same reasons its AFA arguments fail.

## ARGUMENT

### I. Standard of Review

Commerce's determinations, findings, and conclusions must be sustained unless they are unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Courts "hold unlawful and set aside agency action, findings, and conclusions found to be {} arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law{.}" 5 U.S.C. § 706(2). "An abuse of discretion occurs where the decision is based on erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgement in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

Substantial evidence is "'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from

the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Further, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021) (explaining that this "highly deferential review standard recognizes Commerce's special expertise in antidumping duty investigations," and that Federal Circuit affords "tremendous deference" to Commerce's administration of antidumping laws (quotation omitted)). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quotation omitted).

## II. Commerce's Application of AFA to RGC Based on RGC's Failure to Timely Submit Verification Exhibits or Request an Extension Is Supported by Substantial Evidence and Otherwise In Accordance with Law

Commerce's decision to rely on AFA based on RGC's failure to timely submit verification exhibits is supported by substantial evidence and in accordance with law. Under 19 U.S.C. § 1677e(a), where necessary information is not available on the record, or an interested party or any other person (A) withholds information that has been requested, (B) fails to provide such information by the deadlines for submission, (C) significantly impedes a proceeding, or (D) provides such information but the information cannot be verified, Commerce shall use the facts otherwise available in reaching the applicable determination. Additionally, if Commerce

finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. 19 U.S.C. § 1677e(b).

Commerce conducted verification of RGC's questionnaire responses, as required by the statute. *See* IDM at 40-41; *see also* 19 U.S.C. § 1677m(i)(1) ("{Commerce} shall verify all information relied upon in making … a final determination in an investigation{.}"). As part of verification, Commerce requires parties to prepare verification exhibits, certify the accuracy of those exhibits, and file those exhibits on the record of the investigation within five days of the completion of in-person verification. *See* Verification Agenda at 2; *see also* IDM at 39. RGC did not submit its verification exhibits and certifications by the required deadline and did not even seek an extension the deadline until three weeks after it had passed. Verification Exhibit Extension Request at 1. Accordingly, Commerce could not complete verification of the information in RGC's questionnaire responses. IDM at 40. Commerce found RGC withheld information that was requested by Commerce, failed to provide information by the deadline for submission, significantly impeded the proceeding, and provided information that could not be verified under 19 U.S.C. § 1677e(a)(2)(A)-(D). IDM at 40. As such, Commerce relied on facts otherwise available. IDM at 40. Moreover, because by not timely submitting its verification exhibits in order to verify its questionnaire responses, RGC did not cooperate to the best of its ability to comply with Commerce's request for information and, Commerce also employed an adverse inference. IDM at 40-41.

RGC contends Commerce's application of AFA is unlawful for two reasons. First, RGC claims Commerce abused its discretion when denying RGC's out-of-time request for an

extension of time to submit verification exhibits. RGC Br. at 17-22.[1] Second, RGC asserts Commerce was required to include copies of RGC's verification exhibits in the record. RGC Br. at 22-23. Neither argument is availing because Commerce acted within its discretion when denying RGC's untimely extension request and because Commerce was not required to place verification exhibits in the record for RGC when RGC failed to do so.

### A. Commerce Acted Within Its Discretion When Denying RGC's Three-Week-Late Request for an Extension of Time to File Verification Exhibits

Under Commerce's regulations, "{a}n extension request will be considered untimely if it is received after the applicable time limit expires{.}" 19 C.F.R. § 351.302(c)(1). "An untimely request will not be considered {by Commerce} unless the party demonstrates that an extraordinary circumstance exists." 19 C.F.R. § 351.302(c). An extraordinary circumstance is defined in 19 C.F.R. § 351.302(c)(2) as "an unexpected event that: (i) {c}ould not have been prevented if reasonable measure had been taken, and (ii) {p}recludes a party or its representative from timely filling an extension request through all reasonable means." "Examples of extraordinary circumstances include a natural disaster, riot, war, force majeure, or medical emergency. Examples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due." *Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't of Commerce Sep. 20, 2013).

---

[1] RGC's heading states that Commerce "denied due process" when denying RGC's untimely extension request, RGC Br. at 17; however, any due process argument is waived because RGC does not develop such an argument in its motion. *See Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived."). Moreover, a due process argument would fail on the merits because the Federal Circuit "has made clear Commerce's rejection of untimely-filed factual information does not violate a respondent's due process rights when the respondent had notice of the deadline and an opportunity to reply." *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1353 (Fed. Cir. 2015).

This Court reviews Commerce's rejection of a filing as untimely for an abuse of discretion. *Tau-Ken Temir LLP v. United States*, 147 F.4th 1363, 1371 (Fed. Cir. 2025).

> {W}hen evaluating whether Commerce abused its discretion by rejecting a submission as untimely under its own deadlines, relevant considerations generally include: (1) the remedial-not-punitive purpose of the anti-dumping and countervailing-duty laws and the goal of determining margins or rates as accurately as possible; (2) any burden on Commerce in the instant proceeding that would result from accepting the untimely submission; (3) whether any finality concerns would be implicated by accepting the untimely submission; and (4) the late-filing party's efforts (whether as to the untimely submission or throughout the proceeding) and its reasons for the submission's untimeliness.

*Id.* at 1374. The foregoing factors "are non-exhaustive, and the weight of any individual consideration may vary depending on the circumstances." *Id.* at 1374-75.

**1. Commerce's Determination that RGC Failed to Establish Extraordinary Circumstances is Supported by Substantial Evidence and Otherwise in Accordance with Law**

Commerce reasonably concluded that RGC failed to demonstrate extraordinary circumstances to justify its untimely extension request under the standard set forth in 19 C.F.R. § 351.302(c)(2). RGC does not dispute the underlying facts—it merely argues that the facts constitute extraordinary circumstances within the meaning of the regulation. RGC Br. at 18-19.

As Commerce explained, "{t}here was no 'natural disaster, riot, war, force majeure, or medical emergency,' or a similar extraordinary circumstance, preventing {RGC} from seeking a timely extension of the deadline." Extension Denial Letter at 2 (quoting *Extension of Time Limits*, 78 Fed. Reg. at 57,793); *see also* IDM at 38. Commerce also observed RGC's reasons for its untimely request—inexperience, confusion, and internal approval procedures—were more similar to situations unlikely to be extraordinary circumstances, such as insufficient resources or inattentiveness. IDM at 38. In addition to comparing RGC's reasons to the examples provided

to accompany the rule, Commerce analyzed whether RGC met the definition of extraordinary circumstances.

When finding that RGC's circumstances did not prevent RGC from timely filing through reasonable means, Commerce pointed out that RGC had previously timely filed several extension requests and that RGC waited over three weeks after the deadline to submit its out-of-time extension request. IDM at 38. Although RGC points to its inexperience and language barriers to justify its untimely submission, RGC Br. at 18, these factors did not prevent RGC from timely filing several earlier extension requests in this investigation. Request for Extension of Time for Submission of Government's Response to New Subsidy Allegation Questionnaire at 1-2.

