**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **ROYAL GOVERNMENT OF CAMBODIA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br>**Defendant,**<br><br>**and**<br><br>**AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,**<br><br>**Defendant-Intervenor.** | **Before: Hon. Lisa W. Wang, Judge**<br><br>**Court No. 25-00173** |

# DEFENDANT-INTERVENOR AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE'S RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

**Timothy C. Brightbill, Esq.**
**Laura El-Sabaawi, Esq.**
**Stephanie M. Bell, Esq.**
**Kimberly A. Reynolds, Esq.**
**Stephen A. Morrison, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

***Counsel to the American Alliance for Solar Manufacturing Trade Committee***

**Dated: October 5, 2026**

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ..... 1

II. RULE 56.2 STATEMENT ..... 2

A. Administrative Decision Under Review ..... 2

B. Issues of Law Presented ..... 3

III. FACTUAL BACKGROUND ..... 3

IV. STANDARD OF REVIEW ..... 3

V. SUMMARY OF ARGUMENT ..... 5

VI. ARGUMENT ..... 6

A. Commerce Did Not Abuse Its Discretion in Rejecting Cambodia's 23-Day Late Extension Request and Applying Adverse Facts ..... 6

1. Cambodia Cannot Avoid Its Obligation to File Certified Verification Exhibits by Pointing to Working Copies Retained by Commerce ..... 6

2. Commerce Reasonably Denied Cambodia's Twenty-Three-Day-Late Extension Request ..... 9

3. Cambodia's Request for Far-Reaching Remand Fails in Any Event ..... 13

B. Commerce Lawfully Countervailed Transnational Subsidies ..... 15

1. The Statute Contains No Same Country Requirement ..... 15

2. The International-Consortium and Upstream-Subsidy Provisions Do Not Limit Commerce's General Authority ..... 17

3. Commerce Made the Jurisdiction and Specificity Findings Required by Section 1677(5A) ..... 18

4. Former Section 351.527 Did Not Impose a Statutory Limitation ..... 20

C. Commerce's AFA Rate Is Lawful ..... 21

D. Commerce Properly Applied AFA To ISC Cambodia ..... 23

E. Cambodia's Program-Specific Challenges Fail ..... 25

1. Commerce Properly Treated the Electricity Programs and BRGS as Specific Based on AFA ..... 25

2. The Raw-Materials Program Fails for an Independent Reason ........................................................26

3. Any Remand Should Be Limited to Findings Actually Affected by the Verification Issue ..................................27

VII. CONCLUSION ........................................................................................................ 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Gurair Iron & Steel LLC v. United States*,
65 F.4th 1351 (Fed. Cir. 2023) ....................14

*De Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000)....................23

*Dep't of Homeland Sec. v. MacLean*,
574 U.S. 383 (2015)....................16

*Dongtai Peak Honey Indus. Co. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015)....................3, 12, 13

*Floral Trade Council v. United States*,
13 CIT 242, 709 F. Supp. 229 (1989) ....................8, 9

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)....................4

*Gallant Ocean (Thai.) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010)....................4, 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).................... *passim*

*Mitsubishi Heavy Indus., Ltd. v. United States*,
275 F.3d 1056 (Fed. Cir. 2001)....................4, 28

*Monsanto Co. v. United States*,
12 CIT 937, 698 F. Supp. 275 (1988) ....................26

*Mukand, Ltd. v. United States*,
767 F.3d 1300 (Fed. Cir. 2014)....................24

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016)....................23

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)....................4

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011)....................25

*Ross v. Blake*,
578 U.S. 632 (2016)....17

*Rotkiske v. Klemm*,
589 U.S. 8 (2019)....17

*Russello v. United States*,
464 U.S. 16 (1983)....16

*SKF USA Inc. v. United States*,
19 CIT 625, 888 F. Supp. 152 (1995)....14

*Tau-Ken Temir LLP v. United States*,
147 F.4th 1363 (Fed. Cir. 2025)....3

*United States v. Weber Aircraft Corp.*,
465 U.S.792 (1984)....7

*United States v. Wells*,
519 U.S. 482 (1997)....17

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....4

*Ventura Coastal, LLC v. United States*,
736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024)....17

**Statutes**

5 U.S.C. § 552(b)(5)....7

19 U.S.C. 1671(a)....19

19 U.S.C. § 1303(a)(1)....17

19 U.S.C. § 1516a(b)....14

19 U.S.C. § 1516a(b)(1)(B)(i)....3

19 U.S.C. § 1516a(b)(2)....8

19 U.S.C. § 1671....17, 21

19 U.S.C. § 1671(a)....15, 16, 17, 21

19 U.S.C. § 1671(a)(1)....16

19 U.S.C. § 1671(d)....18, 19

19 U.S.C. § 1671 (e) ....................18, 19

19 U.S.C. § 1677(5A)(D)....................19, 20

19 U.S.C. § 1677e(a)(2)(A) ....................24, 25

19 U.S.C. § 1677e(a)(2)(B)....................24, 25

19 U.S.C. § 1677e(a)(2)(C)....................24, 25

19 U.S.C. § 1677e(d)(1)(A) ....................22

19 U.S.C. § 1677e(d)(3)....................23

19 U.S.C. § 1677e(d)(3)(B) ....................23

28 U.S.C. § 2643(c)(1)....................14

**Regulations**

19 C.F.R. § 351.302(c)....................9

19 C.F.R. § 351.308(j) ....................22

19 C.F.R. § 351.308(j)(1)(iv)....................22

19 C.F.R. § 351.519(a)(4)....................27

19 C.F.R. § 351.527 ....................20, 21, 22

**Administrative Materials**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia*, 90 Fed. Reg. 17,406 (Dep't Commerce Apr. 25, 2025)....................2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Kingdom of Cambodia*, 89 Fed. Reg. 80,877 (Dep't Commerce Oct. 4, 2024) ....................24

*Extension of Time Limits*, 78 Fed. Reg. 57,790 (Dep't Commerce Sep. 20, 2013)....................10

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws,* 89 Fed. Reg. 20,766 (Dep't Commerce Mar. 25, 2024)....................21

**Other Authorities**

161 Cong. Rec. H4666....................23

## I. INTRODUCTION

On behalf of the American Alliance for Solar Manufacturing Trade Committee ("Defendant-Intervenor"), defendant-intervenors in this action, we respectfully submit the following response to the March 24, 2026, Rule 56.2 brief and motion filed by Plaintiff Royal Government of Cambodia ("Cambodia" or "Plaintiff"). Rule 56.2 Mot. for J. on the Agency R. of Pl. Royal Gov't of Cambodia (Mar. 24, 2025), ECF No. 29 ("Cambodia Br.").

