**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE LISA W. WANG**

| | |
|---|---|
| **ROYAL GOVERNMENT OF CAMBODIA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE**<br><br>**Defendant-Intervenor.** | **Court No. 25-cv-00173** |

**REPLY BRIEF OF PLAINTIFF ROYAL GOVERNMENT OF CAMBODIA IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Mark B. Lehnardt
Davis & Leiman
1012 Connecticut Ave., N.W., Ste.1012
Washington, D.C. 20036
Tel.: 202.642.4850
Email: MLehnardt@DLTrade.com

*Counsel to Royal Government of Cambodia*

November 20, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii
TABLE OF AUTHORITIES ........ iii
INTRODUCTION ........ 1
ARGUMENT ........ 2
I. Commerce Decision To Apply Adverse Facts Available Based Upon The Absence Of Exhibits From The Verification Of the Royal Government Of Cambodia Was Not Supported By Substantial Evidence Or In Harmony With Law ........ 2
II. Commerce Cannot Countervail So-Called Transnational Subsidies ........ 7
A. Commerce Has No Special Deference To Determine Its Investigative Authority ........ 7
B. The Statute As A Whole Is Clear That Commerce's Authority To Countervail Out-Of-Country Subsidies Is Limited To Two Specific Contexts ........ 11
III. The AFA Rates Commerce Selected Are Outrageously And Unlawfully High ........ 18
IV. ISC Cambodia Is A Standards-Setting Government Agency, Not A Producer Or Seller Of Solar Panels ........ 20
V. To The Extent Cambodia's Other Arguments Survive Commerce's AFA decision, Commerce Cannot Countervail Programs That Are Not Specific Or Companies That Commerce Knows Are Not Producers Or Exporters Of Subject Merchandise. ........ 21
CONCLUSION ........ 22

# TABLE OF AUTHORITIES

## Cases

*AMS Assocs. v. United States*, 737 F.3d 1338 (Fed. Cir. 2013)....14

*Archroma U.S. Inc. v. Dep't of Commerce*, 185 F.4th 1341 (Fed. Cir. 2026)....10

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 123 S. Ct. 748, 154 L. Ed. 2d 653 (2003)....14

*Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025....10

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)....7

*Decatur v. Paulding*, 39 U.S. 497, 14 Pet. 497, 10 L. Ed. 559 (1840)....9

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000)....19, 20

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)....15

*Floral Trade Council v. United States*, 13 CIT 242, 709 F. Supp. 229 (1989)....6

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)....9

*Hawley v. Diller*, 178 U.S. 476, 20 S. Ct. 986, 44 L.Ed. 1157 (1900)....8

*Holmes Prods. Corp. v. United States*, 16 CIT 1101 (1992)....18

*Jindal Poly Films Ltd. v. United States*, 794 F. Supp. 3d 1384, 1390-91 (Ct. Int'l Trade 2025)....4

*Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026)....11, 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024)....8, 10

*Los Angeles Biomedical Research Inst. At Harbor – UCLA Med. Ctr. V. Eli Lilly and Co.*, 849 F.3d 1049 (Fed. Cir. 2017)....7

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014)....20

*Nexteel Co. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022)....9

*Özdemir B oru San. VE Tic. Ltd. Sti. v. United States*, 273 F.Supp.3d 1225 (Ct. Int'l Trade 2017) ....................19

*Shengyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015) ....................14

*Smith-Corona Grp. v. United States*, 713 F.2d 1568 (Fed. Cir. 1983) ....................9

*United States v. Deteroit Timber & Lumber Co.*, 200 U.S. 321 (1906) ....................8

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ....................11, 13

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ....................16

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) ....................11

*West Virginia v. EPA*, 597 U.S. 697 (2022) ....................16, 17

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ....................19

*Yates v. United States*, 574 U.S. 528, 135 S.Ct. 174, 191 L.Ed. 2d 64 (2015) ....................13

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d 1363 (Fed. Cir. 2005) ....................11

**Statutes**

19 U.S.C. § 1516a(b)(2) ....................6

19 U.S.C. § 1671(a) ....................11, 13

19 U.S.C. § 1677 (5A)(D) ....................17

19 U.S.C. § 1677(3) ....................13

19 U.S.C. § 1677(5)(B) ....................12, 17

19 U.S.C. § 1677(5A)(D) ....................15

19 U.S.C. § 1677e(c) ....................19

19 U.S.C. § 1677e(d)(3) ....................20

19 U.S.C. § 3512(d) ....................19

**Other Authorities**

H.R. 1548 (119th Cong.), § 201 .....16

H.R. 3882 (118th Cong.), § 201 .....16

H.R. 6121 (117th Cong.), § 201 .....17

S. 1187 (117th Cong.), § 201 .....16

S. 1856 (118th Cong.), § 201 .....16

S. 691 (119th Cong.), § 201 .....16, 17

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 .....19

**Administrative Determinations**

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) .....16

*Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) .....14

Plaintiff Royal Government of Cambodia (Cambodia) hereby submits its reply brief in support of its Rule 56.2 motion for judgment on the agency record, challenging certain aspects of the final determination of the Department of Commerce and the resulting order in the countervailing duty investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells") from the Kingdom of Cambodia.