RGC focuses on its confusion regarding the requirement to file verification exhibits. RGC Br. at 18-19. However, Commerce explained why RGC's confusion was not reasonable based on the text of the instructions in the verification agenda. IDM at 39. Although the verification agenda uses the word "request" to instruct RGC to file its verification exhibits, Verification Agenda at 2, the document, when read as a whole, clarifies that the filing of verification exhibits is *mandatory*. The verification agenda states Commerce "*will require copies* of certain documents for the verification report." *Id.* at 1 (emphasis added). Additionally, verification exhibits "must be accompanied by" certificates of service and factual accuracy, *id.* at 2-3, which indicates the purpose of filing exhibits is for certification of their authenticity as well as placing the exhibits in the record. Moreover, the verification agenda explains Commerce will compare exhibits taken during verification to exhibits filed following verification, demonstrating that the filing of exhibits is a key part of the verification process. *See id.* at 3 ("If, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided

to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies.”). Thus, the verification agenda put RGC on notice of the requirement to submit verification exhibits and certificates following verification. IDM at 39.

In addition to the written instructions, Commerce considered reminders provided to RGC when analyzing RGC’s reasons for its untimely request. Commerce provided verbal reminders during verification and a reminder email on the day of the deadline. IDM at 39; Briefing Schedule at 4; Extension Request Denial at 2. Although RGC contends Commerce’s latest reminder was “too late,” RGC Br. at 19, RGC ignores that Commerce sent the email as a courtesy following earlier reminders and that RGC had the burden to comply with deadlines and justify untimely extension requests. *See* 19 C.F.R. § 351.302(b)-(c). Commerce concluded that RGC could have taken reasonable steps to prevent the confusion underlying RGC’s untimely extension request. IDM at 39-40. RGC could have reached out to Commerce to seek clarification; indeed, Commerce provided contact information in case RGC had questions. *Id.*

To the extent RGC argues “Commerce didn’t care” about RGC’s difficulties and confusion, RGC Br. at 12, Commerce examined the difficulties and confusion described by RGC and found they did not amount to extraordinary circumstances. Extension Denial Letter at 2; *see also* 19 C.F.R. § 351.302(c)(2). Because Commerce found extraordinary circumstances did not exist, Commerce followed its regulations and rejected the untimely request for an extension of time. *See* 19 C.F.R. § 351.302(c). As such, Commerce followed its regulations, as it must, when denying RGC’s extension request. IDM at 38-39; *see Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) (“Commerce, like other agencies, must follow its own

regulations."); *Kemira Fibres Oy v. United States*, 61 F.3d 866, 875 (Fed. Cir. 1995) ("In fact, we strongly deplore Commerce's or any other agency's failure to follow its own regulations.").

For these reasons, Commerce's determination that RGC's reasons for the delay in filing its verification exhibits and extension request were not "extraordinary circumstances" under 19 C.F.R. § 351.302(c)(2) is supported by substantial evidence and in accordance with law.

#### 2. Relevant Considerations Identified in Federal Circuit Precedent Show Commerce Did Not Abuse Its Discretion When Denying RGC's Untimely Extension Request

Consideration of the factors set forth in *Tau-Ken Temir* further supports the conclusion that Commerce reasonably exercised its discretion.

Beginning with the first consideration, the remedial purpose of CVD investigations and goal of accurately determining rates, Commerce's denial of RGC's untimely request is consistent with that purpose and goal. Commerce's rejection of an untimely submission was not punitive because Commerce followed its regulations relating to the submission of untimely requests for an extension of time under 19 C.F.R. § 351.302(c), which expressly requires extraordinary circumstances and sets a high bar by defining extraordinary circumstances as an unexpected event that could not have been reasonably prevented and precludes the timely filing of an extension request through reasonable means. IDM at 38.

With respect to the second and third considerations, granting the untimely request for an extension of time would have put a burden on Commerce and jeopardized the finality of the proceeding. The deadline for RGC's verification exhibits was January 27, 2025, and Commerce issued verification reports for Solarspace on February 11 and 18 and a verification memorandum for RGC on February 18, 2025. Briefing Schedule at 1, 4; *see also* Verification of Solarspace Technology Co., Ltd. at 1 (Feb. 11, 2025) (P.R. 500), Verification of Solarspace New Energy (Cambodia) Co., Ltd. at 1 (Feb. 18, 2025) (P.R. 501). Also on February 18, 2025, Commerce set

the deadline to submit case briefs as February 25, 2025. Briefing Schedule at 1. The untimely extension request was submitted February 19, 2025, and sought an extension until February 24, 2025, which would necessarily require Commerce to perform an analysis of the verification exhibits submitted, compare them to those taken during verification, and prepare an additional verification report. This is a significant undertaking; for example, the verification report for Solarspace was not ready until more than three weeks after the completion of verification. *See* Briefing Schedule at 1 (stating Solarspace verification concluded on January 24, 2025 and verification report for Solarspace issued February 18, 2025).

To complete the foregoing analysis and report, Commerce would have also had to reset the case brief and rebuttal deadlines and push back all accompanying deadlines in the investigation. *See* Preliminary Determination, 89 Fed. Reg. at 80,876 ("Case briefs or other written comments may be submitted … no later than seven days after the date on which the last verification report is issued{.}"); Briefing Schedule at 1 (explaining rebuttal briefs are due five days after case briefs). Because Commerce needed to complete its final determination by April 18, 2025, the several weeks of delay that granting RGC's untimely request would have caused was likely to jeopardize Commerce's ability to thoroughly and timely complete its determination.[2] The facts here starkly contrast those in *Tau-Ken* , in which Tau-Ken's submission was less than two hours late and the submission was made "more than two months

[2] Because Commerce aligned the deadline for the final determination in the CVD investigation with the final determination in the anti-dumping investigation under 19 U.S.C. § 1671d(a)(1), and the anti-dumping preliminary determination was issued on December 4, 2024, the final determination deadline in the CVD investigation was April 18, 2025. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia*, 89 Fed. Reg. 96,226, 96,228 (Dep't of Commerce Dec. 4, 2024) (preliminary det.) (explaining final determination was "postponed until not later than 135 days after" preliminary determination).

before the preliminary determination and more than five months before the final determination." 147 F.4th at 1375.

Although RGC asserts the burden on Commerce was light because Commerce already possessed copies of verification exhibits, RGC Br. at 21, RGC fails consider the time it would take Commerce to review exhibits following electronic submission, compare those exhibits to copies taken during verification, and prepare a verification report. Further, RGC does not provide any explanation or analysis to support its claim that Commerce had "plenty of time" to verify and consider RGC's untimely verification exhibits. RGC Br. at 21. Indeed, RGC's argument rests on the incorrect statement that it "sought to submit the verification exhibits on February 18, 2025," RGC Br. at 21 (citing Verification Exhibit Extension Request); rather, in a letter dated February 19, 2025, RGC requested an extension until February 24, 2025, to submit verification exhibits. Verification Exhibit Extension Request at 1. Moreover, while RGC points out that case briefing was not completed until March 19, 2025,[3] RGC Br. at 21, it fails to explain how case briefing could have been completed by that date had Commerce granted its request to extend time until February 24, 2025, to submit verification exhibits. Thus, contrary to RGC's arguments, granting RGC's untimely request would have delayed briefing and compromised Commerce's ability to prepare its final determination by April 18, 2025. As in *Dongtai Peak*, "Commerce should not be burdened by requiring acceptance of untimely filings closer to the final deadline for the administrative review." 777 F.3d at 1352.