In its motion, the Royal Government of Cambodia ("Cambodia") asserts that the Department of Commerce ("Commerce") abused its discretion in rejecting Cambodia's 23-day-late request for an extension of time to file certified verification exhibits. *Id.* For this reason, Cambodia requests sweeping relief in the form of a remand of Commerce's determination in its entirety and a second opportunity to cooperate in a completed countervailing duty investigation.

But Commerce did not abuse its discretion. Commerce acted reasonably to ensure the authenticity and reliability of the administrative record and to uphold the integrity of its proceedings. Cambodia's asserted confusion regarding the verification requirements, administrative constraints, lack of local counsel, and time-zone challenges are not extraordinary circumstances that excuse its failure to seek an extension until more than three weeks after the deadline expired. Nor did Commerce's retention of working copies of certain verification documents relieve Cambodia of its obligation to file, certify, and serve the exhibits on which it sought to rely.

Cambodia's remaining challenges fare no better. Cambodia argues that Commerce exceeded its authority by countervailing transnational subsidies, but those arguments are contrary to the text, structure, and purpose of the Tariff Act of 1930 ("Tariff Act"), which directs Commerce to countervail foreign subsidies that benefit merchandise imported into the United States and injure

domestic industry. Commerce's interpretation reflects the best reading of the statute and appropriately focuses on the economic effect of foreign subsidization rather than the geographic location of the recipient.

Cambodia likewise identifies no defect in Commerce's adverse facts available ("AFA") -rate methodology, no error in Commerce's treatment of ISC Cambodia, and no basis for disturbing Commerce's program-specific determinations.

Most importantly, the relief Cambodia seeks bears little relationship to the issues it identifies. At most, Cambodia presents a dispute concerning the consequences of its failure to timely submit verification exhibits. It does not establish any basis for revisiting Commerce's independent transnational-subsidy determinations, benchmark selections, AFA-rate methodology, treatment of ISC Cambodia, or other findings supported by separate legal and factual grounds. The Court should therefore sustain Commerce's determination in full.

## II. RULE 56.2 STATEMENT

### A. Administrative Decision Under Review

The administrative determination under review is *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia*, 90 Fed. Reg. 17,406 (Dep't Commerce Apr. 25, 2025) (final affirm. countervailing duty deter.), P.R. 544, and the accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from Cambodia*, P.R. 538 ("Final IDM"). The period of investigation is January 1, 2023, through December 31, 2023.

### B. <u>Issues of Law Presented</u>

Defendant-Intervenor incorporates by reference the issues presented in Defendant's Response to Plaintiffs' Motion for Judgment on the Agency Record, ECF No. 34 ("Defendant's Response").

## III. <u>FACTUAL BACKGROUND</u>

Defendant-Intervenor incorporates by reference the issues presented in Defendant's Response.

## IV. <u>STANDARD OF REVIEW</u>

The Court must sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The standard applicable to a particular issue depends on the nature of the agency action being challenged.

Commerce's denial of Cambodia's untimely extension request is reviewed for abuse of discretion. *Tau-Ken Temir LLP v. United States*, 147 F.4th 1363, 1371 (Fed. Cir. 2025). Relevant considerations include the interest in accurate determinations, the administrative burden of accepting the late submission, finality concerns, and the filing party's diligence and reasons for delay. *Id.* at 1374-75. Those considerations are non-exhaustive, and their weight depends on the circumstances. *Id.* Commerce retains discretion to enforce its deadlines and administer its proceedings efficiently, particularly where the party had notice and an opportunity to comply. *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1351-53 (Fed. Cir. 2015).

Whether the countervailing-duty statute permits Commerce to countervail transnational subsidies is a question of statutory interpretation. To answer this question, the Court independently determines the best reading of the Tariff Act using the traditional tools of statutory construction

with the overall goal of ascertaining and effectuating congressional intent. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92, 400-01 (2024). The judicial inquiry does not proceed in a vacuum. Instead, the court pays due regard to agency interpretations that reflect a "body of experience and informed judgment" bearing on the meaning and practical operation of the statute. *Id.* at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). That principle is particularly important here, because Congress entrusted Commerce with administering a detailed and highly technical statutory scheme designed to address evolving forms of unfair trade practices, and the agency has developed substantial expertise in carrying out that responsibility. *Cf. Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) ("This court has recognized that the antidumping statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law.") (citations omitted).

Commerce's remaining factual findings and methodological determinations, including its use of facts available and adverse inferences, are reviewed for substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," considering the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The Court may not reweigh the evidence or substitute its judgment for Commerce's, and the possibility of drawing a different conclusion from the record does not render Commerce's determination unsupported. *Gallant Ocean (Thai.) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010); *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001). This standard creates "a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006). Thus, Commerce's determination must be sustained if reasonable and supported by the record as a whole, even when some evidence detracts from its conclusion. *Nippon Steel*, 458 F.3d at 1352.

## V. SUMMARY OF ARGUMENT

Cambodia seeks to transform its failure to complete verification into a basis for reopening virtually every aspect of Commerce's determination. This attempt fails at every turn. Commerce did not abuse its discretion in treating Cambodia's responses as unverified when Cambodia failed to file certified verification exhibits or timely request an extension of time to do so. The fact that Commerce retained working copies of verification exhibits to compare against Cambodia's submissions did not relieve Cambodia of its obligation to create a certified administrative record, and Cambodia's asserted confusion, internal approval procedures, limited resources, and time-zone constraints are not extraordinary circumstances that excuse an extension request filed twenty-three days after the deadline.

Cambodia's challenge to Commerce's transnational subsidy determinations likewise fails on the merits. The text, structure, history, and purpose of the Tariff Act all confirm that Commerce may countervail foreign subsidies based on their economic effect, not the geographic location of the subsidy recipient.

Cambodia also identifies no defect in Commerce's AFA-rate methodology. Commerce followed its statutory directive and the hierarchy prescribed in its regulations, relied on rates calculated for the only cooperating mandatory respondent, and selected rates on a program-by-program basis. Cambodia attacks the resulting number but identifies no error in the analysis that produced it.