## INTRODUCTION

In its opening brief, Cambodia demonstrated that Commerce improperly denied Cambodia's out-of-time request for additional time to submit verification exhibits because Commerce had sent mixed signals about what Cambodia's responsibility was and Commerce failed to address the precise circumstances of Cambodia's request, instead, hiding behind rote application of its regulation. Cambodia also demonstrated how the statutory language defining countervailable subsidies, and the context of the statute of a whole, does not allow Commerce to impose countervailing duties for alleged transnational subsidies. Cambodia demonstrated how Commerce's 534.67% calculated rate for SolarSpace and the out-of-this-world 3,403.96% AFA rate are outrageously high and unlawfully punitive. Cambodia also showed that Commerce knew one of the mandatory respondents was, in fact, a Cambodia government agency with no connection to the solar industry. Finally, Cambodia demonstrated that Commerce cannot countervail – even as AFA – programs that are not specific.

Commerce's response does not present any persuasive argument to the contrary. Commerce hides behind its extension-of-time regulation, claiming – case law holding the opposite – that it must follow its own regulation to justify rejecting Cambodia request for additional time to submit the verification exhibits. Commerce's argument for authority to countervail transnational subsidies is based on the slight change in language in one provision and improperly dismissing the import of the statute as a whole. Commerce dismisses gives short

shrift the Cambodia's challenge to the outrageously high rates imposed in this review, claiming – despite the requirement that AFA rates have some connection to reality – that there is no authority that would require the overall CVD rate to be reasonable. Commerce disclaims any notion that it should be responsible for knowing what is public on its own website in arguing that ISC Cambodia was not improperly included as a respondent. And Commerce punts on Cambodia's specificity arguments, relying instead on its incorrect arguments regarding application of AFA.

As we explain below, this Court should reject Commerce's arguments and remand for reconsideration in accordance with the relief Cambodia seeks.

## ARGUMENT

### I. Commerce Decision To Apply Adverse Facts Available Based Upon The Absence Of Exhibits From The Verification Of the Royal Government Of Cambodia Was Not Supported By Substantial Evidence Or In Harmony With Law

Commerce abused its discretion when it rejected the out-of-time request by the RGC for additional time to submit the verification exhibits. Commerce conceded that it has complete and accurate copies of all verification exhibits, Def.Br at 17-18, yet argues that this Court should affirm the imposition of AFA as a consequence of what essentially is Commerce's game of Gotcha! Specifically, Commerce argues that it requires of verification exhibits to check whether the submitted version matches the pages Commerce takes. Def.Br at 24. This is not a valid reason for Commerce to turn a blind eye to the exhibits Commerce concedes it has, or to ignore this Court's directive to waive the timing requirements when, as here, it would be an abuse of discretion not to.

Commerce misrepresents the number of verbal reminders it gave, thus overstates the effect. Cambodia – in its first CVD investigation ever – was confused by instructions to submit copies of the verification exhibits because it seemed this requirement was satisfied when

Commerce verifiers took copies with them. Commerce asserts that this confusion was invalid base upon the verification agenda instructions to submit verification exhibits. Commerce claims before this Court that it also gave multiple "verbal reminders" of the need to submit the verification exhibits, but Commerce's decision in the investigation states that it provided only a single "verbal reminder." *Compare* DOC Resp.Br. at 18, *with id.* at 7, *and* P.R.502. Commerce does not specify where it gave the verbal reminder or to whom it gave the verbal reminder. Both are important pieces of information because Commerce verifiers visited three different Cambodian government agencies in three different locations, but only provided a single verbal reminder. *See* Def.Br at 7; Verif. Agenda, P.R.481. Thus, Commerce cannot claim that the single verbal reminder gave notice to all verified agencies of the Cambodian government.

Further, Commerce fails to acknowledge the relevance of timing. Specifically, the verification agenda and verbal reminder (typically provided on the morning of the first day of verification) were first in time, before Commerce took copies of the verification exhibits at the end of each day. To the uninitiated, the instructions and verbal reminder were superseded by Commerce physically taking a complete paper copy at the end of the day. Thus, citing the written notice and verbal notice do not resolve any confusion created by Commerce's actions. *See* Def.Br at 7-8, 17-18.

Commerce unreasonably limited its assessment of extraordinary circumstances. Commerce explains that it rejected Cambodia's request based upon a strict reading of "extraordinary circumstances," in its own regulations. *Final IDM*, at 38 ("there was no extraordinary circumstance like a natural disaster, riot, war, force majeure, or medical emergency preventing the Government of Cambodia from timely filing their verification exhibits"), P.R. 538. Commerce, however, ignores this court's explanation that the plain language of section

351.302 is "not explicitly limited." *Jindal Poly Films Ltd. v. United States*, 794 F. Supp. 3d 1384, 1390-91 (Ct. Int'l Trade 2025). Commerce should have considered the specific circumstances of Cambodia's inexperience, lack of resources, and confusion as extraordinary.