RGC's conduct and reasons for untimeliness further demonstrate that Commerce acted within its discretion in denying the untimely extension request. When considering "the late-

---

[3] Case briefs were due March 12, 2025, and rebuttal briefs were due March 19, 2025. Placing UN COMTRADE data on the Record and Third Extension of Time for All Interested Parties to Submit Case Briefs at 1 (Mar. 6, 2025) (P.R. 514).

filing party's efforts" and "reasons for the submission's untimeliness," whether "the late-filing party *timely* filed an extension request" is relevant "given the regulation's more exacting 'extraordinary circumstance' standard for untimely filed extension requests." *Tau-Ken*, 147 F.4th at 1374 & n.10 (quoting 19 C.F.R. § 351.302(c)). The Federal Circuit observed "{o}ne important and apparent difference" between *Dongtai Peak*, in which the Court upheld Commerce's rejection of an untimely submission, and *Tau-Ken*, in which the Court found Commerce abused its discretion in rejecting an untimely submission, was that the respondent in *Dongtai Peak* submitted a two-day-late extension request while the respondent in *Tau-Ken* submitted a timely extension request. *Id.* at 1372-73. Here, RGC's extension request was submitted 23 days after the deadline, significantly longer than the delay in *Dongtai Peak*. Verification Exhibit Extension Request at 1.

RGC's conduct "throughout the proceeding" evidences an understanding of both how to timely request extensions and the potential consequences of failing to do so. *Tau-Ken*, 147 F.4th at 1374. RGC sought and received multiple extensions of time when it timely requested them. Extension of Deadline for Initial Questionnaire Response at 1; Second Extension of Deadline for Initial Questionnaire Response at 1; Extension of Deadline for Supplemental Questionnaire Response at 1; Second Extension of Deadline for Supplemental Questionnaire Response at 1. Further, Commerce had previously rejected a 14-day-late extension request when it determined RGC failed to show that it satisfied the extraordinary-circumstances requirement. Denial of Extension to Submit Government's Response to New Subsidy Allegation Questionnaire at 1-2. Thus, RGC was aware of the importance of timely submissions and the standards for timely and untimely extension requests. With that knowledge, RGC elected not to seek an extension until after obtaining counsel. *See* RGC Br. at 19 (stating hiring counsel was catalyst for untimely

extension request). Indeed, counsel for RGC waited a week after being retained to submit the extension request and has not provided any explanation for that delay. RGC Br. at 14.

The reasons provided for RGC's extension request include its inexperience with Commerce proceedings and confusion regarding the requirements for submitting verification exhibits. Verification Exhibit Extension Request at 1-5; *see also* RGC Br. at 18-19. RGC's inexperience, however, was not unexpected because RGC was aware of its unfamiliarity with CVD proceedings. RGC Br. at 21. Yet RGC elected not to seek clarification from Commerce before allowing the deadline to pass, even though Commerce provided contacts for that purpose. Verification Agenda at 3. These facts are dissimilar to those in *Tau-Ken*, where Tau-Ken's counsel showed efforts to comply with handbook advice on electronic filings and timely submitted an extension request soon after encountering unexpected technical issues that could prevent a timely filing of the underlying submission. 147 F.4th at 1368, 1376. Here RGC relied in part on its inexperience with Commerce proceedings to explain its untimely submission, which was not unexpected and could have been avoided by working with Commerce to obtain assistance, as RGC had done previously in the same proceedings.

Moreover, RGC does not provide justification for its over three-week delay in submitting an out-of-time extension request beyond its speculation that such a request would not have been granted. RGC Br. at 19. In *Tau-Ken*, the Federal Circuit emphasized that Tau-Ken's counsel filed the extension request "soon after its counsel encountered technical issues that seemed to jeopardize a timely filing." 147 F.4th at 1376. Likewise, in *Grobest & I-Mei Indus. (Viet.) Co. v. United States*, 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012), this Court considered that the late-filing party "was diligent in seeking to correct {its} omission" and "promptly fil{ed} its late

submission as soon as it discovered the omission." *Id.* at 1367. RGC has not demonstrated similar diligence.

The foregoing considerations support the conclusion that Commerce acted within its discretion when denying RGC's untimely extension request. *Cf. Linyi Chengen Imp. & Exp. Co. v. United States*, 174 F.4th 1351, 1362 (Fed. Cir. 2026) (explaining Commerce has discretion to determine "the appropriate balance between the interests of finality and accuracy"). Accordingly, Commerce lawfully denied RGC's out-of-time request for an extension of time to submit verification exhibits.

### B. Commerce Was Not Otherwise Required to Place RGC's Verification Exhibits in the Record

RGC also argues Commerce itself should have placed the copies Commerce took of the verification exhibits on the record. RGC Br. at 22-23. As an initial matter, "although Commerce *may* develop the administrative record, the *burden* to develop it ultimately rests with interested parties like Plaintiff{}." *Aristocraft of Am., LLC v. United States*, 269 F. Supp. 3d 1316, 1327 (Ct. Int'l Trade 2017) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).

Further, as Commerce explained, simply placing RGC's exhibits collected during verification on the record would not fulfill the purpose of verification:

> The purpose of Commerce taking a copy of verification exhibits is to ensure that the proper verification exhibits are filed onto the record. Where there are inconsistencies between what was filed by an interested party and what Commerce took as verification exhibits, Commerce may use its copy of the verification exhibits to address these inconsistencies.

IDM at 40 (citing Verification Agenda at 2-3; *QVD Food Co.*, 658 F.3d at 1324). In other words, part of Commerce's verification process is comparing what it receives at verification and what is filed to ensure the exhibits are correct. Moreover, the filing of verification exhibits serves the

additional purpose of requiring RGC to "certify the accuracy of its submission." *Id.* Indeed, as Commerce explained, "{i}f Commerce were to place its own verification exhibits on the record, Commerce cannot certify the accuracy of this information on behalf of the {RGC}." *Id.* Thus, Commerce properly rejected RGC's argument that Commerce must place its copies of exhibits on the record.

RGC further cites to 19 U.S.C. § 1516a(b)(2) to support its argument that Commerce must include copies of the verification exhibits on the record of the investigation. RGC Br. at 22-23. However, the RGG's reliance on this statute is misplaced. Section 1516a deals with "*{j}udicial review*" of Commerce determinations and the record presented to the Court, not the administrative record before Commerce. *See* 19 U.S.C. § 1516a (emphasis added). Nothing in § 1516a(b)(2) precludes Commerce from finding questionnaire responses are unverified when a respondent fails to file verification exhibits on the record. Thus, § 1516a(b)(2) is immaterial to the Court's review of the question here: whether Commerce was required to allow RGC to untimely submit and certify its verification exhibits to complete verification of RGC's questionnaire responses. As RGC cites no other authority, Commerce's determination not to place copies of exhibits collected at verification on the administrative record is supported by substantial evidence and in accordance with law.