Nor does Cambodia establish error in Commerce's treatment of ISC Cambodia or the challenged domestic subsidy programs. ISC Cambodia received Commerce's questionnaire and failed to respond. It was thus reasonable for Commerce to apply facts available to conclude that ISC Cambodia manufacturers or produces the subject merchandise.

Cambodia's remaining program-specific arguments either rise and fall with Cambodia's failed challenge to Commerce's AFA determination or, in the case of the raw-material duty exemption program, fail because Commerce considered the audit evidence and reasonably found that it did not satisfy either regulatory exception to countervailability.

The Court should therefore sustain Commerce's determination in full.

## VI. ARGUMENT

### A. Commerce Did Not Abuse Its Discretion in Rejecting Cambodia's 23-Day Late Extension Request and Applying Adverse Facts

Cambodia advances two related theories for why Commerce allegedly abused its discretion in treating the Government of Cambodia's questionnaire responses as unverified. First, Cambodia argues that it should have been relieved of its obligation to file certified verification exhibits because Commerce retained copies of certain exhibit documents to use during the verification process. Cambodia Br. at 22-23. Second, Cambodia argues that its asserted confusion about filing requirements and known administrative constraints—including inexperience with administrative reviews, cumbersome internal approval requirements, and limited resources—are "extraordinary circumstances" justifying a more than three-week delay in seeking an extension of time to submit the exhibits. Cambodia Br. at 17-21. On the basis of these arguments, Cambodia seeks reconsideration of the programs examined during verification, Commerce's transnational-subsidy determinations, AFA-rate calculation, treatment of ISC Cambodia, and other program-specific findings. *Id.* at 21-22.

#### 1. Cambodia Cannot Avoid Its Obligation to File Certified Verification Exhibits by Pointing to Working Copies Retained by Commerce

Cambodia first argues that Commerce had no need to reject its questionnaire responses as unverified because Commerce's officials retained copies of the documents they reviewed during

verification. *Id.* at 22-23. That argument overlooks the distinct purposes served by Cambodia's required post-verification filing and Commerce's retention of working copies of certain documents. Cambodia was required to file, certify, and serve the exhibits to establish the factual material on which it asked Commerce to rely. Commerce retained its own copies to confirm that Cambodia's subsequent filing accurately reproduced the documents presented during verification. Commerce's comparison copies therefore supplemented the required filing; they did not replace it. Further, working copies may contain Commerce work product, which is protected from disclosure. 5 U.S.C. § 552(b)(5) (protecting inter-agency or intra-agency memoranda under the deliberative process privilege); *see also United States v. Weber Aircraft Corp.*, 465 U.S.792, 802-04 (1984).

The certification requirement is central to this distinction. A respondent's certified and served filings create the reviewable administrative record. Commerce's retained copies of verification exhibits protect the integrity of that record by providing a basis for comparison between the as-filed exhibits and the documents assessed by the agency during the review process. In this case, by certifying the exhibits prior to submission, Cambodia would have assumed responsibility for their factual accuracy and confirmation that the materials filed on ACCESS were the same materials presented to Commerce during verification. Commerce could not provide that certification on Cambodia's behalf. Likewise, Commerce's internal copies could not satisfy Cambodia's obligation to serve certified exhibits on other interested parties, thereby permitting those parties to review the materials, identify any discrepancies, and address Cambodia's reliance on them.

The verification agenda expressly reflected these complimentary functions and the importance of receiving a respondent's certified filings to the integrity of the administrative record.

The agenda thus directed Cambodia to file and serve the verification exhibits, required certificates of factual accuracy and service, and established a deadline for submission through ACCESS sufficient to provide other interested parties and Commerce with time to review and assess those filings. Letter from Aleks Nakutis, Program Manager, AD/CVD Operations, Off. I, Enf't and Compliance, to Government of Cambodia, re: *Verification of the Government of Cambodia's Questionnaire Responses submitted in the Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the Kingdom of Cambodia* (Jan. 7, 2025), P.R. 481, at 2-3 ("Verification Agenda"). The agenda separately explained that Commerce would compare the filed exhibits against the copies retained during verification and take appropriate steps if the two sets did not match. *Id.* at 3. Axiomatically, that comparison process required Cambodia to make its own certified filing. Cambodia's argument that Commerce could have submitted the retained documents on Cambodia's behalf collapses the distinction between documents Commerce examined during verification and the certified exhibits Cambodia sought to place on the administrative record.

Cambodia's reliance on 19 U.S.C. § 1516a(b)(2) does not relieve Cambodia of its obligation to independently certify and serve the exhibits upon which it relied. That provision identifies the materials comprising the record for judicial review of an agency determination. It does not authorize Commerce to certify and submit a respondent's factual information on the respondent's behalf.

*Floral Trade Council v. United States*, 13 CIT 242, 709 F. Supp. 229 (1989), is similarly inapt. That case concerned whether materials considered by the agency were sufficiently

intertwined with its determination to form part of the record for judicial review.[1] It did not hold that Commerce must use uncertified working copies from verification to cure a respondent's failure to file, certify, and serve its verification exhibits in accordance with Commerce's procedures.

Commerce therefore reasonably declined to treat its comparison copies as Cambodia's certified record submission. The point of Commerce's comparison copies was to test the completeness and accuracy of Cambodia's filing. Cambodia thwarted this purpose by failing to submit a filing against which that comparison could occur. Because Commerce could not certify Cambodia's exhibits, serve them on Cambodia's behalf, or provide other interested parties the review contemplated by the administrative process, Commerce's possession of copies of certain documents did not excuse Cambodia's failure to complete the required post-verification submission. Final IDM at 39-41.