Commerce also ignores its responsibility to waive timing regulations when failure to do so would be an abuse of discretion. Further, this court in *Jindal* highlighted the Federal Circuit's holding that "'a [timing] regulation which is not required by statute may, in appropriate circumstances, be waived and must be waived where failure to do so would amount to an abuse of discretion.'" *Id.*, 794 F. Supp. 3d at 1391 (*quoting NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1217 (Fed. Cir. 1995)). Finally, the court in *Jindal* explained that "Commerce abuses its discretion and thus issues a decision not in accordance with law when its 'decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Id.* (*citing Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005).

Here, Commerce attempts to hide behind the four corners of its regulation, claiming it had no choice but to follow its regulation. *See* Def.Br at 18-19 (*citing Kemira Fibres Oy v. United States*, 61 F.3d 866, 875 (Fed. Cir. 1995). But the law is clear that Commerce's review of extraordinary circumstances was overly narrow and that Commerce must waive the timing regulation in certain circumstances. Thus, Commerce's *per se* rejection of Cambodia's request based upon an overly-narrow reading of the regulation and Commerce's refusal to consider waiving the requirements of the regulation amount to "an erroneous interpretation of the law." *Jinadal*, 794 F. Supp. 3d at 1391. Further, as we have established, Commerce's failure to consider timing "represents an unreasonable judgment in weighing relevant factors." *Id.*

Commerce faults Cambodia for waiting to file an out of time extension request because it timely filed requests earlier in the investigation. Def.Br at 22-23; *Final IDM* at 38, P.R.538. But Commerce ignores the very different circumstances of those extension requests: Cambodia was given a questionnaire with a due date for its response, and – unlike with the verification exhibits – Commerce did not travel to Cambodia and take copies of Cambodia's response before the deadline. Cambodia had prior no experience with verification exhibits.

Moreover, Commerce's claims that an analysis of *Tau-Ken* factors weighs in its favor are entirely specious. First, Commerce's claim that its decision was not punitive because it followed its regulations, Def.Br at 19, fails because it ignores the clear imperative of the Federal Circuit when applying a timing regulation would be unreasonable. *NTN Bearing*, 74 F.3d at 1217. Second, Commerce's complaining that there was not enough time to "perform an analysis of the verification exhibits,…prepare an additional verification report," and reset the deadlines for briefs. Def.Br at 20. But the only analysis of the verification exhibits Commerce claims it would need is a page-by-page comparison to make sure the submitted pages were the same as the pages Commerce took, Def.Br at 17-18, an exercise that could not take more than 15 minutes. Further, the Commerce verifiers routinely draft the verification report during the verification – Commerce would not be starting from scratch, but from a nearly complete report. Commerce argues that Cambodia provides no proof that there was sufficient time remaining to consider the verification exhibits, but the proof is in Commerce's own actions: Commerce itself placed new benchmark information on the record more than two weeks later, on March 6, 2025, P.R.514-517, relying upon this information determine substantially higher subsidy rates, and Commerce reset the deadlines for the briefs until a full month later. Def.Br at 21 & n3. Commerce's analysis of *Tau-Ken* factors falls short.

Last, Commerce seems to reject the notion that it is subject to statutes related to appeals, and preserving the record to allow parties a meaningful opportunity to appeal. Def.Br at 25. Commerce is subject to the statutory provisions ensuring meaningful judicial review, including the requirement to preserve as the record on appeal all information obtained by the Secretary {or} the administering authority." *See* 19 U.S.C. § 1516a(b)(2). Commerce obtained copies of the verification exhibits during verification, took the copies to Washington, D.C., and thus had a responsibility to include them on the record of the proceeding. *See Floral Trade Council v. United States*, 13 CIT 242, 709 F. Supp. 229 (1989) (where documents from earlier underlying investigations had been reviewed by Commerce in course of scope proceedings but excluded from administrative record for review, court held documents sufficiently intertwined with relevant inquiry were part of record for review). Commerce doesn't always take copies of verification exhibits, and in such cases it may not have an affirmative responsibility to include those exhibits on the record of the review. But Commerce did take copies of the verification exhibits in this investigation, and thus cannot escape its statutory responsibility.

Finally, Commerce's claim that it required submission of verification exhibits for a respondent's certify that they are accurate is superficial. Def.Br at 24-25. To the extent Commerce had any doubt about what it scrutinized during verification, Commerce could request a single-page certification.