## III. <u>Commerce Can Countervail Transnational Subsidies</u>

RGC argues that Commerce impermissibly countervailed programs provided by GOPRC. RGC Br. at 23. Accordingly, RGC claims Commerce cannot countervail subsidies provided from GOPRC to companies in Cambodia. RGC Br. at 26. However, RGC's argument is contrary to the plain language and context of the relevant statutes, which demonstrate that Commerce can countervail transnational subsidies.

### A. **Relevant Background Relating to the Revocation of the Regulation Prohibiting the Countervailing of Transnational Subsidies**

The Tariff Act of 1930 authorized the assessment of countervailing duties "{w}henever any country … shall pay or bestow … any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country{.}" Tariff Act of 1930, § 303, 46 Stat. 687; *see also* 19 U.S.C. § 1303(a)(1), *repealed by* Pub. L. No. 103-465, title II, § 261(a), 108 Stat. 4908 (1994). Thus, by explicit statutory mandate, countervailing duties could only be imposed on bounties or grants from the same country in which the manufacturing or production of the merchandise occurred. However, Congress—in the Trade Agreements Act of 1979—created 19 U.S.C. § 1671. *See* Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144. While the 1979 amendments partially retained § 1303,[4] the new § 1671(a)(1) contained certain key distinctions from the old § 1303. As relevant here, § 1671(a)(1) adopted the term "subsidy" rather than the "bounty or grant" language used in § 1303(a)(1). Section 1671(a)(1) also removed § 1303(a)(1)'s requirement that the country providing the subsidy be the same as the country of manufacture or production. In 1994, Congress fully repealed § 1303 with the passage of the Uruguay Round Agreements Act (URAA). Pub. L. No. 103-465, §§ 261, 262, 108 Stat. 4908. The URAA further modified the countervailing duty framework to its current form.

In 1998, Commerce promulgated 19 C.F.R. § 351.527, which was based on the agency's prior interpretation of the repealed § 1303, and stated, with the limited exceptions of subsidies provided to international consortia or upstream subsidies, that a subsidy did not exist if

---

[4] Countries that were "a country under the {Subsidies} Agreement" became subject to an injury test and investigation under § 1671(a)(1), while countries that were not under the Subsidies Agreement were not subject to that injury test were still subject to § 1303(a)(1) until its repeal. Pub. L. No. 96-39, 93 Stat. 144.

Commerce determined the subsidy was supplied "{b}y a government of a country other than the country in which the recipient firm is located{.}" 19 C.F.R. § 351.527 (1998); *see also Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, Final Rule*, 89 Fed. Reg. 20,766, 20,826 (Dep't of Commerce Mar. 25, 2024) (*RISE Final Rule*). At that time, Commerce's administrative experience was that "'the government of a country normally provides subsidies for the general purpose of promoting the economic and social health of *that* country and its people, and for the specific purpose of supporting, assisting, or encouraging domestic manufacturing or production{.}'" *Regulations Improving and Strengthening Enforcement of Trade Remedies Through the Administration of Antidumping and Countervailing Duty Laws,* 88 Fed. Reg. 29,850, 29,870 (Dep't of Commerce May 9, 2023) (*RISE Proposed Rule*) (quoting *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,847 (Dep't of Commerce Feb. 26, 1997) (*CVD Proposed Rule*) (emphasis added)). Commerce also thought that the repeal of § 1303 had not necessarily eliminated the transnational subsidies rule. *See Preamble, Countervailing Duties*, 63 Fed. Reg. 65,348, 65,405 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).

Over the next two decades, Commerce observed that situations in which a government subsidizes production in another country had become increasingly prevalent.[5] In 2023, Commerce proposed eliminating 19 C.F.R. § 351.527, explaining that its past interpretation of § 1671 was overly restrictive and that the statute did not prohibit Commerce from countervailing transnational subsidies outside the context of an international consortium or upstream subsidy.

[5] Commerce specifically noted China's initiatives in driving capacity in other countries and propping up other countries' export platforms. *See RISE Final Rule*, 89 Fed. Reg. at 20,826.

*RISE Proposed Rule*, 88 Fed. Reg. at 19,870. After undertaking notice-and-comment rulemaking, Commerce published a final rule that withdrew 19 C.F.R. § 351.527, stating that, "when appropriate, Commerce will investigate and countervail transnational subsidies." *See RISE Final Rule*, 89 Fed. Reg. at 20,826. In doing so, Commerce observed that 19 U.S.C. § 1671 did not impose geographic limitations on countervailing transnational subsidies and reiterated that its former interpretation of the statute was overly restrictive, as nothing in that statute prohibited countervailing duties on subsidies provided by a government or public entity in one country that benefit producers or exporters in another. *Id.* at 20,826. Indeed, as Commerce stated, restricting the ability to countervail transnational subsidies that injured domestic producers would be inconsistent with the very purpose of the countervailing duty laws. *Id.*

Commerce further explained that, as opposed to 25 years ago when the regulation limiting Commerce's ability to countervail transnational subsidies was issued, the current landscape included "governments provid{ing} cross-border equity infusions, fundings, loans, *etc.*" that "promote the grantor country as well as the recipient's country manufacturing capacities for a particular industry{,} as well as "direct investments in a third country from state-owned enterprises{.} *Id.* at 20,826-27.

**B. The Statutory Framework for Countervailing Duties Allows Commerce to Countervail Transnational Subsidies**

As the Court of Appeals for the Federal Circuit has recently confirmed, Commerce has broad delegated authority to fill in the details of a statutory scheme, particularly where Congress is silent on an issue. *See Archroma U.S., Inc. v. Dep't of Commerce*, --- F.4th ----, No. 2024-2159, 2026 WL 2275132, at *5-6 (Fed. Cir. Aug. 7, 2026). Here, the countervailing duty statute explicitly authorizes Commerce to assess duties when the government of a country is providing a subsidy that constitutes a financial contribution, confers a benefit, and is specific. But Congress

did not limit countervailable subsidies to only those provided by the government of the same country as the country where the subject of the investigation is physically located. As such, Commerce properly exercised its authority to find that transnational subsidies can be countervailable and RGC cannot demonstrate that countervailing transnational subsidies conflicts with the countervailing duty statutes.

### 1. The Plain Text and Context of 19 U.S.C. § 1671 Permits Commerce to Assess Duties on Transnational Subsidies

Nothing in the plain language of 19 U.S.C. § 1671(a) prohibits Commerce from assessing countervailing duties on transnational subsides; as such, Commerce—with its discretion and flexibility to carry out countervailing duty laws—may countervail transnational subsidies so long as the statutory requirements are otherwise met. Subsection (a) states:

> If … {Commerce} determines that the government of *a country* or any public entity within the territory of *a country* is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold, (or likely to be sold) for importation, into the United States … there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.