**2. Commerce Reasonably Denied Cambodia's Twenty-Three-Day-Late Extension Request**

Cambodia alternatively argues that Commerce abused its discretion by refusing to reopen the record and permit Cambodia to file its verification exhibits more than three weeks after the filing deadline had elapsed. But Cambodia points to no extraordinary circumstance justifying its belated extension request. *See* 19 C.F.R. § 351.302(c) (untimely extension requests are only considered if the requesting party "demonstrates that an extraordinary circumstance exists"). Commerce's regulations define an extraordinary circumstance as an unexpected or unforeseen

---

[1] Specifically, *Floral Trade Council* involved to an appeal in which plaintiff claimed that documents relied on and cited to by Commerce in its determination should be part of the record. *See Floral Trade Council*, 709 F. Supp. at 230-31. The Court found that because Commerce relied on certain documents from other proceedings, they "became sufficiently connected" to the investigation to be considered part of the record. *Id.* at 231. In the instant case, however, the documents at issue are expressly *not being relied on* by Commerce due to Cambodia's failure to timely provide certified copies.

event that could not have been prevented through reasonable measures and that precluded a timely extension request "through all reasonable means." *Id.* § 351.302(c)(2).

Cambodia identifies no such event. Instead, Cambodia points to its status as a first-time participant in a countervailing duty investigation, limited resources, lack of counsel, internal approval procedures, the time difference between Washington, D.C., and Phnom Penh, and its asserted confusion regarding the necessity of filing certified verification exhibits. Cambodia Br. at 18-20. These circumstances were all known well before the deadline and did not prevent Cambodia from reaching out to Commerce to request additional guidance or clarification, or from timely requesting an extension to comply with the verification submission deadline. *See Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't Commerce Sep. 20, 2013) (inadequate resources and inattentiveness generally do not constitute extraordinary circumstances).

Indeed, Cambodia's own conduct during the course of the investigation confirms that its circumstances did not prevent it from timely seeking an extension. Cambodia submitted multiple timely extension requests before verification. *See, e.g.*, Letter from The Royal Government of Cambodia to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The Kingdom of Cambodia: Extension Request for Submitting Government's Response to Section II of the Initial Countervailing Duty Questionnaire* (Aug. 2, 2024), P.R. 198; Letter from The Royal Government of Cambodia to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The Kingdom of Cambodia: Request for Further Extension of Time* (Aug. 12, 2024), P.R. 223; Letter from The Royal Government of Cambodia to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The Kingdom of Cambodia: Request for Extension of Time for Submission of Supplemental Questionnaire to Initial*

*Questionnaire Response* (Sep. 13, 2024), P.R. 328; Letter from The Royal Government of Cambodia to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The Kingdom of Cambodia: Request for Further Extension of Time for Submission of Supplemental Questionnaire to Initial Questionnaire Response* (Sep. 18, 2024), P.R. 340. These submissions demonstrate that Cambodia knew how to request additional time and the importance of doing so before the applicable deadline elapsed. Final IDM at 38-40. Its standing internal approval requirements and the time difference between Cambodia and Washington did not prevent these earlier requests, reflecting that Cambodia could and should have accounted for those factors as the deadline for submitting verification exhibits approached.

The same is true of Cambodia's asserted confusion about the verification process. The verification agenda directed Cambodia to file and serve the exhibits, identified the applicable deadline and certifications, explained the distinct purpose of Commerce's retained copies, and identified two contacts for "any questions regarding th{e} verification." Verification Agenda at 3. If Cambodia had any lingering doubts concerning the necessity of filing certified verification exhibits, Cambodia could and should have reached out to these contacts prior to the filing deadline. Commerce's regulation makes allowances for an unexpected event that prevented a party from timely submitting an extension request through all reasonable means—not for a party's failure to promptly raise questions concerning the verification process.

The length of Cambodia's delay further supports Commerce's decision. Cambodia waited twenty-three days after the submission deadline to seek an extension. Letter from Dusten Hom, Int'l Trade Compliance Analyst, AD/Operations, Off. I, to All Interested Parties, re: *Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the Kingdom of Cambodia, Notification of Deadlines for the submission of Case and*

*Rebuttal Briefs* (Feb. 18, 2025), P.R. 502; Letter from Davis & Leiman to Sec'y Commerce, re: *Investigation of Crystalline Silicone Photovoltaic Cells, Whether or Not Assembled into Modules, from the Kingdom of Cambodia: Out-of-Time Request for Extension of Time to Submit Verification Exhibits* (Feb. 19, 2025), P.R. 504; Final IDM at 38-39. By that point, Commerce had issued its verification memoranda and established a briefing schedule. *See* Memorandum from Dusten Hom, Sr. Int'l Trade Compliance Analyst, AD/CVD Operations, Off. I, through Aleksandras Nakutis, Program Manager, Off. I, AD/CVD Operations, to The File, re: *Countervailing Duty Investigations of Crystalline Silicon Photovolic Cells, Whether or Not Assembled into Modules from the Kingdom of Cambodia* (Feb. 11, 2025), P.R. 500, at 1; Memorandum from Dusten Hom, Sr. Int'l Trade Compliance Analyst, AD/CVD Operations, Off. I, through Aleksandras Nakutis, Program Manager, Off. I, AD/CVD Operations, to The File, re: *Countervailing Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the Kingdom of Cambodia* (Feb. 18, 2025), P.R. 501, at 1. Cambodia explains that it did not act sooner because Commerce had denied an earlier untimely extension request and therefore Cambodia believed another request would be futile. Cambodia Br. at 19. That explanation reinforces Cambodia's awareness of the importance of requesting an extension before the applicable deadline. It does not establish an extraordinary circumstance justifying Cambodia's failure to do so. *See Dongtai*, 777 F.3d at 1351 (concluding Commerce properly rejected untimely extension request where respondent was on notice that an untimely request might be rejected).

*Dongtai* is on all fours and confirms the reasonableness of Commerce's refusal to accept Cambodia's belated filing. There, the respondent cited overlapping deadlines, a national holiday, trouble coordinating with translators and counsel, and technical problems as evidence of good cause justifying a belated extension request. *Id.* at 1350. The Federal Circuit upheld Commerce's

rejection of the late submission because those circumstances were known before the deadline and did not prevent a timely extension request. *Id.* at 1351-53. Similarly, Cambodia's established internal procedures, limited resources, and time zone constraints fail to establish that Cambodia faced any extraordinary impediment in requesting an extension of time before the deadline passed. Cambodia "was entirely capable of at least submitting an extension request on time, but simply failed to do so." *Id.* at 1352. Commerce thus did not abuse its discretion in denying the extension request, rejecting the verification exhibits, concluding that Cambodia failed to act to the best of its ability, and applying adverse facts. *See id.*

**3. Cambodia's Request for Far-Reaching Remand Fails in Any Event**

Cambodia asserts that, because Commerce allegedly abused its discretion by failing to grant a request for an extension of time submitted more than three-weeks after the relevant deadline passed, the Court should order Commerce to reconsider not only the programs examined during verification, but also Commerce's transnational subsidy determinations, AFA-rate calculation, treatment of ISC Cambodia, and other program-specific findings. Cambodia Br. at 15-16, 21-22, 34. Even if Cambodia had established that Commerce abused its discretion (and it has not), such sweeping relief would be inappropriate.