Commerce's refusal to consider Cambodia's unique circumstances, and its specious assessment of *Tau-Ken* factors undermines the credibility of its decision. Commerce's rejection of Cambodia's request for additional time to submit verification exhibits was unreasonable, unsupported by substantial evidence, and not in accordance with law

## II. Commerce Cannot Countervail So-Called Transnational Subsidies

Commerce impermissibly countervailed in its investigation of solar cells produced in Cambodia subsidy programs that the Department preliminarily determined on the basis of AFA were provided by the Government of China.[1] The Trade Law does not permit Commerce generally to countervail so-called transnational subsidies, however, limiting investigations of transnational subsidies to international consortia and upstream subsidies. Commerce's arguments for its preferred interpretation of the statute demand deference from this Court, myopically focus upon one three-word change in a single section of the Trade Act, and claim authority from alleged silence in the statute. Def.Br at 25-40. Commerce's thin reasoning fails because it is this Court's prerogative to engage in statutory construction, not the agency's, and the statute read as a whole contradicts Commerce's preferred interpretation.

### A. Commerce Has No Special Deference To Determine Its Investigative Authority

Initially, this Court owes Commerce no special deference when determining whether the statute authorizes Commerce generally to investigate transnational subsidies. It has always been the case that no deference is granted when statutory language is clear. *See, e.g.*, *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

[1] Cambodia notes that the same issue, with similar arguments, has been raised in two other consolidated cases involving solar cells from Vietnam and Thailand, which were investigated contemporaneously with Cambodia. *See JA Solar Vietnam Co., Ltd., et al. v. United States*, Consol. Ct. No. 25-157, and *Canadian Solar Int'l Ltd., et al. v. United States*, Consol. Ct. No. 25-161. Cambodia incorporates by reference the arguments expressed in the opening and reply briefs submitted in those case. *See JA Solar Vietnam Co., Ltd., et al. v. United States*, Consol. Ct. No. 25-157, Br. of JA Solar Vietnam, ECF 46, Br. of Boviet Solar, ECF 49, Reply Br. of JA Solar, ECF 71, Reply Br. of Boviet Sloar, ECF 72; *see Canadian Solar Int'l Ltd., et al. v. United States*, Consol. Ct. No. 25-161, Br. of Trina Solar, ECF 32, Br. of Canadian Solar, ECF 33; *see Los Angeles Biomedical Research Inst. At Harbor – UCLA Med. Ctr. V. Eli Lilly and Co.*, 849 F.3d 1049, 1062n.6 (Fed. Cir. 2017)(a court "can properly take judicial notice of the records of related court proceedings").

effect to the unambiguously expressed intent of Congress."). Further, in cases where there is some ambiguity, the Supreme Court plainly stated in *Loper Bright*, "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority… {C}ourts need not and under the APA may not defer to an agency interpretation of the law simply because it is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024).

Commerce attempts a misguided argument, demanding more deference than the law allows it. The cases Commerce cites to claim deference, however, are inapposite. Def.Br at 38-39. The statutory provisions in the cases Commerce relies upon are either inaccurate citations or relate to calculation methodologies where Commerce's expertise is relevant.

Initially, Commerce mistakenly cites the syllabus in *Loper Bright* as if it was the opinion of the Supreme Court. Def.Br at 39. The Supreme Court, however, referring to the syllabus as "the headnote," warned that the syllabus at the start of its opinions cannot be relied upon as a legal authority: "the headnote is not the work of the court, nor does it state its decision…. It is simply the work of the reporter, gives his understanding of the decision, and is prepared for the convenience of the profession in the examination of the reports." *United States v. Deteroit Timber & Lumber Co.*, 200 U.S. 321, 337 (1906); *compare id.*, 200 U.S. at 336-37, *with Hawley v. Diller*, 178 U.S. 476, 20 S. Ct. 986, 44 L.Ed. 1157 (1900)(second paragraph of syllabus).

Contrary to the language from the syllabus, the Court's opinion in *Loper Bright* is a clear rebuke of the prior notion that a court should give deference to an agency's preferences when the court performs its constitutional function of statutory construction: "Whatever respect an Executive Brance interpretation was due, a judge 'certainly would not be bound to adopt the construction by the head of a department.'" *Loper Bright*, 603 U.S. at 386 (*citing Decatur v.*

*Paulding*, 39 U.S. 497, 14 Pet. 497, 515, 10 L. Ed. 559 (1840)). "Otherwise, judicial judgment would not be independent at all." *Id.* While the Court may provide deference regarding findings of fact – deference "cabined to factbound determinations," *id.* at 389, "'{t}he interpretation of the meaning of statutes, as applied to justiciable controversies,' {is} exclusively a judicial function." *Id.* at 387 (first alteration in original).

Indeed, in the case Commerce cites for the deference it demands here are from cases that are examples of "factbound determinations." Commerce cites *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983), for the proposition that, "Commerce has 'broad discretion in executing the law' in line with the 'general standards' set by Congress." Def.Br at 38. But *Smith-Corona* is a case about "certain adjustments … made to foreign market value." *Smith-Corona*, 713 F.2d at 1571.