19 U.S.C. § 1671(a) (emphasis added). The indefinite article "a" in the phrase "a country" to describe the authority providing a subsidy does not require the country of the authority providing a countervailable subsidy to be the same as the country in which the company receiving the subsidy is located; rather, it allows Commerce to impose countervailing duties on transnational subsidies provided by "a country" so long as the merchandise at issue is imported or sold for importation (or likely to be sold) into the United States. Put simply, Congress, by deliberately using the phrase "a country" without further restrictions, has permitted Commerce to countervail

subsidies even if they originate from the government of a country that is not the country of manufacture or production of the product at issue.

While RGC argues that Commerce's interpretation places excessive importance on the words "a government of a country," RGC in no way explains why Commerce, or this Court, should ignore the plain language of the statute. *See* RGC Br. at 27-28. Indeed, if Congress had meant to restrict Commerce's ability to countervail transnational subsidies, it would have cabined the language to the government of "*the* country" in which the subsidy is received or state that the government of a country is providing a countervailable subsidy with respect to the manufacture, production, or export of merchandise *in that country*. That it chose not to is telling, particularly given that § 1671 was the direct successor to former § 1303, which stated explicitly that countervailing duties would be levied "whenever any country … shall pay or bestow … any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced *in such country*{.}" 19 U.S.C. § 1303 (repealed 1994); *see also United States v. Wells*, 519 U.S. 482, 493 (1997) (holding that, when "Congress deliberately dropped the term 'materiality{,}" it did not "intend{} materiality to be an element of the {statute}"); *Burrus v. Vegliante*, 336 F.3d 82, 89 (2d Cir. 2003); *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). Former § 1303 demonstrates that Congress knew how to limit countervailing duties to only subsidies from the governments of countries in which the manufacturing and production of the merchandise took place; the Court should not ignore Congress's deliberate decision to remove this restriction when enacting § 1671.

Additionally, in defining "subsidy" and "authority," 19 U.S.C. § 1677(5)(B) similarly employs indefinite articles, defining a subsidy as a situation in which "*an* authority provides a financial contribution" (emphasis added) and an "authority" as "*a* government of *a* country or any public entity within the territory of the country" (emphasis added). Like § 1671(a), § 1677(5)(B) contains no restriction, or even implication, that the authority providing the subsidy must be from the same country as the merchandise being subsidized.[6]

**2. Allowing Commerce to Countervail Transnational Subsidies Would Not Render 19 U.S.C. § 1671(d)-(e) Superfluous**

RGC asserts that allowing Commerce to countervail transnational subsidies outside the context of an international consortium or upstream subsidy allegation would render 19 U.S.C. § 1671(d)-(e) superfluous and would contravene a rule of statutory construction, *expressio unius est exclusion alterius*.[7] RGC Br. at 24-25. However, RGC's arguments fall short.

While subsections (d) and (e) indeed grant Commerce explicit authority to investigate—respectively—international consortiums and upstream subsidies and provide frameworks for how to do so under those scenarios, they do not restrict Commerce from otherwise investigating transnational subsidies and would not be rendered superfluous if the statute were interpreted as allowing Commerce to do so. These subsections create frameworks under which Commerce countervails subsidies either provided indirectly or through membership in a consortium, as

---

[6] Although RGC contends § 1677(5)(B) indicates Commerce is prohibited from countervailing subsidies from third-party countries, RGC Br. at 24, its argument is based on reading the definition as "government of a country … within a country" rather than "government of a country" or "any public entity within the territory of the country," which would be redundant and illogical.

[7] "The statutory interpretive canon of expressio unius est exclusio alterius, provides that expressing one item of an associated group or series excludes another left unmentioned." *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 425 (Fed. Cir. 2018) (alteration adopted) (quotation omitted).

opposed to the type of subsidies at issue here. *See* 19 U.S.C. § 1671(d) (directing Commerce to countervail subsidies provided to entity "to assist, permit, or otherwise enable their participation in that consortium"); *id.* § 1671(e) (directing Commerce to include amount of any upstream subsidy, as described in section 1677-1(a), in assessing countervailing duties); *id.* § 1677-1(a) (defining upstream subsidy as subsidy provided to input product and stating that customs union of multiple countries will be treated as singular country for purposes of provision). Neither provision implies that Commerce may otherwise only investigate subsidies from the government of only one country—that of manufacture or production; instead, they recognize that, under certain specific factual scenarios, multiple countries may be involved in a singular subsidy scheme and provide guidance for how Commerce is to address the situation. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("{T}he canon *expressio unius est exclusion alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." (quotation omitted)).

Subsections (d) and (e) thus apply in limited factual circumstances and do not prohibit Commerce from generally countervailing subsidies provided by the government of one country to a company in the country under investigation in a proceeding. Nor does a general authority to countervail subsidies from a single third-country government subsume or render superfluous those subsections. As Commerce explained, while "{a}n interested party may still allege a subsidy pursuant to sections {1671(d) or (e)} if the case specific facts are more aligned with these frameworks.{,}" "the existence of those provisions does not impinge on whether Commerce may investigate and countervail transnational subsidies under distinct fact patterns."

IDM at 12-13. Multiple countries acting together to provide subsidies is not the same as the government of a particular country providing subsidies to a company located in another country.

The continuing applicability of subsections (d) and (e) has been evidenced by Commerce's actual actions since the repeal of 19 C.F.R. § 351.527. For example, in the countervailing duty investigation of epoxy resins from Korea, Commerce considered whether the relationship between several Chinese and Korean companies constituted an international consortium. *See Certain Epoxy Resins from the Republic of Korea*, 90 Fed. Reg. 14,605 (Dep't of Commerce Apr. 3, 2025), and accompanying IDM at Cmt. 22 (*Epoxy Resins* IDM). While Commerce ultimately determined that the requirements for finding an international consortium under § 1671(d) were not satisfied, it still examined the relationship under that subsection. In the same investigation, Commerce determined that the cross-border provision of certain inputs for LTAR from China constituted a countervailable subsidy under 19 U.S.C. § 1677(A)-(E), 1677(5A), *not* § 1671(d) or (e). *See Epoxy Resins* IDM at Cmt. 18. And in an investigation of certain van-type trailers from Mexico, Commerce similarly examined whether the relationship between Mexican and Korean companies constituted an international consortium, though preliminarily determining that the requirements of section 1671(d) were not met. *See Certain Van-Type Trailers and Subassemblies Thereof from Mexico*, 91 Fed. Reg. 34,218 (Dep't of Commerce June 5, 2026), and accompanying PDM at 37.

As Commerce explained, "{t}he existence of a transnational subsidy {is} case-specific" and its "methodology in investigating and countervailing any other transnational subsidy programs in subsequent cases may develop over time, depending on the case-specific circumstances before {it}." IDM at 13 (citing *RISE Final Rule*, 88 Fed. Reg. at 20,827). While Commerce will examine subsidies provided to an international consortium by multiple countries

under § 1671(d) and an upstream subsidy provided by an association of multiple countries constituting a customs union under § 1671(e), Commerce is still permitted under the statute to investigate an alleged transnational subsidy pursuant to § 1671(a) and to assess duties on such a subsidy so long it determines the existence of a countervailable subsidy—*i.e.,* an authority provided a financial contribution conferring a benefit the subsidy is specific. 19 U.S.C. §§ 1671(a), 1677(5)(A)-(E), 1677(5A).