Any remand should address only the consequences of the particular error identified. *See* 19 U.S.C. § 1516a(b); 28 U.S.C. § 2643(c)(1); *see also SKF USA Inc. v. United States*, 19 CIT 625, 629-30, 888 F. Supp. 152, 156-57 (1995) (sustaining unaffected portions of Commerce's determination and remanding only on the defective issue). Commerce's verification agenda covered selected programs administered by the General Department of Customs and Excise, the Council for the Development of Cambodia, and the Credit Guarantee Corporation of Cambodia. Verification Agenda. If the Court concludes that Commerce should have accepted Cambodia's

verification exhibits, Commerce should determine in the first instance whether those exhibits affect its findings concerning the programs addressed at verification. The Court should not presume that the exhibits establish non-specificity, non-use, an effective input-consumption system, or any other fact Cambodia seeks to establish.

Nor would an error concerning the verification exhibits undermine Commerce's independent legal conclusions regarding transnational subsidies or findings based on separate record deficiencies. *See Al Gurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) (holding that remand is unnecessary where the error does not undermine the agency's ultimate conclusion given independently sufficient supporting findings). Cambodia did not timely provide requested information concerning polysilicon and silicon wafers, and Commerce found the information concerning relevant input-market conditions incomplete. Final IDM at 17-18; Letter from Aleksandras Nakutis, Program Manager, AD/CVD Operations, Off. I, En'f & Compliance, to Government of The Kingdom of Cambodia, re: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the Kingdom of Cambodia: New Subsidy Allegation Questionnaire* (Sep. 20, 2024), P.R. 366; Letter from The Royal Government of Cambodia to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The Kingdom of Cambodia: Request for Extension of Time for Submission of Government's Response to New Subsidy Allegation* (Oct. 7, 2024), P.R. 389; Letter from Aleksandras Nakutis, Program Manager, AD/CVD Operations, Off. I, En'f & Compliance, to Government of The Kingdom of Cambodia, re, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the Kingdom of Cambodia: Denial of Extension to Submit Government's Response to New Subsidy Allegation Questionnaire* (Oct. 9, 2024), P.R. 395. Those deficiencies are distinct from Cambodia's failure to file its verification exhibits and separately

supported Commerce's use of facts available in evaluating market distortion for the transnational-subsidy programs. Final IDM at 17-20. A ruling that Commerce should have accepted the late verification exhibits would not erase these independent deficiencies, invalidate Commerce's statutory interpretation, or require reconsideration of determinations unaffected by the exhibits.

Accordingly, even if the Court identifies an abuse of discretion in Commerce's refusal to accept Cambodia's untimely extension request, any remand should be limited to Commerce's consideration of the verification exhibits and their effect, if any, on the specific findings that depended on the Cambodian government's verification information.

### B. Commerce Lawfully Countervailed Transnational Subsidies

Cambodia asks the Court to impose a same-country limitation on Commerce's ability to countervail transnational subsidies, but that limitation is divorced from the statutory text, structure, history, and purpose. The Tariff Act authorizes Commerce to countervail subsidies provided by one government to production occurring in another country. Nothing in 19 U.S.C. § 1671(a) requires the subsidizing government and subsidy recipient to be located in the same country, and Congress deliberately removed the same-country language that appeared in the predecessor statute. Commerce's current interpretation reflects the best reading of the statute.

#### 1. The Statute Contains No Same Country Requirement

Cambodia's interpretation cannot be reconciled with the text Congress enacted. Section 1671(a) applies when "the government of a country or any public entity within the territory of a country" provides, directly or indirectly, a countervailable subsidy "with respect to the manufacture, production or export of a class or kind of merchandise" imported into the United States. 19 U.S.C. § 1671(a)(1). Section 1677(5)(B), in turn, defines an "authority" as "a government of a country or any public entity within the territory of the country." These provisions

identify the subsidy provider. Neither requires the recipient, production facility, and granting authority to be located in the same country.

The grammar confirms that reading. In Section 1677(5)(B), "within the territory of the country" modifies "public entity." The phrase establishes the territorial relationship between a public entity and the government to which it is attributed. It does not modify an unstated "recipient," "producer," or "production facility." Cambodia's interpretation would effectively replace the enacted definition with "the government of the country in which the recipient firm is located." Congress included no such language.

The statute's use of territorial language elsewhere reinforces the point. Congress expressly imposed a territorial condition on a "public entity," but imposed no corresponding condition on the location of the recipient. That distinction must be respected. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally{.}" (cleaned up)); *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."). The Court should not engraft a limitation requiring that the subsidy recipient be located "within the territory of the country" providing the subsidy when Congress omitted such language from the statute. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.").

Congress's treatment of the predecessor statute provides additional confirmation. Former Section 303 applied to a bounty or grant bestowed on merchandise "manufactured or produced in such country." Former 19 U.S.C. § 1303(a)(1) (repealed 1995). Congress did not carry that same-

country language into § 1671. The Trade Agreements Act of 1979 replaced the former formulation for countries governed by the new countervailing-duty framework, and the Uruguay Round Agreements Act later repealed § 1303. Pub. L. No. 96-39, 93 Stat. 144 (1979); Pub. L. No. 103-465, §§ 261-262, 108 Stat. 4809, 4908-10 (1994). Courts presume that a change in statutory language has "real and substantial effect" and do not restore language omitted from the current provision. *Ross v. Blake*, 578 U.S. 632, 641-42 (2016); *see also United States v. Wells*, 519 U.S. 482, 493 (1997) (where Congress amended a statute and dropped a materiality requirement that existed in the earlier statutory text, "most likely inference" was that Congress did so within intent to remove the requirement).