Commerce cites *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996), for the more limited proposition that "Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from Chevron deference." Def.Br at 38-39. Whatever distinction Commerce attempts to draw, *Fujitsu* relates to factbound determinations, including "complex economic and accounting decisions of a technical nature," that rely on "Commerce's technical expertise in identify, selecting and applying methodologies." *Fujitsu*, 88 F.3d at 1039. The Commerce decisions challenged in *Fujitsu* were the calculation of below-cost sales, use of constructed value versus third-country sales, the calculation of imputed interest adjustment, level of trade adjustments. *Id.*, 88 F.3d at 1036-37.

Commerce cites to *Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) for the proposition that it is afforded "greater deference than under the *Chevron* framework," for its

methodological selections. Def.Br at 39. But this case, too, is about factbound determinations related to identifying particular market situations. *Nexteel*, 28 F.4th at 1231 (finding Commerce's decision was not supported by substantial evidence).

Commerce cites *Bio-Lab*, to claim that "general statutory terms implicitly delegate authority to Commerce and give it flexibility." Def.Br at 39. But the Court there addressed what "'appropriate,' 'comparable' and 'significant'" in the statutory directive for Commerce to value factors of production. *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025)(*citing Loper Bright*, 603 U.S. at 395). But *Bio-Lab* relies upon *Loper Bright*'s pronunciation that such deference is only when there is an express delegation of authority by Congress, and even then the Court is "to independently interet the statute and effectuat ethe will of Congress subject to constitutional limits… {and} 'fix{ing} the boundaries of {the} delegated authority.'" *Loper Bright*, 603 U.S. at 395 (citations omitted)(second and third alterations in original).

Even *Archroma*, which Commerce cites for authority to "'fill up the details' of a statutory scheme," Def.Br at 37, is not a case about what investigative authority Commerce has, but whether Commerce can set a deadline for parties to provide notice of intent to participate in a sunset review. *Archroma U.S. Inc. v. Dep't of Commerce*, 185 F.4th 1341, 1343 (Fed. Cir. 2026). And even in cases where there is an express delegation of authority, the authority is still subject to this Court's review. *See Loper Bright*, 603 U.S. at 394-5.

The reality facing Commerce with these cases is that, while Commerce may enjoy some deference in terms of methodological and procedural decisions, "agencies have no special competence in resolving statutory ambiguities." *Loper Bright*, 603 U.S. at 400-01.

### B. The Statute As A Whole Is Clear That Commerce's Authority To Countervail Out-Of-Country Subsidies Is Limited To Two Specific Contexts

The statutory scheme, construed as a whole – as it must be – is clear that Commerce's investigation is limited the country in which the firm allegedly receiving a subsidy is located. Commerce focuses on three word that changed with statutory revisions in 19 U.S.C. § 1671(a), and dismisses other provisions to claim authority to investigate any subsidy provided by a government outside the investigated country. The short shrift Commerce gives to the statute as a whole, however, betrays the weakness in its argument

The court does not read statutory provisions in isolation, the statute must be read as a whole. *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d 1363, 1367 (Fed. Cir. 2005). Further, "{i}t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1342 (Fed. Cir. 2025)(internal quotations omitted), *aff'd sub. nom. Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026). An agency's interpretation that is not in line "with the design and structure of the statute as a whole" is invalid. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

While the statute plainly limits Commerce's investigative power to "a county," and not expansively to "any country," Commerce claims ambiguity in the statute is resolved by a change in pre- and post-1994 statutory language. Before 1994 revisions the statute stated,

> Whenever *any country* .. shall pay or bestow … any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country,

which in 1994 changed to

> If … the government of *a* country or any public entity within the territory of *a* country is providing, directly or indirectly, a

> countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold, (or likely to be sold) for importation, into the United States.

Def.Br at 26-29. Thus, "any country" changed the "the government of a country," and "in such country" was removed. Although Commerce argues that "a country" is ambiguous because it is not limited by "in such country," and the country and the subsidy-recipient need not be located within the same country. Def.Br at 29. But this interpretation ignores the change from "any country" to "a country." The effect of the change from "any country" to "a country" limited the term "country" from many to one, thus removing the need to specify "in such country." Had Congress retained, "any country" while removing "in such country," the statute would be different – perhaps what Commerce would like it to say now. But the change to "a country" provided a sufficiently clear continuation of the same limitation.

The Defendant and Defendant-Intervenor puts forth other grammatical theories regarding the statutory provision further describing what "subsidy means. In 19 U.S.C. § 1677(5)(B), the statute defines subsidy as:

> (B) Subsidy described
>
> A subsidy is described in this paragraph in the case in which an authority—
>
> (i) provides a financial contribution,
> (ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or
> (iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,
>
> to a person and a benefit is thereby conferred. For purposes of this paragraph and paragraphs (5A) and (5B), the term "authority" means a government of a country or any public entity within the territory of the country.