### 3. Commerce Is Not Statutorily Prohibited from Finding That a Transnational Subsidy Is Specific

RGC argues that a transnational subsidy cannot be specific because, under 19 U.S.C. § 1677(5A)(D), subsidies can only be specific if they are granted "to an enterprise or industry within the jurisdiction of the authority providing the subsidy{.}" RGC Br. at 26. But, while RGC contends "within the jurisdiction" means the recipient of a subsidy must be within the geographic territory of the authority providing the subsidy, *id.*, nothing in the statute supports this overly restrictive reading. While we do not contest that geographic jurisdiction could satisfy the statutory requirement, there is no reason to infer that legal jurisdiction cannot also do so.

There is no ambiguity to the word "jurisdiction" here and this Court well understands that jurisdiction is not only territorial but legal (*e.g.*, subject matter jurisdiction). The Federal Circuit and this Court have frequently used "within" to describe subject matter jurisdiction, which is clearly not geographic or territorial in nature. *See, e.g.*, *Beasley v. Shinseki*, 709 F.3d 1154, 1157 (Fed. Cir. 2012) (discussing "legal issues within our jurisdiction"); *United States v. Maverick Mktg., LLC*, 322 F. Supp. 3d 1373, 1379 n.12 (Ct. Int'l Trade 2018) ("The type of claim at issue here is a matter already within the jurisdiction of this Court."); *Former Emp. of Drive Sol Glob. Steering, Inc. v. U.S. Sec'y of Lab.*, 181 F. Supp. 3d 1369, 1379 (Ct. Int'l Trade 2016) ("Plaintiff's challenge … is not a matter within the Court's jurisdiction."). Because RGC cannot

establish the statute precludes Commerce from finding specificity for transnational subsidies, the language in § 1677(5A)(D) does not undermine Commerce's authority to assess countervailing duties on such subsidies.

As Commerce found regarding the Belt and Road Initiative, Chinese law demonstrates that "outbound investment by state-invested enterprises and their subsidiaries at all levels outside of China are subject to Chinese law. … As a result, we are finding that this program is *de facto* specific{.}" IDM at 26. Commerce further explained with regard to the provision of inputs for LTAR:

> {O}utbound investment by state-invested enterprises and their subsidiaries at all levels outside China are subject to Chinese law. … {A} "state-invested enterprise" is defined as a "wholly state-owned enterprise or company with the state being the sole investor, or a company in which the state has a stake, whether controlling or non-controlling{.}"

*Id.* at 33 (internal citations omitted) (emphasis removed). Indeed, Commerce found that "Solarspace Tech, the Chinese parent company and majority shareholder to Solarspace, has several state-owned and state-controlled investors, and therefore, under GOPRC's State-Owned Assets Law, is considered a 'state-invested enterprise.'" *Id.* (citations omitted). Commerce thus reasonably found that, because the companies at issue were subject to Chinese law, they were within the jurisdiction of the Chinese government despite being physically located outside of China.

RGC does not meaningfully dispute Commerce's factual findings regarding the jurisdiction of GOPRC. To the extent RGC attempts to raise such a challenge, it has failed to exhaust its administrative remedies. In its case brief before Commerce, RGC made no mention of the programs it now alleges are unlawfully countervailed transnational subsidies. *See generally* RGC Case Brief. Under 28 U.S.C. § 2637(d), Congress expressly mandated that the

Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's countervailing duty determinations. This Court "generally takes a strict view of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (quotation omitted).

Parties may only avoid the requirement to exhaust their administrative remedies if their argument falls into one of a few limited exceptions, including: "(1) plaintiff's argument involves a pure question of law; (2) there is a lack of timely access to the confidential record; (3) a judicial decision rendered subsequent to the administrative determination materially affected the issue; or (4) raising the issue at the administrative level would have been futile." *Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1326 (Ct. Int'l Trade 2024) (quotation omitted); *see also Corus Staal*, 502 F.3d at 1378 n.4. These exceptions, however, do not apply here.

There was no issue regarding timely access to the confidential record, nor has there been a subsequent judicial decision on the transnational subsidy issue. The "pure question of law" exception is also inapplicable because whether these companies were within the jurisdiction of GOPRC is a factual question that requires scrutiny of the relevant companies' relationships with GOPRC to determine if the companies are within the jurisdiction of the granting authority for purposes of the subsidies they received. *See* 19 U.S.C. § 1677(5A)(D) (stating that, for subsidy to be countervailable, subsidy must be "a specific subsidy, in law or in fact, to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*" (emphasis added)). The futility exception is also unavailing because Commerce in the IDM considered party comments and made certain changes to its determination, including arguments made by GOPRC and petitioner related to transnational subsidies. *See, e.g.*, IDM at Comment 2 (discussing changes to

benchmarks selected for measuring benefit of provision of inputs from China for LTAR); *see also Corus Staal*, 502 F.3d at 1379 (stating futility exception requires party to show they "would be required to go through obviously useless motions" and "{t}he mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust its administrative remedies" (quotation omitted)).

### C. Commerce's Change in Position is Insufficient to Support RGC's Statutory Interpretation Argument

RGC complains that Commerce, in its final determination, failed to meaningfully address the issue of its authority to countervail transnational subsidies. RGC Br. at 24, 27-29. But RGC conflates Commerce's final determination to countervail certain transnational subsidies in this specific proceeding with the issue of whether Commerce was permitted to countervail transnational subsidies under the statute at all, which is a legal issue. For the reasons explained above, Commerce can countervail transnational subsidies based on the plain language of the statute. In determining to countervail the transnational subsidies in this case, Commerce was required to consider the record evidence and explain its reasoning. RGC also ignores Commerce's extensive analysis regarding its change in position. *See* IDM at Comment 1; *RISE Final Rule* at 20,826-27.

To the extent RGC argues Commerce's regulations are unreasonable even if permissible under the statute, that contention is also unavailing. The Federal Circuit has recently confirmed that the Tariff Act authorizes Commerce to "fill up the details" of a statutory scheme. *Archroma*, 2026 WL 2275132, at *5. In doing so, the Court emphasized Commerce's "broad delegated authority" to effectuate the statutory scheme, particularly when the language in the relevant statute is silent. *Id.* at *6. Here, although Commerce did not prescribe a regulation memorializing its authority to assess duties on transnational subsidies, it nonetheless filled in the

details of the statutory scheme by explaining why the statute permitted it to countervail transnational subsidies and exercised its discretion in withdrawing 19 C.F.R. § 351.527.[8]

Because the statute does not limit Commerce's authority to investigate subsidies based on the country they originate from, "Congress's silence on this issue, in combination with its delegation of authority … clears the path for" Commerce to fill in the details of how and when to countervail subsidies. *Id.* at *6 (quoting *Lesko v. United States*, 161 F.4th 1352, 1360 (Fed. Cir. 2025) (*en banc*)). This Court's decision in *Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025), confirms as much. *Id.* at 1347-48 (relying on *Loper Bright* and *Seven County* to hold that Congress intended Commerce to have reasonable flexibility in carrying out countervailing duty laws).