Cambodia invokes *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1357-58 (Ct. Int'l Trade 2024), and *Loper Bright*, 603 U.S. at 395, to argue that Commerce cannot infer authority to countervail transnational subsidies from statutory silence. Cambodia Br. at 27-28. But Commerce did not rely on silence. Section 1671(a) affirmatively directs Commerce to countervail subsidies provided "directly or indirectly" by "the government of a country" if the statutory requirements are met. Sections 1677(5) and 1677(5A) define those requirements without requiring that the subsidy recipient be within the granting authority's geographical boundaries. And the predecessor statute demonstrates that Congress knew how to impose a same-country condition when it wished to do so. Commerce's interpretation gives effect to the enacted language, its structure, and its history. Final IDM at 9-13. Under *Loper Bright*, that is the best reading of the statute. *Loper Bright*, 603 U.S. at 400-01.

### 2. The International-Consortium and Upstream-Subsidy Provisions Do Not Limit Commerce's General Authority

Cambodia also relies on 19 U.S.C. §§ 1671(d) and (e) of the Act to argue that Congress intended to limit Commerce's ability to countervail transnational subsidies only in the context of

international consortia. Cambodia Br. at 24-25. But neither provision purports to limit the circumstances when Commerce can countervail a subsidy provided by a country to the manufacture, production, or export of goods for sale in the U.S. market.

Section 1671(d) addresses subsidies provided through an international consortium and instructs Commerce how to attribute a member country's share of the subsidy. Section 1671(e) addresses upstream subsidies, including a subsidy bestowed on an input product that benefits downstream merchandise subject to investigation. Each provision establishes specialized rules for particular forms of subsidy arrangements. Neither provision states that Commerce may countervail cross-border subsidization only in connection with those arrangements, and neither limits Section 1671(a)'s general directive to Commerce to countervail subsidies provided "directly or indirectly" to the manufacture, production, or export of goods for import to the United States.

Cambodia's interpretation would convert provisions addressing particular situations into implied restrictions on Commerce's authority to countervail foreign subsidies. But Congress did not describe 19 U.S.C. §§ 1671(d) and (e) as exceptions to a general same-country rule, and no such general rule appears in the statute. The more natural reading is the one that allows each provision to perform its assigned function: 19 U.S.C. 1671(a) establishes the general conditions for imposing countervailing duties, while 19 U.S.C. §§ 1671(d) and (e) specify how Commerce must treat international consortia and upstream subsidies. That reading gives effect to all three provisions without adding an exclusivity limitation that Congress did not enact.

### 3. Commerce Made the Jurisdiction and Specificity Findings Required by Section 1677(5A)

Cambodia separately argues that the challenged subsidies cannot satisfy 19 U.S.C. § 1677(5A)(D) because Cambodian recipients cannot be "within the jurisdiction" of the Chinese government. Cambodia Br. at 25-26. This argument rests on a mistaken understanding of the

definition of "jurisdiction." Jurisdiction means "the authority of a sovereign power to govern or legislate" or "the power or right to exercise authority: CONTROL." *Jurisdiction*, Merriam-Webster, merriam-webster.com/dictionary/jurisdiction (last visited Oct. 1, 2026). Thus, giving the words in Section 1677(5A)(D) their plain and ordinary meaning, a subsidy is specific if it is conferred on an enterprise or industry within the authority of the government providing it. 19 U.S.C. § 1677(5A)(D).

Here, Commerce addressed this statutory requirement when Commerce found that (1) Chinese law subjects outbound investments by state-invested enterprises and their subsidiaries to continuing governmental supervision; (2) Solarspace Tech, Solarspace Cambodia's Chinese parent and majority shareholder, had state-owned and state-controlled investors and qualified as a state-invested enterprise under China's State-Owned Assets Law; (3) Solarspace Cambodia remained within the Chinese government's legal and supervisory reach; (4) Chinese government support was directed to particular capacity-cooperation projects and a limited group of industries, including the solar industry. Final IDM at 25-26, 33-34.

Cambodia does not identify an evidentiary defect in these findings. Instead, it argues that an enterprise operating in Cambodia cannot be "within the jurisdiction" of the Chinese government. But 19 U.S.C. § 1677(5A)(D) uses the term "jurisdiction," not "territory," and Commerce reasonably found that Solarspace Cambodia remained subject to China's legal and supervisory authority. Because Cambodia's argument depends on reading a territorial limitation into a provision that contains none, it provides no basis for disturbing Commerce's specificity determination.

#### 4. Former Section 351.527 Did Not Impose a Statutory Limitation

Cambodia places substantial weight on the fact that Commerce previously interpreted the countervailing-duty statute differently and embodied that interpretation in former 19 C.F.R. § 351.527. But under *Loper Bright*, the relevant question is not whether Commerce has consistently adhered to a particular interpretation of the statute. The goal is rather to identify the best interpretation of the statute. *See Loper Bright*, 603 U.S. at 400-01 (requiring courts to exercise independent judgment to determine the statute's best reading). Commerce's previous interpretation of the Tariff Act, as set forth in 19 C.F.R. § 351.527, is of limited utility in determining Congressional intent. Instead, it falls to the Court to determine whether, in light of the plain text, object, and purpose of the Statute, Congress intended to limit Commerce's ability to countervail foreign subsidies to situations where a foreign governments subsidizes the manufacture, production, or export of goods within its physical territory. As elaborated above, the statute demonstrates no such intent.

Indeed, Commerce concluded that former 19 C.F.R. § 351.527 reflected an overly restrictive interpretation of the statute because it elevated the location of the subsidy recipient over the economic effect of the subsidy itself. The countervailing duty statute focuses on whether a foreign government provided a countervailable subsidy that benefits merchandise imported into the United States thereby injuring the domestic industry, not on the location of the subsidy recipient. *See* 19 U.S.C. § 1671(a). Consistent with that economic focus, Commerce concluded that 19 U.S.C. § 1671 "does not impose geographic limitations on countervailing unfair foreign subsidies" and rescinded 19 C.F.R. § 351.527. *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,826 (Dep't Commerce Mar. 25, 2024) (final

rule). The question now is whether Commerce's current interpretation of the statute is the best. *Loper Bright*, 603 U.S. at 400-01.