Defendant-Intervenor surmises that "within the territory of a country" only modifies "public entity" and therefore there is no indication that the recipient of a government-provided subsidy must be in the same location as the government itself. Def.-Int. Br. at 15-16. Meanwhile, Commerce claims that “an authority” and “a government of a country” contain no limitations. Def.Br at 31. But these arguments ignores the definition of “country,” which is singular except in the context of customs unions. *See* 19 U.S.C. § 1677(3). Thus, any argument that “a country” should be read as if Congress had left the term as “any country” must fail.

The structure of the statute supports this reading. *Univ. of Texas*, 570 U.S. at 353. The definition of subsidy contained in section 1671(a) is the “General Rule,” while provisions derogating from that general rule – including countervailable subsidies received by an international consortium and upstream subsidies – are listed next. 19 U.S.C. § 1671(a); *Yates v. United States*, 574 U.S. 528, 540, 135 S.Ct. 174, 191 L.Ed. 2d 64 (2015)(“‘the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute’”). Were the general rule not limited as Commerce concedes the predecessor provision was, there would be no need to identify exceptions. Contrary to Commerce’s mere assertion, Def.Br at 31, subsections 1671(d)-(e) would impermissibly be rendered superfluous. *V.O.S. Selections*, 149 F.4th at 1342.

Commerce concedes that Cambodia’s reading of the statute was Commerce’s reading of the statute for decades. Def.Br at 26-28. But also, Commerce recently found that “to allow Commerce to inherently address subsidies from governments outside the country under investigation without evidence of the responding companies participation in an international consortium engaged in the production of subject merchandise – would render the international consortium provision superfluous.” *See Utility Scale Wind Towers From Malaysia: Final*

*Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) *and accompanying Dec. Mem*. at Cmt. 6. Neither Commerce nor Defendant-Intervenor address this recent declaration.

That Commerce's authority is not further expanded beyond international consortia and upstream subsidies is supported by the rule of statutory construction, "*expressio unios est exclusio alterius*." *Shengyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1359 & n.1 (Fed. Cir. 2015) (*citing Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S. Ct. 748, 154 L. Ed. 2d 653 (2003) ("The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which {is} abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." (Internal quotations marks and citations omitted)). Without much analysis, Commerce shrugs off the application of *expression unios est exclusion alterius*, on the basis that it is not always appropriate to apply this tool of statutory construction. Def.Br at 32. But where there is a series of things that go hand in hand – as the two exceptions to the general rule of subsection 1671(a) – the rule applies. That is, because Congress included two explicit exceptions, other applications are not permitted. *See, e.g., AMS Assocs. v. United States*, 737 F.3d 1338, 1344 (Fed. Cir. 2013) ("The unambiguous plain language of the regulation only authorizes Commerce to act on a *prospective* basis, and such express prospective authorization reasonably is interpreted to preclude retroactive authorization; *expressio unius est exclusion alterius*.").

The result of applying the "expressio unios" cannon is further supported by statutory provisions requiring specificity, while Commerce's interpretation produces conflicts. For any alleged subsidy, transnational or otherwise, countervailability requires specificity. The statutory

requirement of specificity needs a "determination whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*…." 19 U.S.C. § 1677(5A)(D) (emphasis added). Under the plain language of the specificity provisions, a measure that is transnational in nature cannot be specific. China is not alleged to be providing a subsidy to an enterprise or industry within China, but outside its jurisdiction.

Commerce's specificity arguments otherwise do not hold up. Commerce asserts that, "the Government of China provides the input only to a limited number of industries that use {the input} in production," *Post-Prelim IDM* at 19, 21, 23, P.R.494; *Final IDM*, at 26, and, e.g., that "the Government of China . . . directed an expansion of its polysilicon production in China, enabling state-owned and state-controlled companies to produce and sell polysilicon to Cambodian manufacturers of solar cells at artificially low costs," *id*. at 18, but that is not what the statute requires. Commerce must make its finding on the fact that the Government of China provides the subsidy to a limited number of companies within China, not companies in Cambodia. Commerce therefore wrongly "confine{s} itself to examining a particular statutory provision in isolation," *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132 (2000), ignoring its obligation to read the statute as a whole.

Notwithstanding Commerce's recently promulgated regulations, through which it claims authority to countervail transnational subsidies despite no changes to the underlying statute, Commerce had for over 25 years (correctly) taken the position that such subsidies were not actionable. In 1998, Commerce specifically rejected the argument that there was a statutory basis for countervailing subsidies provided by one country to an entity producing or manufacturing the subject merchandise in another country. *Countervailing Duties; Final Rule*,

63 Fed. Reg. 65,348, 65,405 (Dep't of Commerce Nov. 25, 1998) (specifically rejecting the argument that the statutory basis for not countervailing subsidies provided by one country to an entity producing or manufacturing the subject merchandise in another country no longer exists).