Moreover, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress. *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided prior to *Chevron*). And indeed, Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference:

> This court has recognized that the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. This deference is both

[8] We recognize that in *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024), the Court stated that Commerce's authority to issue regulations to implement the statute does not necessarily empower it to give meaning to statutory terms. *Id.* at 1357-58. However, *Ventura* dealt with the interpretation of the word "partners" in 19 U.S.C. § 1677(33)(C). *Id.* That is very different from Commerce exercising its authority in determining that it can countervail transnational subsidies under the statute, and recognizing this authority would not render *Loper Bright* meaningless. Moreover, *Ventura* was issued before the Federal Circuit's decisions in *Archroma* and *Mosaic*, and the Court must consider the impact of those cases.

> greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (applying this distinct deference separately from and concurrently with *Chevron* deference in force); *accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework"). Therefore, general statutory terms implicitly delegate authority to Commerce and give it flexibility. *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025). The statutory provisions at issue here do not limit or restrict Commerce from determining what constitutes a subsidy is so long as it meets the financial contribution, benefit, and specificity requirements.

When Congress has delegated authority to an agency, the reviewing court independently interprets the statute and effectuates the will of Congress "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024) (quotation omitted). Here, Congress has delegated to Commerce the authority and discretion to effectuate the URAA; the Court should therefore consider Commerce's broad authority to countervail transnational subsidies in light of the guidelines set in *Loper Bright*, *Lesko*, *Archroma*, and *Mosaic*. And, in determining whether Commerce acted arbitrarily and capriciously, it should consider the final determination in conjunction with the proposed and final rules revoking 19 C.F.R. § 351.527 and paving the way for Commerce to exercise its authority under the statute to countervail transnational subsidies.

*See Archroma*, 2026 WL 2275132, at *6-7 (confirming that, when issue fits within bounds of Commerce's delegated power, only other question is whether Commerce engaged in reasoned decision-making).

RGC does not argue that Commerce acted arbitrarily and capriciously in repealing 19 C.F.R. § 351.537. Nor could it reasonably do so, given that Commerce complied with notice-and-comment rulemaking requirements and adequately explained its rationale for withdrawing the regulation. *See generally RISE Proposed Rule*, 88 Fed. Reg. at 29,870, *RISE Final Rule* at 20,826-20,827. Commerce explained its logic at the time it promulgated the regulation and the subsequent shift in foreign governments' motivations to provide third-country subsidies, acknowledged that its prior interpretation of 19 U.S.C. § 1671(a) was overly restrictive, found that the statute does not prohibit it from countervailing transnational subsidies, and considered and responded to the comments on the proposed rule. *RISE Final Rule* at 20,826-20,827. While RGC argues that under Commerce's position "the presumptions underlying the law have changed," RGC at 29, RGC misunderstands Commerce. The presumptions underlying the law remain unchanged; rather, it is the presumptions Commerce held in issuing its regulatory prohibition that have changed. *See* IDM at 9-12.

## IV. Commerce's Calculation of the AFA Rate is Supported by Substantial Evidence and Otherwise In Accordance With Law

Commerce is afforded significant discretion in determining the appropriate AFA rate. *KYD, Inc. v. United States*, 607 F.3d 760, 765 (Fed. Cir. 2010). In this case, Commerce determined the AFA rate in accordance with 19 U.S.C. § 1677e(d)(1)(A) and 19 C.F.R. § 351.308(j), which together establish the four-tier sequential analysis, or "AFA hierarchy," which Commerce normally uses to determine the appropriate AFA rate in CVD proceedings and the use of which has been upheld by the Federal Circuit and this Court. IDM at 41-42; *see, e.g.*,

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1352-54 (Fed. Cir. 2021) (summarizing statutory and regulatory framework); *Bio-Lab, Inc. v. United States*, 487 F. Supp. 3d 1291, 1301-02 (Ct. Int'l Trade 2020) (upholding Commerce's application of AFA hierarchy); *Trans Tex. Tire, LLC v. United States*, 519 F. Supp. 3d 1289, 1307 (Ct. Int'l Trade 2021) (same).

At the first step of Commerce's hierarchy, under 19 C.F.R. § 351.308(j)(1)(i), Commerce applied the highest above-*de minimis* rate calculated for a cooperating company for the identical program in the investigation. IDM at 42. This allowed Commerce to determine the AFA rate using four programs used by Solarspace. *Id.*

Moving to the second step, where no rate exists in the investigation, Commerce determines if an identical program was used in another proceeding involving the same country. 19 C.F.R. § 351.308(j)(1)(ii). This was the first investigation involving Cambodia, and thus no identical programs were used in other CVD proceedings in Cambodia. IDM at 42.

At the third step, Commerce will determine if there is a similar or comparable program in any CVD proceeding involving the same country and apply the highest above *de minimis* rate for a similar or comparable program. 19 C.F.R. § 351.308(j)(1)(iii). In this investigation, Commerce found tax programs to be similar and therefore applied Solarspace's highest rate from a tax program to other tax programs at issue. IDM at 42-43. Commerce made the same finding and followed the same procedure for LTAR programs. *Id.* at 43.

Fourth and finally, where no rate exists for a similar or comparable program, Commerce applies the highest above *de-minimis* rate from any non-company-specific program in a countervailing proceeding involving the same country that the company's industry could possibly use. 19 C.F.R. § 351.308(j)(1)(iv). Here, Commerce found there was not a similar

program to which it could compare loan programs. IDM at 43-44. Accordingly, Commerce applied the highest rate of Solarspace's four measurable programs, which was the provision of silicon glass for LTAR, for which Commerce calculated a 471.25 percent rate. *Id.* at 42, 44, 50.

RGC argues that the AFA rates selected were "unlawfully and outrageously high." RGC Br. at 29. Without citation, RGC claims the combined AFA rate for 17 different programs is "higher than any rate in Commerce's history." RGC Br. at 30. RGC cites no authority for its position that AFA rates must be analyzed in the aggregate rather than for each specific program to which they apply. RGC Br. at 30-32; *cf. ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285, 1301 (Ct. Int'l Trade 2018) (noting party "identifie{d} no authority that requires Commerce to consider the aggregate effect on a company's overall subsidy rate in selecting AFA for a particular program-specific rate").

RGC contends that Commerce erred in concluding the cross-border provision of Chinese silicon wafer for LTAR, a Chinese subsidy, is the same or similar to Cambodian loan and tax programs. RGC Br. at 31. However, Commerce did not find that Cambodian tax and loan programs were similar to Chinese LTAR programs. Commerce applied the highest rate calculated for Solarspace's tax programs to similar tax programs. IDM at 42-43, 50. Likewise, Commerce applied Solarspace's highest LTAR rate to other LTAR programs. *Id.* For the loan programs, Commerce found there was no similar program, and accordingly resorted to the highest above *de-minimis* rate from any non-company-specific program in a countervailing proceeding involving the same country that the company's industry could possibly use. IDM at 43-44, 50; *see also* 19 C.F.R. § 351.308(j)(1)(iv) .