This investigation underscores why it is. Commerce found that Chinese government policy lending and Chinese provision of solar inputs for less than adequate remuneration benefitted the production of subject merchandise by Chinese-controlled entities operating in Cambodia. Final IDM at 18-26, 33-34. Under Cambodia's interpretation, those subsidies would escape countervailing duties not because they failed to satisfy the statutory requirements of financial contribution, benefit, specificity, or harm, but solely because the subsidized manufacture occurred outside China—even though China retains authority over the manufacturing entities. Nothing in the statutory text compels such an absurd result. Congress enacted and subsequently amended the Tariff Act to protect domestic industries from unfair competition. The focus of the statutory inquiry is thus on the economic consequences of foreign subsidization—not the location of the subsidy recipient. Commerce's decision to rescind 19 C.F.R. § 351.527 pays fidelity to Congressional intent and, thus, should be upheld.

**C. <u>Commerce's AFA Rate Is Lawful</u>**

Cambodia repeatedly characterizes the resulting 3,403.96 percent AFA rate as "outrageously high," "punitive," and disconnected from reality. Cambodia Br. at 29-32. But Cambodia's objection is directed at the result, not the analysis. Because Cambodia fails to identify any legal, methodological, evidentiary, or computational defect in Commerce's determination, the rate should be upheld.

Congress identified sources on which Commerce may rely when selecting countervailing duty AFA rates, and Commerce established a regulatory hierarchy for making such a selection. 19 U.S.C. § 1677e(d)(1)(A); 19 C.F.R. § 351.308(j). Commerce followed that hierarchy in this

case. Thus, Commerce first used Solarspace's calculated rates for identical programs, then used rates for similar or comparable programs where appropriate, and, where no similar program existed, proceeded to the regulation's fourth tier. Final IDM at 42-44, App. Cambodia does not dispute that Commerce followed this framework.

Instead, Cambodia principally argues that Commerce treated Chinese programs providing goods for less than adequate remuneration as "similar" to Cambodian loan and guarantee programs. Cambodia Br. at 30-32. This misconstrues the record. Commerce expressly determined that no similar or comparable program existed for the loan and guarantee programs and therefore proceeded to the fourth tier of the hierarchy for those programs. Final IDM at 43-44; 19 C.F.R. § 351.308(j)(1)(iv). Cambodia thus criticizes a comparison Commerce never made.

Nor does Cambodia identify any flaw in the underlying rates Commerce used. Every component rate in the AFA calculation came from a subsidy rate calculated for Solarspace—the only cooperating mandatory respondent—in the same investigation. Final IDM at 50 n.189. Cambodia does not challenge the underlying calculations, the benchmarks used to calculate those rates, or Commerce's arithmetic. Final IDM at 42-44, App.; Cambodia Br. at 29-32. Rather, Cambodia focuses its challenge on the resulting rate, asserting that it does not reflect commercial reality. This argument misses the mark. Congress expressly rejected any argument that an AFA rate must reflect commercial reality. In this regard, under the statute, Commerce "is not required" either to estimate the rate the respondent would have received had it cooperated or to demonstrate that the selected rate reflects the respondent's alleged commercial reality. 19 U.S.C. § 1677e(d)(3).[2]

---

[2] Indeed, in enacting the language in 19 U.S.C. § 1677e(d)(3)(B), Congress undid case law that had required that AFA rates be grounded in commercial reality in order to induce compliance by non-cooperating respondents. *See* 161 Cong. Rec. H4666, at H4690-91 (Mr. Meehan) and H4696 (Ms. Jackson Lee) (noting that the bill provided Commerce with "more discretion to determine dumping or subsidy rate{s} to apply to uncooperative" respondents. *See, e.g.*, *F.illi De*

Ultimately, Cambodia objects to the calculated aggregate rate rather than any component of Commerce's analysis. But Commerce's obligation was to select a rate for each program under the framework Congress prescribed. Nothing in § 1677e(d) requires Commerce to conduct a separate aggregate-reasonableness inquiry after selecting those program-specific rates. *See also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347-48 (Fed. Cir. 2016) ("The statute simply does not require Commerce to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statutes and regulations. Congress decided what requirements Commerce must fulfill in reaching its determinations . . . and we do not impose conditions not present in or suggested by the statute's text."). Because Cambodia identifies no error in Commerce's application of the hierarchy or selection of any component rate, the Court should sustain Commerce's AFA-rate determination. Final IDM at 41-44, App.

**D. <u>Commerce Properly Applied AFA To ISC Cambodia</u>**

Cambodia's challenge to Commerce's treatment of ISC Cambodia fails for a simple reason: Commerce issued a quantity-and-value questionnaire to ISC Cambodia, confirmed delivery, and received no response. *Id.* at 45; Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the Kingdom of Cambodia*, 89 Fed. Reg. 80,877 (Dep't Commerce Oct. 4, 2024) (prelim. affirm. countervailing duty deter. and alignment of final deter. with final antidumping duty deter.), P.R. 382, at 12. Cambodia does not dispute either receipt of the questionnaire or ISC Cambodia's failure to respond. Cambodia Br. at 32-33. This lack of cooperation satisfies the statutory prerequisites for

---

*Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *Gallant Ocean*, 602 F.3d 1319.

Commerce's use of facts available and an adverse inference. *See* 19 U.S.C. § 1677e(a)(2)(A)-(C) (Commerce shall use facts otherwise available where an interested party withholds requested information, fails to provide information by the established deadline, or significantly impedes a proceeding); *see also Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) (decision to apply facts otherwise available supported by substantial evidence where party failed to provide requested information).

Rather than engage with the reasons Commerce gave for applying facts otherwise available, Cambodia asks the Court to infer that ISC Cambodia was not a producer or exporter of subject merchandise based on a government web domain listed in the petition and information referenced in a February 4, 2025 email. Cambodia Br. at 32-33. Neither argument addresses ISC Cambodia's failure to respond to Commerce's questionnaire by the established deadline and, thus, neither argument suffices to undermine Commerce's decision to apply facts otherwise available to ISC Cambodia. *See* 19 U.S.C. § 1677e(a)(2)(A)-(C).

In any event, the burden of developing the record rested with ISC Cambodia and Cambodia—not Commerce. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011). ISC Cambodia failed to meet that burden when it failed to respond to Commerce's questionnaire or timely place on the record evidence to establish that it was not a manufacturer or producer of subject merchandise. Likewise, neither ISC Cambodia nor the Government of Cambodia timely placed record evidence establishing ISC Cambodia's alleged status as a standards-setting agency. Commerce therefore was not required to independently investigate public websites, develop evidence on the parties' behalf, or construct a favorable record. after the deadline for submitting materials to the agency had elapsed. *See id.* (noting that Commerce acted properly in declining to

rely on information it placed on the record given the lack of opportunity to assess the reliability of the evidence).