When Commerce promulgated the original section 351.527 of its regulations, Commerce explained that transnational subsidies were not countervailable because section 351.527 derives from prior section 303(a)(l) of the Act (now repealed), which stated:

> Whenever any country . . . shall pay or bestow, directly or indirectly, any bounty of grant upon the manufacture or production or export of any article . . . manufactured or produced in such country . . . there shall be levied a duty equal to the net amount of such bounty or grant. . . . {T}here is no other indication that Congress intended to eliminate this rule {providing that transnational subsidies are not countervailable}."

*Id.* With no changes to the statute since its 1998 regulations were promulgated, Commerce cannot now reasonably claim that the statute in fact means the opposite. Indeed, deviating following decades of a single interpretation of the statute implicates the major questions doctrine. That is, when an agency "'claim{s} to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in {its} regulatory authority,'" the agency must identify "clear congressional authorization" supporting that authority, not just "a merely plausible textual basis." *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022). The significant economic and political shifts represented by the new interpretation Commerce has adopted require that Congress be more explicit rather than allow Commerce to take this authority upon itself. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). To date, Congress has declined to grant expansive authority to Commerce, despite many opportunities. *West Virginia*, 597 U.S. at 731; see S. 691 (119th Cong.), § 201; H.R. 1548 (119th Cong.), § 201; S. 1856 (118th Cong.), § 201; H.R. 3882 (118th Cong.), § 201; S. 1187 (117th Cong.), § 201; H.R. 6121

(117th Cong.), § 201. These bills address several of the issued identified in this brief: amending the international-consortium and upstream-subsidy provisions to account for cross-border scenarios, e.g., S. 691 (119th Cong.), § 201(a)(4), (c), and adding third-country governments to the list of interested parties in Section 771(9), e.g., *id.* § 201(b)(2). Congress has not taken up the invitation to expand the law, and the agency cannot "work around the legislative process to resolve {the issue} for itself." *West Virginia*, 597 U.S. at 743 (Gorsuch, J, concurring)(citation modified).

Finally, Commerce dismisses specificity provisions confirming that the statute does not permit Commerce to countervail alleged transnational subsidies. Def.Br at 34-37. But the statute limits Commerce's specificity analysis for domestic subsidies "to an enterprise or industry within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677 (5A)(D). The term "authority," as used here, means "a government of a country or any public entity within the territory of the country." 19 U.S.C. § 1677(5)(B)(iii). Commerce raises the novel argument that "jurisdiction" as used in the statute isn't a geographical term but relates to the reach of the courts of China into Cambodia. Def.Br at 34-37. The statute, however, carries no indication that "jurisdiction" relates to the courts of a third country. Had Congress wanted to use jurisdiction here to mean "subject to the courts or laws of," it would have been easy enough to say so.

Commerce's argument also doesn't fit with the larger context of specificity. Were the term "jurisdiction" to be interpreted as "subject to the laws of," then Commerce would be required to examine specificity in the context of all companies subject to the laws of the authority (the government of the country providing the subsidy). In the context here, that would mean Commerce would have to examine whether the alleged financial contribution and benefit were specific to an enterprise or industry (or groups thereof) among all companies anywhere in

the world that are subject to the laws of China – as Commerce has loosely defines subject to the laws of China here. Commerce did not embark in such an analysis, and such an analysis could only end in ridiculousness given that the Belt-Road Initiative is largely worldwide. Such a ridiculous interpretation is not permitted.

Commerce attempts to sidestep a serious analysis of the problems presented by the language of the specificity statute by claiming that Cambodia "made no mention of the programs it now alleges are unlawfully countervailed transnational subsidies," Def.Br at 35, and therefore failed to exhaust administrative remedies. Commerce does not identify a proper standard for exhaustion – whether a party raised the issue in its own case brief. This Court has held that "exhaustion may be excused if the issues was raised by another party, or if it is clear that the agency had an opportunity to consider it." *Holmes Prods. Corp. v. United States*, 16 CIT 1101, 1104 (1992). The relevant consideration is whether Commerce had an opportunity to address the issue in the administrative proceeding, that is, was the issue raised by any party below. Here, BYD raised the issue in its case briefs. *See* BYD Case Br. at 6-9, P.R.524.

Accordingly, Commerce's interpretation of the statute countervailing subsidies alleged to have been provided by the Government of China to producers in Cambodia conflicts with the statute's plain meaning, other provisions of the statutory framework, Commerce's own prior interpretation of the statute, and more than two decades of Commerce practice. Commerce exceeded its authority by countervailing alleged transnational subsidy programs in the Final Determination, thus this case should be remanded to Commerce to recalculate subsidy rate without transnational subsidies.