Further, RGC argues "Courts have interpreted the statue as requiring the AFA rate to be a reasonably accurate estimate of the respondent's actual rate." RGC Br. at 30 (citing *F.lli De*

*Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). However, 19 U.S.C. § 1677e(d)(3) states, if Commerce "uses an adverse inference under subsection (b)(1)(A) in selecting among the facts otherwise available, {Commerce} is not required, … (B) to demonstrate that the countervailable subsidy rate … used by {Commerce} reflects an alleged commercial reality of the interested party." Moreover, the AFA rate applied to RGC was based entirely on rates which were calculated in this proceeding, in accordance with Commerce' AFA hierarchy. RGC fails to explain how each underlying AFA rate is unsupported by substantial evidence or otherwise miscalculated, instead making generalized complaints about rates being too high. RGC Br. at 29-32. Indeed, although RGC claims the rates calculated have "no basis in fact," RGC Br. at 32, RGC ignores that Commerce relied on rates calculated for a cooperating respondent, Solarspace, and RGC does not present any challenge to the rates calculated for the four programs Solarspace used. Moreover, RGC has not come forward with "evidence that the rate for any subsidy program is based on aberrational data or is otherwise unsupported." IDM at 44.

For the reasons explained above, this Court should reject RGC's argument that Commerce's AFA rates are unreasonable.[9] *Zhaoyuan Junbang Trading Co. v. United States*, 822 F. Supp. 3d 1342, 1360 (Ct. Int'l Trade 2026) ("Because Plaintiffs have not challenged Commerce's AFA rate by articulating any basis upon which the Court could conclude that Commerce's selection of the highest rate was unlawful, the Court sustains Commerce's AFA rate determination as in accordance with law and supported by substantial evidence.").

---

[9] To the extent RGC argues that, if it prevails in its argument that the transnational subsidies at issue in this case are not countervailable, the AFA rate will require recalculation, we explain above why Commerce lawfully concluded that these transnational subsidies are countervailable.

**V. Substantial Evidence Supports Commerce's Inclusion of ISC Cambodia in this Investigation as a Producer and/or Exporter of Solar Cells from Cambodia**

RGC contends that ISC Cambodia is a government entity, not a producer or exporter of subject merchandise, therefore Commerce should remove ISC Cambodia from the list of subject producers and importers. RGC Br. at 32-33. In support, RGC cites an email from the Cambodian embassy that includes a link to a Commerce webpage on Cambodian trade standards as well as the petition, which lists ISC Cambodia with a ".gov.kh" web address. *Id.* (citing Email Correspondence (Feb. 4, 2025) (P.R. 496), and Petition at Exhibit I-23).

ISC Cambodia received, but did not respond to, Commerce's quantity-and-value questionnaire. PDM at 12; IDM at 45. As such, Commerce determined ISC Cambodia withheld necessary information that was requested of it, failed to provide information within the deadlines established, and significantly impeded the proceeding under 19 U.S.C. § 1677e(a)(2)(A)-(C). PDM at 12; IDM at 45. Commerce preliminarily applied AFA to ISC Cambodia because, in failing to respond to the quantity-and-value questionnaire, ISC Cambodia did not act to the best of its ability to comply with requests for information under 19 U.S.C. § 1677e(b). IDM at 45 (citing PDM at 12). For these reasons and to "ensure{} that ISC Cambodia {did} not obtain a more favorable result by failing to cooperate than if they had fully complied with {Commerce's} request for information{,}" Commerce applied the AFA rate to ISC Cambodia. PDM at 12.

RGC does not dispute that ISC Cambodia received and failed to respond to Commerce's questionnaire. RGC Br. at 32-33. RGC also does not argue that the information it submitted via email was timely. RGC Br. at 32-33. Accordingly, any such challenges are waived for failure to present them in RGC's motion for judgment on the agency record. *See Kaptan Demir Celik Endustrisi v. Ticaret A.S.*, 803 F. Supp. 3d 1291, 1307 (Ct. Int'l Trade 2025) ("{T}he party must include its arguments in its opening brief to the court; arguments omitted from the opening brief

are considered waived."); *Dong-A Steel Co. v. United States*, 527 F. Supp. 3d 1350, 1358 (Ct. Int'l Trade 2021) ("{I}t is axiomatic that any claim which is not pressed is deemed abandoned." (quotation omitted)).

Rather, RGC asserts Commerce should have intuited, without any questionnaire response, that ISC Cambodia was incorrectly listed in the petition as a producer and exporter of subject merchandise. RGC Br. at 32-33. In making this argument, RGC relies on an email RGC sent to Commerce; however, RGC ignores that the factual information contained in this email was not accepted as part of the record. After receiving RGC's *ex parte* email regarding a website containing information on ISC Cambodia, Commerce placed the email in the record solely to document the communication but informed RGC "the deadline to submit factual information has passed and we will not be accepting any new factual information at this time." Email Correspondence at 2; IDM at 45. It was ISC Cambodia's, and RGC's, burden to timely develop the administrative record with information regarding ISC Cambodia's activities. *See Aristocraft of Am.*, 269 F. Supp. 3d at 1327 ("{A}lthough Commerce *may* help develop the administrative record, the *burden* to develop it ultimately rests with interested parties like Plaintiffs."). Thus, while RGC "argue{s} that Commerce should have done more, they unwittingly concede that they did too little." *Id.*

Because RGC does not identify record evidence timely submitted to Commerce establishing that ISC Cambodia is not a producer or exporter of subject merchandise, Commerce's application of the AFA rate to ISC Cambodia is supported by substantial evidence and in accordance with law.

## VI. RGC's Challenge to Commerce's Application of Countervailing Duties to Certain Programs Fails Because RGC's Challenge to Commerce's Application of AFA Fails

To close RGC asserts it "should be given a fresh opportunity to address any decision Commerce dismissed as moot," specifically the electricity programs, customs duty exemptions for raw materials program, and Business Recovery Guarantee Scheme. RGC Br. at 33-34. RGC's argument here is entirely derivative of its above argument regarding the application of AFA. However, for the reasons explained above, Commerce's decision to apply AFA to RGC is supported by substantial evidence and otherwise in accordance with the law. Because the application of AFA is RGC's sole basis for challenging Commerce's determination with respect to these three programs, and the application of AFA should be sustained, this Court should sustain Commerce's findings regarding these three programs.

## CONCLUSION

For these reasons, we respectfully request the Court deny RGC's motion, sustain Commerce's final determination, and enter judgement for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

REBECCA T MITCHELL
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 616-0467
Email: Rebecca.Mitchell@usdoj.gov

*Attorneys for Defendant*

Of Counsel:

KARL MUELLER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

August 17, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(b)(1) of the Standard Chambers Procedures of this Court, that this brief contains 13,639 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Rebecca T. Mitchell
REBECCA T. MITCHELL