Because ISC Cambodia failed to respond to Commerce's questionnaire, it failed to cooperate to the best of its ability with Commerce's investigation. Commerce therefore properly applied AFA, and the agency's determination should be sustained. 19 U.S.C. § 1677e(a)(2)(A)-(C).

**E. <u>Cambodia's Program-Specific Challenges Fail</u>**

Cambodia seeks a "fresh opportunity" to relitigate Commerce's determinations regarding the Electricity Fee Reduction Program, the Rural Electrification Fund ("REF"), the Customs Duty Exemption and Related Incentives for Raw Materials Program, and the Business Recovery Guarantee Scheme ("BRGS"). Cambodia Br. at 33-34. But with one exception, those arguments depend entirely on Cambodia's challenge to Commerce's application of AFA. Because Commerce reasonably determined that the Government of Cambodia's responses were unverified and applied AFA, Commerce was not required to accept Cambodia's unsupported descriptions of those programs. Final IDM at 40-41, 46-48.

**1. Commerce Properly Treated the Electricity Programs and BRGS as Specific Based on AFA**

Before Commerce, Cambodia argued that the Electricity Fee Reduction Program was not specific or used during the period of investigation, that REF could not be used by the solar industry, and that BRGS was broadly available to Cambodian businesses. *Id.* at 45-48. Commerce reasonably concluded that those arguments depended on unverified government information and therefore did not undermine Commerce's AFA findings. *Id.*

That conclusion followed directly from Commerce's determination that Cambodia withheld requested information, failed to provide information by the deadline, impeded the

proceeding, and supplied information that could not be verified. *Id.* at 40-41. With no verified information concerning the operation, eligibility, or administration of these programs, Commerce reasonably found, as AFA, that the programs involved financial contributions and were specific. *Id.* at 46-48.

Cambodia counters that use of AFA is inappropriate because Commerce did not examine every aspect of the relevant programs during verification. This misunderstands the purpose of verification. Verification is a "spot check," not an exhaustive audit, and Commerce "has considerable latitude in picking and choosing which items it will examine in detail." *Monsanto Co. v. United States*, 12 CIT 937, 943-44, 698 F. Supp. 275, 281 (1988). Commerce was not required to verify every factual assertion in Cambodia's responses before determining that Cambodia had failed to satisfy its verification obligations.

Once Commerce reasonably concluded that Cambodia's submissions regarding the relevant programs were unverified, Commerce was not required to accept Cambodia's unsupported descriptions of how these programs operated. The AFA determination meant that Commerce was entitled to reject the unverified factual predicates underlying Cambodia's claims regarding non-use, eligibility, and specificity. Final IDM at 40-41, 46-48. Cambodia cannot rely on information that Commerce reasonably found could not be verified to challenge Commerce's treatment of the electricity programs or BRGS.

**2. The Raw-Materials Program Fails for an Independent Reason**

The Customs Duty Exemption and Related Incentives for Raw Materials Program stands on different footing because Commerce addressed Cambodia's argument on the merits. Cambodia contends that post-entry audits conducted by the General Department of Customs and Excise satisfy Commerce's regulations governing duty-exemption programs. Cambodia Br. at 15-17.

Commerce considered that evidence and rejected the argument. Final IDM at 47-48. That decision was supported by substantial evidence.

Under 19 C.F.R. § 351.519(a)(4), an import-duty exemption does not confer a countervailable benefit if the government either maintains and applies a reasonable and effective system tracking input consumption or actually examines the relevant inputs and confirms their consumption in exported products. Commerce found neither requirement satisfied. *Id.* Specifically, Commerce explained that Cambodia's audit materials did not demonstrate that an actual examination occurred or reveal the scope and thoroughness of any examination. *Id.* at 47-48 & n.187. Commerce also found no verified evidence of a reasonable and effective input-consumption system. *Id.*

Cambodia's challenge reduces to the assertion that Commerce should have viewed the audit evidence differently. But Commerce did not overlook that evidence. It considered the materials Cambodia identifies, explained why they did not demonstrate either a qualifying examination or a reasonable and effective input-consumption system, and found the regulatory exceptions inapplicable. *Id.* at 47-48. At most, Cambodia points to an alternative interpretation of the same evidence. That is insufficient to justify reversal. *See Mitsubishi Heavy Indus.*, 275 F.3d at 1062 (the possibility of drawing a different conclusion from the record does not render Commerce's determination unsupported by substantial evidence). Accordingly, Commerce's finding regarding the raw-material duty-exemption program should be sustained regardless of Cambodia's broader challenge to the verification issue.

### 3. Any Remand Should Be Limited to Findings Actually Affected by the Verification Issue

Cambodia seeks a "fresh opportunity" to relitigate these program determinations. Cambodia Br. at 33-34. But even if the Court concludes that Commerce should have accepted

Cambodia's verification exhibits, the Court should not presume that those exhibits establish non-specificity, non-use, or compliance with the regulatory requirements governing duty-exemption programs.

At most, Commerce should determine in the first instance whether the verification exhibits affect any of the program findings discussed above. Because Commerce relied on AFA with respect to the electricity programs and BRGS and separately addressed the merits of the raw-material duty-exemption program, any remand should be limited to the effect, if any, of the verification exhibits on those determinations. Final IDM at 46-48.

## VII. CONCLUSION

For these reasons, the Court should deny Cambodia's motion for judgment on the agency record and sustain Commerce's Final Determination in full. Commerce reasonably enforced its verification deadline, lawfully countervailed transnational subsidies, selected the AFA rate under the governing hierarchy, and properly applied AFA to ISC Cambodia and the challenged domestic

programs. At minimum, any remand should be narrowly tailored to the specific defect found and should not reopen determinations supported by independent statutory, factual, and legal grounds.

Respectfully submitted,

*/s/ Timothy C. Brightbill*

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Stephanie M. Bell, Esq.
Kimberly A. Reynolds, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the American Alliance for Solar Manufacturing Trade Committee*

Dated: October 5, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor American Alliance for Solar Manufacturing Trade Committee Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,773 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

American Alliance for Solar Manufacturing Trade Committee
(Representative Of)

October 5, 2026
(Date)