## III. The AFA Rates Commerce Selected Are Outrageously And Unlawfully High

To the extent this Court allows Commerce to continue to determine subsidy rates based upon AFA, Commerce must revise its AFA rate to something within this galaxy. Commerce

applied AFA to assign individual program rates for 17 different subsidy programs totaling 3,403.96%. This 3,403.96% rate is thousands of percentage points higher than any AFA rate in Commerce's history that counsel has been able to find while preparing this brief. A rate this high is so punitive and disconnected from any reality that it is contrary to law and unsupported by substantial evidence.

Contrary to Commerce's assertion, Def.Br. at 42, Cambodia cited principles of fairness and accuracy that underpin the trade law – even in the context of AFA. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (the "overriding purpose of Commerce's administration of antidumping laws … to calculate dumping margins as accurately as possible"); *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, ("SAA"), H.R. Doc. No. 103-316, at 875 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4202 (stating, procedural "speed" is not intended to outweigh "accuracy of results and fairness to the parties involved."); 19 U.S.C. § 3512(d) (stating, the SAA is authoritative). Further, Commerce is required to "corroborate that information from independent sources that are reasonably at their disposal," when applying rates that rely on secondary information. 19 U.S.C. § 1677e(c). Further, Courts have interpretated the statute as requiring the AFA rate to be a reasonably accurate estimate of the respondent's actual rate. *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)(holding the corroboration requirement tempers the deterrent value of an AFA rate to prevent overreaching reality to maximize deterrence). The courts have required that "Commerce demonstrate{} probative value {of the AFA rate} by 'demonstrating {that} the rate is both reliable and relevant.'" *Özdemir B oru San. VE Tic. Ltd. Sti. v. United States*, 273 F.Supp.3d 1225, 1247 (Ct. Int'l Trade 2017). While statutory amendments have removed the specific requirement that AFA

rates be a reasonably accurate estimate of the respondent's actual rate, the principles underlying *F.lli De Cecco* and *Özdemir* remain: the statutory changes did not remove the underlying principles of accuracy, fairness, reasonableness.

The primary purpose of the AFA statute is not to punish companies, but rather to calculate accurate rates. *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("{Commerce's} primary objective {must be} the calculation of an accurate rate."). The outrageousness of the 3,403.96% rate speaks for itself: there is no other way to view the 3,403.96% AFA rate except as unlawfully punitive. "Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual {net countervailable subsidy rate}." *F.lli De Cecco*, 216 F.3d at 1032. Even though Commerce is not required to demonstrate that the AFA countervailing duty rate "reflects an alleged commercial reality *of the interested party*," 19 U.S.C. § 1677e(d)(3), the statute does not abandon reality all together. Commerce must demonstrate some connection to the commercial reality of the industry, or at least use a different methodology that is so obviously punitive.

## IV. ISC Cambodia Is A Standards-Setting Government Agency, Not A Producer Or Seller Of Solar Panels

Commerce improperly ignored information on its own website establishing that ISC Cambodia is not a producer or exporter of subject merchandise. Commerce argues that Cambodia's argument is that 'Commerce should have intuited, without any questionnaire response, that ISC Cambodia was incorrectly listed in the petition as a producer and exporter of subject merchandise." Def.Br at 45. Commerce's characterization isn't far off. Cambodia's argument is that the ridiculousness of Commerce ignoring information on its own website – information that should be imputed to Commerce – calls for a rational assessment of how to

information Commerce should know. Commerce cannot intentionally blind itself to what Commerce itself has published on its own website. Record information corroborates the facts surrounding ISC Cambodia – regardless of whether the URL is formally on or not on the record. The website with Petitioner's listing ISC Cambodia with Cambodian manufacturers is plainly a government website, ending in ".gov.kh." *Petition*, Ex.I-23 (listing ISC Cambodia), P.R.2. Accordingly, Commerce should remove ISC Cambodia from the list of producers and exporters that are subject to this investigation.

**V. To The Extent Cambodia's Other Arguments Survive Commerce's AFA decision, Commerce Cannot Countervail Programs That Are Not Specific Or Companies That Commerce Knows Are Not Producers Or Exporters Of Subject Merchandise.**

Commerce unlawfully decided that Cambodia's questionnaire responses were "unverifiable," and reached its program-specific determination on the basis of AFA. Commerce does not appear to contest this argument, relying only on its arguments defending its decision to apply AFA. Thus, should this Court conclude that Commerce improperly applied AFA to Cambodia, this Court should also include in the scope of remand the ability of Cambodia to raise arguments initially denied as moot.

## CONCLUSION

For the foregoing reasons, and for the reasons raised in Cambodia's opening brief, ECF 29, Cambodia requests that the Court grant its Rule 56.2 Motion For Judgment On The Agency Record and remand this matter for further proceedings at Commerce in accordance with this Court's decision.

Respectfully submitted,

/s/Mark B. Lehnardt
Davis & Leiman
1012 Connecticut Ave., N.W., #1012
Washington, D.C. 20036
T. 202.642.4850
*Counsel to Royal Government of Cambodia*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Mark B. Lehnardt, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and the Scheduling Order to this case. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is **6,719** words.